Peter S. Partee, Sr.
Jack A. Molenkamp
Andrew Kamensky (to be admitted *pro hac vice*)
Scott H. Bernstein
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

*Proposed Attorneys for Debtors*
*  and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, et al., | Case No. 10-16040 (ALG) |
| Debtors.[1] | Joint Administration Requested |

### DECLARATION OF ANDREW RICKERT IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Andrew Rickert, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

### I.    Introduction

1.     I am the Executive Vice President, Treasurer, and Assistant Secretary of Credit-Based Asset Servicing and Securitization LLC ("C-BASS").  In that capacity, I have personal knowledge of (i) the Debtors' financial condition, business, operations, policies and procedures, (ii) the events leading up to these chapter 11 cases, and (iii) other matters set forth herein.

2.     On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case by filing a *Voluntary Petition* for relief under chapter 11 of Title 11 of the United

---

[1]     The other Debtors are C-BASS CBO Holding LLC, C-BASS Credit Corp., C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC, and Sunfish Management Group LLC.

States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in the Debtors' cases.

3.      Concurrently with the filing of their *Voluntary Petitions* for relief under chapter 11 of the Bankruptcy Code, the Debtors have filed a number of motions (collectively, the "First Day Motions") seeking entry of orders that the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. Indeed, absent the immediate ability to make certain essential payments as sought in the First Day Motions, I believe that the Debtors' estates would suffer immediate and irreparable harm. In my opinion, approval of the First Day Motions will minimize disruptions to the Debtors' operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful liquidation under chapter 11 of the Bankruptcy Code.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other employees of the Debtors, my review of relevant documents or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial affairs. I am authorized to submit this Declaration on behalf of the Debtors. If called to testify, I would testify competently to the facts set forth in this Declaration.

## II.    Factual Background

### A.    The Debtors' Corporate Structure and Business

5.      C-BASS is a Delaware limited liability company the outstanding membership interests of which are owned (i) 45.5% by MGIC Mortgage and Consumer Asset I, LLC, a wholly-owned subsidiary of MGIC Investment Corporation ("MGIC"), (ii) 45.5% by Residual Interest Investments LP, a wholly-owned subsidiary of Radian Group, Inc. ("Radian"), and (iii) 9% by non-debtor C-BASS Holding LLC, which is owned by certain current and former members of C-BASS's senior management.   Each of MGIC and Radian is a publicly-traded mortgage insurance and reinsurance company.

6.      C-BASS owns 100% of the outstanding membership interests in Debtors C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC, and Sunfish Management Group LLC.  C-BASS also owns 100% of the outstanding common membership interests in Debtor C-BASS CBO Holding LLC.    The outstanding preferred membership interests in Debtor C-BASS CBO Holding LLC are held by 125 unaffiliated individuals.  C-BASS also owns 100% of the outstanding common stock of C-BASS Credit Corp.

7.      From its founding in 1996, C-BASS was a leading issuer, servicer, and investor specializing in credit-sensitive residential mortgage assets.   These assets included performing subprime and "Alt A," non-performing, re-performing, and second-lien residential mortgage loans and small commercial mortgage loans ("Whole Loans"), as well as subordinated and mezzanine residential mortgage-backed securities with prime, subprime, Alt A and high loan-to-value collateral ("RMBS").   C-BASS was a long-term investor in this sector of the residential mortgage market and generally either held purchased assets in its portfolio or securitized them

and retained the most subordinate or "first-loss" tranches of issued securities as well as servicing rights for the securitized assets.

8.     C-BASS serviced the vast majority of its Whole Loans and the underlying collateral for its RMBS through Litton Loan Servicing, LP ("Litton"), which was a wholly-owned subsidiary of C-BASS until the Fall of 2007, when it was sold, along with the attendant servicing rights, to facilitate the transactions contemplated by the Override Agreement (as defined and discussed below).  In part due to Litton's market-leading servicing techniques, C-BASS was able to maximize the value of its RMBS and Whole Loans.

9.     C-BASS also sponsored a number of collateralized bond and debt obligation issuances and retained management rights with respect to such issuances (the "CBO Management Rights") in Debtor C-BASS Investment Management LLC ("CIM").  CIM earns substantial fees as a result of its ownership of the CBO Management Rights.

**B.     The Debtors' Capital Structure**

10.     The Debtors financed their prepetition activities through a variety of secured and unsecured debt as well as RMBS and Whole Loan repurchase agreements (collectively, the "Repurchase Agreements").  Substantially all of the Repurchase Agreements constituted repurchase agreements within the meaning of section 101(47) of the Bankruptcy Code and fell within the safe-harbor of section 559 of the Bankruptcy Code.

11.     In the Summer of 2007, C-BASS was a party to (i) Whole Loan Repurchase Agreements with three different counterparties (collectively, the "Whole Loan Repo Counterparties") representing an aggregate repurchase obligation in excess of $750 million and (ii) RMBS Repurchase Agreements with 17 different counterparties (collectively, the "RMBS Repo Counterparties"; together with the Whole Loan Repo Counterparties, the "Repo Counterparties"), representing an aggregate repurchase obligation in excess of $730 million.

12.     The Debtors' principal secured debt consisted of a $1,855,000,000 senior secured credit facility (the "Senior Credit Facility") syndicated among a number of lenders (the "Senior Lenders") and secured *inter alia* by first-priority liens on and security interests in substantially all of the Debtors' assets (the "Senior Credit Facility Collateral") other than (i) the assets covered by the Repurchase Agreements and (ii) the assets of Debtors Sunfish Management Group LLC and C-BASS Credit Corp., neither of which is an obligor under the Senior Credit Facility.

13.     The Debtors' principal unsecured financing consisted of (i) four issuances by C-BASS of subordinated promissory notes totaling $115 million (collectively, the "Sub-Debt"), (ii) six issuances of C-BASS subordinated promissory notes as part of trust-preferred securities issuances totaling $285 million (collectively, the "TruPs"), and (iii) two promissory notes issued by C-BASS, each in the original principal amount of $50 million, one payable to MGIC and one to Radian ("Parent Notes"). The Sub-Debt and the Trups are subordinate by their terms to the Debtors' debt obligations, including the Senior Credit Facility, the Parent Notes, and amounts owed under the Repurchase Agreements, but are not subordinate to certain claims held by current and former employees of the Debtors (collectively, the "Employee Claims") or to trade debt.

**C.     The 2007 Out-of-Court Restructuring**

14.     Until early 2007, C-BASS's vertical business strategy was extremely successful, causing C-BASS's net stockholders' equity to soar to over $700 million.

15.     As calendar year 2007 progressed, however, what was then termed the "sub-prime mortgage crisis" in the domestic residential mortgage market worsened significantly, causing the Repo Counterparties and the Senior Lenders to "mark-to-market" their respective collateral and to make numerous substantial margin calls on C-BASS. From January 2007 through June 2007, capital calls totaling in excess of $290 million were made upon and honored by C-BASS. In July

2007, additional capital calls in excess of $580 million were made upon C-BASS, of which C-BASS was able to honor approximately $285 million.

16.     Consequently, during a harrowing period from July 2007 through early November 2007, the Debtors entered into large-scale forbearance and restructuring negotiations with all of the Repo Counterparties, the Senior Lenders, MGIC, Radian, holders of the Sub-Debt (the "Sub-Debt Holders"), holders of the TruPs (the "TruPs Holders"), various counterparties to hedging instruments (collectively, the "Hedge Counterparties"), and holders of the Employee Claims (collectively, the "Employee Claim Holders"; together with the Repo Counterparties, the Senior Lenders, the Sub-Debt Holders, the TruPs Holders, MGIC, Radian and the Hedge Counterparties, the "Override Parties").

17.     During these negotiations, certain of the Debtors, the Senior Lenders and the Repo Counterparties entered into five separate forbearance agreements (collectively, the "Pre-Override Forbearance Agreements")  that enabled the Debtors to preserve their assets while engaging in an expedited bidding and auction process for the sale of Litton as a going concern. Pursuant to the second of the Pre-Override Forbearance Agreements, the Debtors granted liens on and security interests in certain additional collateral to the Senior Lenders.

18.     On September 27, 2007, the Debtors entered in an agreement for the sale of Litton to The Goldman Sachs Group, Inc. for $428 million in cash (the "Litton Sale Agreement").  At the same time, the Debtors prepared to file chapter 11 bankruptcy cases and obtained multiple commitments for highly negotiated multi-party debtor-in-possession financing.

19.     With the Litton Sale Agreement in hand and the specter of bankruptcy looming, negotiations among the Debtors and the Override Parties culminated in the execution of that certain Override Agreement, dated as of November 13, 2007, by and among certain of the

Debtors and literally all of the Override Parties (the "Override Agreement"). The Override Agreement represented a landmark achievement, effectively accomplishing a long-term forbearance agreement among all of the Override Parties in exchange for *inter alia* (i) an agreed-upon allocation of the Litton Sale Proceeds among the Repo Counterparties, the Senior Lenders and the Debtors, (ii) a temporary restructuring or "overriding" of the Override Parties' respective claims for the period covered by the Override Agreement, and (iii) broad releases among the Debtors and the Override Parties.

20.     Pursuant to the Override Agreement, the Debtors also granted numerous liens and security interests, including without limitation (i) first-priority liens on and security interests in all unencumbered assets of certain of the Debtors to the Senior Lenders as additional collateral security for the Senior Credit Facility, (ii) second-priority liens on and security interests in the Senior Credit Facility Collateral as additional collateral security for all of the Repurchase Agreements, (iii) second-priority liens on and security interests in the RMBS or Whole Loans subject to each Repurchase Agreement as additional collateral security for all other Repurchase Agreements, and (iv) third-priority liens on and security interests in the RMBS and Whole Loans subject to the Repurchase Agreements as collateral security for the Senior Credit Facility. The Debtors also agreed to grant "springing" liens on and security interests in their assets to unsecured Override Parties once secured Override Parties were paid in full.

21.     Under the Intercreditor Agreement executed simultaneously with the Override Agreement (the "Intercreditor Agreement"), each Override Party with first-priority lien on or security interest in collateral has the exclusive and unilateral right to enforce such liens and security interests against, and otherwise consent to dispositions of, such collateral, notwithstanding the junior liens granted on such collateral to the other Override Parties.

22.     On December 10, 2007, CBASS closed the sale of Litton to The Goldman Sachs Group, Inc. and distributed the sale proceeds in accordance with the Override Agreement, causing it to go effective.

**D.     Events Leading to the Chapter 11 Filing**

23.     At the time the Override Agreement went effective, the Debtors strongly believed that substantial equity existed in the assets serving as collateral for the Override Parties.  As the domestic mortgage crisis spread beyond the "sub-prime" sector to encompass the entire residential mortgage market and deepened by an order of magnitude that no one could have predicted, however, it became clear that no such equity existed and that the Debtors would not be able to meet the requirements of the Override Agreement.

24.     As a result, the Debtors entered into multiple amendments of the Override Agreement and one additional forbearance agreement with the Senior Lenders (the "Post-Override Forbearance Agreement").  Under the Post-Override Forbearance Agreement, the Senior Lenders agreed to forbear from exercising default remedies until October 15, 2010 in exchange for various operational and other covenants from the Debtors and broad releases from the Debtors to a defined group of releasees, including without limitation the Senior Lenders and the Administrative Agent (as defined below).  In accordance with the Post-Override Forbearance Agreement, the vast majority of the collateral for the Senior Credit Facility has been sold and the proceeds thereof applied to reduce the balance of the Senior Credit Facility.

25.     Similarly, the Debtors entered into forbearance and termination agreements with most of the Repo Counterparties.  Pursuant to those agreements, the applicable Repurchase Agreements were terminated, the Debtors and the applicable Repo Counterparties exchanged broad releases, and the assets subject to such Repurchase Agreements were sold or retained by the applicable Repo Counterparties.  Those Repo Counterparties who did not enter into

forbearance and termination agreements with the Debtors have terminated their Repurchase Agreements and disposed of the related assets.

26.     Pursuant to the Restructuring Facilitation Agreement, dated as of September 20, 2010 (the "RFA"), by and among the Debtors, JPMorgan Chase Bank, N.A., as administrative agent under the Senior Credit Facility (the "Administrative Agent"), and certain lenders under the Senior Credit Facility that are signatories to the RFA (collectively, the "Participant Lenders"), the Administrative Agent and Participant Lenders agreed, *inter alia,* to forbear from exercising default remedies through November 15, 2010 and to permit the Debtors to use up to $8.2 million of the cash proceeds of the Remaining Collateral in accordance with the terms of the RFA and, after the Petition Date, in accordance with the agreed upon cash collateral and adequate protection order described below.  The RFA also (i) specifies a timeline pursuant to which the Debtors are to use their respective best efforts to liquidate the Remaining Collateral, (ii) obligates the Senior Lenders to vote in favor of and otherwise support a chapter 11 plan satisfying certain specified criteria, (iii) obligates the Senior Lenders to release their liens on and security interests in certain collateral under a chapter 11 plan provided that certain specified conditions are satisfied, and (iv) provides broad releases to a defined group of releasees, including without limitation the Senior Lenders and the Administrative Agent.

27.     The Senior Credit Facility Collateral remaining in the Debtors' possession and control as of the Petition Date (collectively, the "Remaining Collateral") consists principally of (i) various subordinated tranches of RMBS, (ii) the CBO Management Rights, (iii) certain Whole Loans, (iv) one "real estate owned" or "REO" property, (v) claims against various third parties, some of which are debtors in chapter 11 bankruptcies, (vi) deposits with surety bond providers, (vii) furniture, fixtures, equipment and various forms of intellectual property, (viii) receivables

for the unused amount, if any, of professional retainers, and (ix) cash collateral on deposit in the Debtors' centralized cash operating account. The outstanding principal balance of the Senior Credit Facility as of the Petition Date is approximately $170 million—an amount well in excess of the current fair market value of the Remaining Collateral.

## III.     First Day Motions

28.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and promote a smooth transition to chapter 11, the Debtors have requested various relief in their First Day Motions. The First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, to make payments necessary to maintain employee morale, and to ensure the continuation of the Debtors' cash management system and other business operations without interruption. Receiving this Court's approval of the relief sought in the First Day Motions is essential to giving the Debtors an opportunity to maximize the value of their estates for the benefit of all of the Debtors' constituents.

29.     Several of the First Day Motions request authority to pay certain prepetition claims. It is my understanding that Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that "except to the extent that relief is necessary to avoid immediate and irreparable harm," the Court shall not consider motions to pay prepetition claims during the first twenty (20) days following the filing of a chapter 11 petition. Accordingly, as set forth below, the Debtors have narrowly tailored their requests for authority to pay prepetition claims to those circumstances where failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

**A.** **Motion of the Debtors and Debtors-in-Possession for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases Under Fed. R. Bankr. P. 1015(b), (II) Waiving Requirements of 11 U.S.C. § 342(c)(1), Fed. R. Bankr. P. 1005 and Fed. R. Bankr. P. 2002(n), and (III) Authorizing the Debtors to File Required Monthly Operating Reports on a Consolidated Basis**

30.     By motion filed concurrently herewith, the Debtors are requesting (i) to have their cases jointly administered pursuant to Bankruptcy Rule 1015, (ii) a waiver of the requirements that the captions in these chapter 11 cases contain certain identifying information with respect to each Debtor, and (iii) authorization to file monthly operating reports on a consolidated basis, subject to certain conditions, including consultation with the office of the United States Trustee for the Southern District of New York (the "<u>UST</u>").

31.     The Debtors are seeking joint administration of their chapter 11 cases because each of the Debtors are affiliates, as that term is defined in section 101(2) of the Bankruptcy Code, by virtue of Debtor C-BASS being the direct or indirect parent of each of the other Debtors.  Because of their affiliate status, it is my understanding that joint administration of the Debtors' cases will be less costly and burdensome than the separate administration of the cases.  For example, I understand that joint administration will permit the use of a single, general docket for the Debtors' cases and combined notices to creditors and other parties in interest of the Debtors' respective estates.  The Debtors believe it is likely that numerous filings and additional matters, including notices, applications, motions, orders, hearings and other proceedings will be made, issued, or convened in these cases.  Many of these will affect all of the Debtors.  Therefore, joint administration will protect parties in interest by ensuring that parties affected by each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in their cases.

32.     I believe that the rights of the respective creditors of the Debtors will not be adversely affected by joint administration of these chapter 11 cases because the motion requests

only administrative consolidation of the Debtors' cases, and the Debtors are not seeking substantive consolidation. Each creditor will be required to file a claim against a particular Debtor's estate. Motions and other pleadings, however, may be jointly filed. Thus, the rights of all creditors will be enhanced by the reduced costs resulting from joint administration. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files. Finally, I believe supervision of the administrative aspects of these chapter 11 cases by the UST will be greatly simplified. Accordingly, I believe that joint administration is in the best interests of the Debtors, their creditors, and all parties in interest.

33.     The Debtors are also seeking a waiver of the requirements imposed by section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rules 1005 and 2002(n) that the Debtors' caption and other notices mailed in these cases include the Debtors' tax identification numbers and other information relating to the Debtors. Inclusion of the Debtors' tax identification numbers, other names used during the eight years prior to filing the bankruptcy petition, and addresses on each caption is cumbersome, and may be confusing to parties in interest. More importantly, a waiver of these information requirements is purely procedural in nature and will not affect the substantive rights of parties in interest. As an alternative to including each Debtor's address and tax identification number in the caption, the Debtors propose to use a consolidated caption to indicate that any filed pleading relates to the jointly administered bankruptcy cases of the Debtors, and to list the names of all of the Debtors in a footnote to each pleading filed and each notice mailed by the Debtors in these chapter 11 cases. I believe that the use of this simplified caption, without reference to any other names used during the past eight years and tax identification numbers for each individual debtor, will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification.

34.     Finally, the Debtors seek authority to file the monthly operating reports required by the Operating Guidelines promulgated by the UST on a consolidated basis if the Debtors determine, after consultation with the UST, that consolidated reports would further administrative economy and efficiency in these chapter 11 cases without prejudice to any party in interest and that the reports would accurately reflect the Debtors' consolidated business operations and financial affairs.    Notwithstanding the foregoing, each of the Debtors are proposing to file separate monthly reports of disbursements on an individual basis.

**B.      Motion of the Debtors and Debtors-in-Possession for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to Pay Prepetition Payroll Taxes, Withholdings and Reimbursable Expenses, (II) Authorizing, But Not Directing, the Debtors to Continue Employee Benefit Programs on a Postpetition Basis, and (III) Authorizing All Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

35.     By motion filed concurrently herewith (the "Employee Motion"), the Debtors are requesting that the Court enter an order (a) authorizing, but not directing, the Debtors, in the exercise of their business judgment, to pay employee-related taxes, withholdings and reimbursable expenses; (b) authorizing, but not directing, the Debtors, in the exercise of their business judgment, to continue employee benefit programs on a postpetition basis; and (c) authorizing all financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing (the "Employee Motion").

36.     As of the Petition Date, the Debtors employ thirteen (13) full time, salaried employees on the payroll (collectively, the "Employees").   The average gross bi-weekly payroll for the Employees, based upon historical data, is approximately $144,023.   On November 1 and 2, 2010, the Debtors transferred sufficient funds to Ceridian, a third-party service provider, to pay all of the salaries and the employee and employer portions of the related payroll taxes, on a current basis, for the Employees through November 30, 2010.   Immediately thereafter, Ceridian

paid all of the salaries through November 30, 2010. Accordingly, the Debtors believe that there are no accrued and unpaid amounts for salaries with respect to the Employees. Ceridian pays the employee and employer portions of the related payroll taxes for the Employees on a quarterly basis and therefore is holding the funds allocated to pay payroll taxes for the month of November in trust.

37.     To minimize the personal hardship the Employees may suffer if the Employee-related obligations are not paid when due, the Debtors, by their Employee Motion, seek authority (but not direction) to pay certain prepetition claims for, federal and state withholding taxes, payroll taxes, expense reimbursements, payments under Employee benefit programs and certain other Employee benefits in the ordinary course of business and to continue to pay such obligations as they arise in the ordinary course of the Debtors' business (all collectively, the "Employee Obligations").

38.     Although the Debtors request that reimbursement requests be submitted promptly, it is possible that a few Employees were not able to comply with such requests. Accordingly, the Debtors are unable to provide a detailed amount of unpaid prepetition reimbursable expenses at this time because it is likely that Employees will submit requests for reimbursement of reimbursable expenses incurred prepetition after the Petition Date. Based on historical practices, however, the Debtors estimate that the total obligation will not exceed $500 on account of reimbursable expenses as of the Petition Date. The Debtors seek authorization to pay all unpaid reimbursable expenses and to continue to pay reimbursable expenses in the ordinary course of business in accordance with their policies relating to reimbursable expenses.

39.     I believe that the ability of the Debtors to preserve and maximize the value of their businesses as a going-concern is dependent to some extent upon the continued service,

satisfaction, and loyalty of the Employees. I submit, therefore, that the Debtors' estates and their creditors will suffer immediately and irreparable harm if the Debtors are unable to retain the Employees. Further, the amounts to be paid pursuant to the Employee Motion are reasonable compared with the importance and necessity of the Employees and the losses the Debtors likely will suffer if these amounts are not paid. I am informed by the Debtors' bankruptcy counsel that section 1129(a)(9)(B) of the Bankruptcy Code requires the Debtors to pay such claims arising from Employee Obligations in full to confirm a chapter 11 plan to the extent the Employees' claims are afforded priority status under the Bankruptcy Code. Accordingly, I believe that the payment of the Employees' claims will not result in any prejudice to other creditors.

40. Accordingly, I believe that approving the Debtors' request to pay or otherwise honor the Employee Obligations is imperative to the Debtors' ability to maximize the value of their assets for the benefit of their stakeholders, and will in no way prejudice the rights of other unsecured creditors

41. Finally, to effectuate the payment of the Employee Obligations, the Debtors request that the Court enter an order authorizing all banks and financial institutes to honor all prepetition checks for payment of prepetition wages and benefits and prohibiting all banks from placing any holds on, or attempting to reserve, any automatic transfers to the Employees' accounts for prepetition wages and benefits.

**C.** **Motion of the Debtors and Debtors-in-Possession for Interim and Final Orders (I) Authorizing Continued Use of Centralized Cash Operating Account, (II) According Administrative Expense Status for Intercompany Receivables, (III) Authorizing Continued Use of Existing Business Forms, (IV) Waiving the Investment and Deposit Requirements Of Section 345 of The Bankruptcy Code, (V) Authorizing the Closure of Unnecessary Bank Accounts, and (VI) Granting Certain Related Relief**

42. By motion filed concurrently herewith, the Debtors are requesting that the Court enter interim and final orders authorizing the (i) authorizing the Debtors' continued use of their

single, centralized cash operating account for all Debtors in accordance with the Debtors' prepetition ordinary business practices and the transfer of funds among the Debtors that the continued use of the centralized cash operating account entails, (ii) authorizing the Debtors' bank to maintain the Debtors' centralized cash operating account in the ordinary course and authorizing the Debtors to pay any related fees, (iii) according administrative expense status to intercompany receivables generated by the use of the centralized cash operating account, (iv) authorizing the continued maintenance of existing business forms, provided that the legend "Debtors-in-Possession" is imprinted or stamped on such forms, (v) waiving the investment and deposit requirements of section 345(b) of the United States Bankruptcy Code for cause, and (vi) authorizing the closure of various unnecessary bank accounts.

43.     As of the Petition Date, the Debtors maintain thirteen (13) bank accounts (the "Bank Accounts") in the ordinary course of its business, including (i) a centralized cash operating account (the "Operating Account") that is subject to a control agreement in favor of the Administrative Agent, (ii) four (4) subsidiary accounts (the "Subsidiary Accounts") that are dormant with zero dollar balances and serve no function for the Debtors, and (iii) eight (8) accounts (the "Counterparty Accounts") that are under the exclusive control of certain Repo Counterparties or the Senior Lenders.  The Debtors have no authority to draw on the Counterparty Accounts and those accounts serve no purpose for the Debtors.  The Debtors intend to close the Subsidiary Accounts and the Counterparty Accounts as soon as a reasonably practicable.

44.     Since the Operating Account is maintained at JPMorgan Chase, a bank on the United States Trustee's List of Authorized Bank Depositories, there is little risk to these bankruptcy estates by maintaining the status quo with respect to the Operating Account.

Furthermore, given the Debtors' corporate and financial structure, the number of affiliated entities and the control agreements in place with respect to the Operating Account, it would be difficult and unduly burdensome for the Debtors to establish an entirely new operating account and a new cash management and disbursement system for each separate legal entity. The cash management system utilizing the Operating Account is equipped with payment, cash receipt, and portfolio management mechanisms that facilitate vital functions of the Debtors' operations, including (i) interactions with JPMorgan Chase through the proprietary JPMorgan ACCESS module (a browser-based platform that provides the Debtors with applications for information retrieval, compliance, portfolio management and cash transaction operations), (ii) the Debtors' payment of wages, employee- and employer-funded tax obligations, and filings required in connection therewith through their third-party payroll services provider, (iii) collection of certain management fees (via automatic wire transfers) from the trustees for seventeen different CBO funds, and (iv) compliance with the prepetition RFA.

45. In addition to maintaining the Operating Account, the Debtors do not intend to "freeze" any intercompany balances that existed as of the Petition Date, and will continue to maintain all receipts and disbursements and records of all inter-Debtor transfers postpetition. In this way, all transfers and transactions will be properly documented in the books and records of each Debtor, and intercompany balances will be maintained. In addition, postpetition intercompany receivables by and among the Debtors will be entitled to administrative expense claim status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code. Based on the foregoing, the Debtors believe that maintenance of their existing cash management system utilizing the Operating Account is in the best interests of their estates and all parties in interest.

The Debtors, therefore, seek authority to maintain and use their centralized Operating Account during the pendency of these chapter 11 cases.

46.     In the ordinary course of the operation and maintenance of the Bank Accounts, the Debtors incur routine bank charges and fees relating to the administration of those Bank Accounts. The Debtors seek authority to pay any such customary prepetition banking and custody fees (the "Service Charges") relating to the administration of the Bank Accounts. JPMorgan Chase could assert offset and/or recoupment claims to cover any such fees, so the Debtors' ability to access funds in their Operating Account depends on reaching an appropriate means of paying these fees. The Debtors also seek authority to pay any customary postpetition banking and custody fees in the ordinary course as administrative expenses. The Debtors submit that this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates because it will prevent any disruption to their cash management system.

47.     In addition to requesting authority to maintain their cash management system by the Cash Management Motion, the Debtors request authority to continue to use their existing Business Forms (defined below). In the ordinary course of their business, the Debtors use a variety of checks, invoices, stationary and other pre-printed business forms (collectively, the "Business Forms"). Because of the nature and scope of the Debtors' business operations, it is important that the Debtors be permitted to continue to use their Business Forms without alteration or change as they existed immediately before the Petition Date; provided, however, as soon as practicable after the Petition Date, the Business Forms will be stamped or imprinted to include the legend "Debtor-in-Possession." As soon as practicable after the Petition Date, the Debtors will include the legend "Debtor-in-Possession" on the checks they print electronically.

48.     Finally, the Debtors request relief from the requirements of section 345 of the Bankruptcy Code and authority to continue to invest and deposit funds in a safe and prudent manner in accordance with their existing practices.  I am informed by the Debtors' bankruptcy counsel that section 345 of the Bankruptcy Code requires, among other things, that the Debtors' deposits and investments must be insured or guaranteed by the United States or by a department, agency or instrumentality of the United States, or backed by the full faith and credit of the United States.  If not, then I am informed by the Debtors' bankruptcy counsel, that the entity with whom the funds are deposited must either obtain a bond in favor of the United States or provide United States obligations to the United States Trustee to secure the estates' funds it holds.

49.     The benefits to the Debtors of waiving the requirements of section 345(b) of the Bankruptcy Code far outweigh any potential harm to their estates, and the failure to waive the requirements may needlessly hinder the Debtors' efforts to maximize value for the benefit of all of their constituents.  I believe that JPMorgan Chase, the financial institution at which the Debtors maintain the Bank Accounts, is a financially stable banking institution that is approved as a bank depository for chapter 11 cases by the UST in this District.  All such deposits are prudent and designed to yield the maximum reasonable net return on the funds invested, taking into account the safety of such deposits and investments and consistent with the Debtors' financing requirements.  Accordingly, I believe that cause exists to waive the investment and deposit restrictions under section 345(b) of the Bankruptcy Code to the extent that the Debtors' Bank Accounts do not strictly comply.

**D. Motion of the Debtors and Debtors-in-Possession for (I) For Entry of Interim and Final Orders (A) Authorizing the Limited Use of Cash Collateral and (B) Granting Adequate Protection to the Senior Lenders, and (II) For the Scheduling of a Final Hearing on the Use of Cash Collateral and the Grant of Adequate Protection to the Senior Lenders**

50.     By motion (the "<u>Cash Collateral Motion</u>") filed concurrently herewith, the Debtors request entry of an interim order (a) authorizing the Debtors' limited use of Cash Collateral (as defined in the Cash Collateral Motion) to fund an orderly liquidation of their estates and to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing, (b) granting adequate protection to the Senior Lenders, and (c) scheduling a final hearing (the "<u>Final Hearing</u>") on the Cash Collateral Motion to consider entry of a final order granting the relief requested in the Cash Collateral Motion.

51.     It is essential to the Debtors' efforts to maximize the value of their estates that they obtain authority to use the Cash Collateral. The reasons supporting the Debtors' need to use Cash Collateral during the course of the Debtors' chapter 11 cases are compelling. As the Debtors have extremely limited funds, use of the Cash Collateral is required to fund the day-to day operating expenses of the Debtors, including payments to remaining employees and other payments that are essential to sustaining the value of the Debtors' assets during the wind-down of their estates. Indeed, absent the use of the Cash Collateral, the Debtors believe and submit the value of the Debtors' assets will quickly erode. Therefore, authorization to use the Cash Collateral pending the Final Hearing is in the best interests of the Debtors, their estates and their creditors. Accordingly, I believe there is cause to grant the relief requested in the Cash Collateral Motion.

**E.**     **Motion of the Debtors and Debtors-in-Possession for Entry of an Order Establishing Notice and Service Procedures**

52.     By motion filed concurrently herewith, the Debtors are seeking the entry of an order establishing appropriate notice and service procedures in these chapter 11 cases (the "Notice and Service Procedures Motion").   Any creditor or party in interest that wishes to receive notice other than as required by Bankruptcy Rule 2002 and Local Bankruptcy Rule 2002 must file a notice of appearance and request for service of papers (a "Request") with the Clerk of Court and serve a copy of such Request upon each of the parties set forth on the Master Service List.   Each Request must include such party's:   (a) name, (b) address, (c) client's name, if applicable, (d) telephone number, (e) facsimile number, and (f) electronic email ("e-mail") address, unless such party files a request to be exempted from providing an e-mail address

53.     In the Notice and Services Procedures Motion the Debtors propose to establish a Master Service List, which shall include:   (i) the office of the United States Trustee for the Southern District of New York, (ii) the Debtors, (iii) the attorneys for the Debtors, (iv) the creditors holding the thirty (30) largest claims against the Debtors' estates (until the attorneys for any official committee of unsecured creditors appointed in these cases (the "Committee") enter a notice of appearance), (v) counsel for any other official committee appointed or designated in these chapter 11 cases, (vi) counsel to the Administrative Agent for the Senior Lenders, Davis Polk & Wardwell LLP, (vii) the Internal Revenue Service, (viii) the New York State Attorney General, (ix) the Securities and Exchange Commission, (x) any party whose interests are directly affected by a specific pleading, and (xi) those persons or entities who have formally appeared and requested service in the Debtors' cases pursuant to Bankruptcy Rule 2002.   The Debtors request that pleadings in these chapter 11 cases only be served upon the Master Service List with certain exceptions.

54.     The proceedings with respect to which notice would be limited to the persons and entities listed on the Master Service List would include all matters covered by Bankruptcy Rule 2002, with the express exception of the following:  (a) notice of the first meeting of creditors pursuant to section 341 of the Bankruptcy Code, (b) notice of the time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c), (c) notice of the time fixed for filing objections and the hearing to consider approval of a disclosure statement or confirmation of a plan of reorganization, and (d) notice of and transmittal of ballots for accepting or rejecting a plan of reorganization.  Notice of the foregoing matters would be given to all parties in interest in accordance with Bankruptcy Rule 2002 and other applicable Bankruptcy Rules and Local Rules, unless otherwise ordered by the Court or otherwise proscribed by the Bankruptcy Code.

55.     Pursuant to the Revised Electronic Filing Procedures, service by e-mail may be made on a person who has requested, or is deemed to have requested, electronic notice in accordance with Bankruptcy Rule 9036 or the Revised Electronic Filing Procedures; provided, however, that hard copies of documents or notices shall be served in the following circumstances:  (a) service of a complaint and summons in an adversary proceeding under Bankruptcy Rule 7004, service of a motion commencing a contested matter under Bankruptcy Rule 9014(b), or a subpoena issued under Bankruptcy Rule 9016; (b) notice of the meeting of creditors required under Bankruptcy Rule 2002(a)(1); and (c) where service upon an agency of the United States, including the United States Attorney and the United States Trustee, or chambers is required by the Bankruptcy Rules, the Local Rules, or order of this Court.

56.     If notice is served by e-mail, service of a paper copy of documents on interested parties by any other method is not necessary and e-mail service shall satisfy the Court's rules for service.  The Debtors propose that service by e-mail be effective as of the date the document is

sent to the e-mail address provided by the party and that upon the completion of noticing of any particular matter, the Debtors will file electronically with the Court either an affidavit of service or certificate of service, annexing thereto the list of those parties to whom notice was provided.

57. The proposed notice and service procedures set forth in the Notice and Service Procedures Motion and described herein will enable the Debtors to avoid the extraordinary costs and expenses of serving all pleadings and papers filed by the Debtors in these cases on every party in interest, while enabling the Debtors (or their agents) to provide notice to key parties in interest identified on the proposed master service list. Accordingly, I believe the relief requested in the Notice and Services Procedure Motion is appropriate and in the best interest of the Debtors, their creditors and all parties in interest.

**F.      Motion of Debtors and Debtors-in-Possession for Entry of an Order Authorizing the Employment and Retention of Donlin, Recano & Company, Inc. as Noticing, Claims and Balloting Agent for the Debtors**

58. By motion filed (the "<u>Donlin Retention Application</u>") concurrently herewith, the Debtors seek to retain Donlin as their claims, balloting and noticing agent because, among other things, Donlin specializes in chapter 11 administration, consulting, and analysis, including noticing, claims proceeding, voting and other administrative tasks in chapter 11 cases. Moreover, in compliance with the Southern District of New York's "Protocol for the Employment of Claims Agents," the Debtors obtained and reviewed engagements from at least three court-approved claims agents. Donlin will be tasked with sending out certain designated notices, receiving and docketing claims, and maintaining claims files and a claims and voting register. The Debtors believe that the retention of Donlin will expedite service of the notices, streamline the claims administration process, and permit the Debtors to focus on their efforts to maximize value to all creditors.

59.     To the best of the Debtors' knowledge, Donlin is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.  The Retention Agreement (as defined in the Donlin Retention Application) outlines the fee arrangement between Donlin and the Debtors.

60.     I believe that due to the number of anticipated claimants and parties in interest in these chapter 11 cases, the retention of Donlin is necessary and in the best interests of the Debtors' estates and their creditors.  Donlin, an independent third party, will provide the most efficient and effective means of providing notice to parties in interest and administering the claims process.  Accordingly, I believe and submit that there is ample cause to grant the relief sought in the Donlin Retention Application.

**G.      Motion of Debtors and Debtors-in-Possession for an Order (A) Approving the Form and Manner of Notice of the Commencement of Their Chapter 11 Cases, (B) Authorizing the Debtors to Prepare an Electronic List of Creditors in Lieu of Submitting and Filing a Formatted Mailing Matrix, and (C) Authorizing the Debtors to File a Consolidated List of Top 30 Unsecured Creditors**

61.     By motion filed concurrently herewith, the Debtors request approval of a form of notice of the commencement of the Debtors' chapter 11 cases, which I am informed by the Debtors' bankruptcy counsel is substantially in the form used in other large chapter 11 cases, and authority to file a consolidated list of the Debtors' top thirty (30) unsecured creditors in lieu of filing a separate top twenty (20) creditor list ("Top 30 List") for each of the Debtors.  Given the nature of the Debtors' businesses, the Debtors believe that filing a consolidated list of their creditors holding the thirty (30) largest unsecured claims would facilitate the UST's review of creditors' claims and its appointment of a creditors' committee in these chapter 11 cases.  By contrast, the filing of multiple Top 20 Lists for each of the eight (8) Debtors actually would impose an unnecessary burden on the UST and the Debtors without providing any corresponding benefit to any party in interest.

62.     By separate motion on regular notice, the Debtors plan to request authorization to retain Donlin, Recano & Company, Inc. ("Donlin") as claims, balloting and noticing agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices.  With such assistance, the Debtors will be capable of filing a consolidated list of creditors and a list of equity security holders upon request and will be capable of undertaking all necessary mailings.  Indeed, because the Debtors have numerous creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

63.     I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit Donlin to promptly notice those parties.  Accordingly, maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices will maximize efficiency and accuracy, and reduce costs.

64.     The Debtors propose that having Donlin mail the Notice of Commencement relieves the Clerk of the Court of the administrative burden of providing notice to the Debtors' creditors.  The Debtors also propose to publish, as soon as practicable, the Notice of Commencement once in the national edition of *The Wall Street Journal*.  It is my belief that publication of the Notice of Commencement is the most practical method by which to notify creditors and other parties in interest who do not receive the Notice of Commencement by mail of the commencement of these chapter 11 cases.  I believe that the proposed notice procedures will ensure that parties in interest receive prompt notice of the commencement of these chapter

11 cases.  Moreover, the proposed notice procedures are beneficial to the Debtors' estates and to the Debtors' creditors because they provide actual notice to all creditors and parties in interest in an efficient and cost-effective matter.

65.     For the foregoing reasons, I believe that waiving the requirement to file a creditors' matrix on the Petition Date, authorizing the filing of a Top 30 List instead of a Top 20 List for each Debtor, and authorizing the method of notice of commencement of the chapter 11 cases is necessary and in the best interests of the Debtors' estates and their creditors.

I declare under penalty of perjury under the laws of the United Sates of America that the foregoing is true and correct.

Executed on November 12, 2010.              _____*/s/ Andrew Rickert*_____
                                                          Andrew Rickert