**Proposed Hearing Date and Time for Hearing on Approval of Bidding Procedures: 11/19/10 at 10:00 a.m. (prevailing Eastern Time)**
**Proposed Objection Deadline for Approval of Bidding Procedures: 11/18/10 at 4:00 p.m. (prevailing Eastern Time)**

**Proposed Hearing Date and Time for Hearing on Approval of Sale: 12/22/10 at 10:00 a.m. (prevailing Eastern Time)**
**Proposed Objection Deadline for Approval of Sale: 12/15/10 at 4:00 p.m. (prevailing Eastern Time)**

Peter S. Partee, Sr.
Jack A. Molenkamp
Andrew Kamensky (to be admitted *pro hac vice*)
Scott H. Bernstein
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

*Proposed Attorneys for Debtors
and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CREDIT-BASED ASSET SERVICING | ) Case No. 10-16040 (ALG) |
| AND SECURITIZATION LLC, et al., | ) |
| | ) Joint Administration |
| Debtors.[1] | ) Requested |

### MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC AND C-BASS INVESTMENT MANAGEMENT LLC FOR (I) ENTRY OF AN ORDER (A) APPROVING BIDDING AND AUCTION PROCEDURES FOR THE SALE OF THE COLLATERAL MANAGEMENT BUSINESS; AND (B) GRANTING RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) AUTHORIZING THE SALE OF THE COLLATERAL MANAGEMENT BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF COLLATERAL MANAGEMENT CONTRACTS; AND (C) GRANTING RELATED RELIEF

Credit-Based Asset Servicing and Securitization LLC ("C-BASS") and C-BASS

Investment Management LLC ("CIM" and together with C-BASS, the "Seller"), debtors and

---

[1] The other Debtors are C-BASS CBO Holding LLC, C-BASS Credit Corp., C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC, and Sunfish Management Group LLC.

debtors-in-possession in the above-captioned cases, by and through their undersigned counsel, submit this motion (the "Motion") for the entry of two orders: (a) a bidding procedures order (i) scheduling an auction, (ii) approving bidding procedures, (iii) approving a break-up fee and expense reimbursement, (iv) scheduling a sale hearing, (v) establishing an objection deadline in connection with the proposed sale, and (vi) approving the proposed form and manner of the sale hearing notice and the notice of assumption and assignment of certain contracts; and (b) a sale order (i) approving the sale of the Seller's collateral management business, (ii) authorizing the assumption and assignment of certain collateral management contracts in connection thereto, and (iii) granting related relief. In support of this Motion, the Seller submits the *Declaration of Andrew Rickert in Support of the Motion of Debtors and Debtors-in-Possession Credit-Based Asset Servicing and Securitization LLC and C-BASS Investment Management LLC for (I) Entry of an Order (A) Approving Bidding and Auction Procedures for the Sale of the Collateral Management Business; and (B) Granting Related Relief; and (II) Entry of an Order (A) Authorizing the Sale of the Collateral Management Business Free and Clear of all Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Collateral Management Contracts; and (C) Granting Related Relief* (the "Rickert Declaration"). In further support of the Motion, the Seller respectfully represents as follows:

## I. General Background

1. On November 12, 2010 (the "Petition Date"), each of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors are operating their businesses and managing

their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or an examiner has been made in these chapter 11 cases and no statutory committees have been appointed or designated.

2.      Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases under the case of C-BASS. A description of the Debtors' businesses, the reasons for filing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 is set forth in the *Declaration of Andrew Rickert in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is being filed contemporaneously with this Motion.

## II.      Jurisdiction, Venue and Predicates for Relief

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and the *Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York* dated July 10, 1984 (Ward, Acting C.J.). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

4.      The predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1, 6006-1 and 9014-1 of the Local Rules of the Bankruptcy Court (the "Local Rules").

## III.      Relief Requested

5.      By this Motion, the Seller requests the entry of an order (the "Bidding Procedures Order"), in substantially the form annexed hereto as **Exhibit A**, (a) authorizing and scheduling an auction (the "Auction") for the sale (the "Sale") of the Seller's collateral management

business, including, without limitation, all of the Seller's right, title and interest in and to or arising under (i) all of the Assigned Contracts (as defined below), (ii) the Class E Securities (as defined below), and (iii) the Ancillary Assets (as defined below) (collectively, the "CM Business"), free and clear of all claims (as defined in section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "Liens"); (b) approving bidding and auction procedures (the "Bidding Procedures") in connection with the Auction; (c) approving the proposed bid protection to FIG LLC, on behalf of itself or one or more of its managed affiliates (the "Proposed Purchaser"), including the proposed Break-Up Fee (as defined below) and Expense Reimbursement (as defined below), in accordance with that certain Asset Purchase Agreement (as amended, the "Purchase Agreement"), dated November 9, 2010, by and among the Seller and the Proposed Purchaser, in the form annexed hereto as **Exhibit C**; (d) setting a date and time for a sale hearing (the "Sale Hearing") to consider the Sale; (e) establishing a deadline to file objections to the Sale (the "Objection Deadline"); (f) approving the proposed form and manner of notice of the Sale Hearing and the Auction (the "Sale Hearing Notice"), in substantially the form annexed as Schedule 1 to the Bidding Procedures Order; and (g) approving the proposed form and manner of notice of assumption and assignment of certain executory contracts as part of the Sale transaction (the "Notice of Assumption and Assignment"), in substantially the form annexed as Schedule 2 to the Bidding Procedures Order. The Seller further requests the entry of an order (the "Sale Order") after the Sale Hearing, in substantially the form annexed hereto as **Exhibit B**, (a) approving and authorizing the Sale of the CM Business free and clear of all Liens and on substantially the same terms and conditions set forth

in the asset purchase agreement of the Successful Bidder (as defined below)[2]; (b) authorizing and approving the Purchase Agreement; (c) authorizing the assumption and assignment of certain executory contracts related thereto; and (d) granting related relief.

## IV.    Specific Background

### A.    Description of the Seller and its CM Business

6.      CIM is registered with the Securities and Exchange Commission (the "<u>SEC</u>") as an investment adviser under the Investment Advisers Act of 1940, (as amended, the "<u>Advisers Act</u>").  C-BASS holds one hundred percent (100%) of the outstanding membership interests in CIM.

7.      Through the CM Business, the Seller provides collateral management services to 17 privately offered collateralized bond obligations (collectively, "<u>CBOs</u>").  The Seller's current management duties with respect to the CBOs consist of (a) monitoring collateral for the CBOs, (b) effectuating dispositions of defaulted CBO collateral as required by the CBO documentation, and (c) exercising certain rights on behalf of the CBOs.  The Seller currently has no investment authority with respect to the CBOs, and since June 2007 has had no investment authority and has made no investment decisions with respect to all but one of the CBOs.  The Seller has had no investment authority and has made no investment decisions with respect to the final CBO since December 2007.

8.      The CM Business is comprised of (a) investment management or portfolio advisory contracts and collateral administration agreements associated with 17 CBOs, as listed on Schedules 2.1(i) and (ii) to the Purchase Agreement (collectively, the "<u>Assigned Contracts</u>");

---

[2]      If the Auction is held and a sale of the CM Business is agreed to according to a Modified Purchase Agreement (as defined herein), the Seller will submit a revised sale order reflecting the sale contemplated by the Modified Purchase Agreement, with a blackline against the Sale Order showing changes made.

(b) the Class E Securities resulting from the C-BASS CBO XIV and C-BASS CBO XVII transactions, as listed on Schedule 2.1(iii) to the Purchase Agreement (collectively, the "Class E Securities"); and (c) any other property in the Seller's possession relating to its management of the CBOs and its obligations under the Assigned Contracts and the CBO Constituent Documents (as defined in the Purchase Agreement), including, without limitation, all books, records, files, proprietary software, excel spreadsheets and proprietary modeling programs (collectively, the "Ancillary Assets" and together with the Assigned Contracts and the Class E Securities, the "Assets"). The Class E Securities carry certain control rights which benefit the collateral manager under the Assigned Contracts, and are therefore being sold as part of the CM Business.

**B.** **The Debtors' Capital Structure and the Restructuring Facilitation Agreement**

9.    As set forth in greater detail in the First Day Declaration, the Debtors financed their prepetition activities with multiple repurchase agreements of mortgage loans and mortgage-backed securities (collectively, the "Repurchase Agreements"), and a variety of secured and unsecured debt. Substantially all of the Repurchase Agreements constituted repurchase agreements within the meaning of section 101(47) of the Bankruptcy Code and fell within the safe-harbor of section 559 of the Bankruptcy Code. The Debtors' principal secured debt consisted of a $1,855,000,000 senior secured credit facility (the "Senior Credit Facility") syndicated among a number of lenders (the "Senior Lenders") and secured by first liens on and security interests in substantially all of the Debtors' assets (other than the assets covered by the Repurchase Agreements) and junior liens on and security interests in the Debtors' assets covered by the Repurchase Agreements (the "Senior Credit Facility Collateral").

10.    As part of a large-scale forbearance and restructuring in the Summer and Fall of 2007, culminating in the execution of the Override Agreement (as defined in the First Day

Declaration), the Debtors granted numerous subordinate liens and security interests, including without limitation subordinate liens and security interests on the Senior Credit Facility Collateral, as additional collateral security for the Repurchase Agreements. Under the Intercreditor Agreement (as defined in the First Day Declaration) executed simultaneously with the Override Agreement, however, the Senior Lenders have the exclusive and unilateral right to enforce their liens and security interests against, and otherwise consent to dispositions of, the Senior Credit Facility Collateral.

11.     Over the course of the past 40 months, based on defaults under the Senior Credit Facility triggered by the mortgage crisis in the United States and pursuant to multiple forbearance and related agreements, the vast majority of the collateral for the Senior Credit Facility has been sold and the proceeds thereof applied to reduce the balance of the Senior Credit Facility to its current principal balance of approximately $170 million. The collateral remaining in the Debtors' possession and control as of the Petition Date (collectively, the "Remaining Collateral") consists principally of (i) various subordinated tranches of mortgage-backed securities, (ii) the CM Business, (iii) whole loans, (iv) REOs, (v) claims against third parties, (vi) deposits with surety bond purchasers, (vii) furniture, fixtures, equipment and various forms of intellectual property, (viii) receivables for the unused amount, if any, of professional retainers, and (ix) cash collateral on deposit in the Debtors' centralized cash operating account.

12.     Similarly, based on defaults under the Repurchase Agreements triggered by the mortgage crisis in the United States, all of the Repurchase Agreements have been terminated by the respective counterparties, and substantially all of the assets subject to the Repurchase Agreements have been sold or retained by such counterparties.

13.     Pursuant to the Restructuring Facilitation Agreement, dated as of September 20, 2010 (the "RFA"), by and among the Debtors, JPMorgan Chase Bank, N.A., as administrative agent under the Senior Credit Facility (the "Administrative Agent"), and certain lenders under the Senior Credit Facility that are signatories to the RFA (collectively, the "Participant Lenders"), the Administrative Agent and Participant Lenders have agreed *inter alia* to permit the Debtors to use up to $8.2 million of the cash proceeds of the Remaining Collateral in accordance with the terms and conditions of an adequate protection stipulation, interim approval of which the Debtors are seeking contemporaneously with the approval of the other first-day motions. The RFA provides a timeline pursuant to which the Debtors are to use their respective best efforts to liquidate the Remaining Collateral. Specifically with respect to the CM Business, the Debtors are required to use their respective best efforts to obtain entry of an order authorizing the sale of the CM Business by December 31, 2010, and to obtain entry of an order approving Bidding Procedures in connection with the sale of the CM Business on or before November 22, 2010.

**C.      The Proposed Sale of the CM Business to the Proposed Purchaser**

14.     C-BASS and CIM, as Seller, and FIG LLC, on behalf of itself or one or more of its managed affiliates, as Proposed Purchaser, have entered into the Purchase Agreement, whereby the Proposed Purchaser has agreed to purchase the CM Business from the Seller.

**D.      Summary of Purchase Agreement**[3]

15.     The salient terms of the Purchase Agreement are as follows:

---

[3]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement. To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.

(a)   **Assets to be Sold.**   The assets to be sold consist of the Assigned Contracts, the Class E Securities and the Ancillary Assets that comprise the CM Business.

(b)   **Purchase Price.**   At the Closing, the Proposed Purchaser shall pay to the Seller, by wire transfer of immediately available funds to an account designated by the Seller, the purchase price (the "Purchase Price") equal to two million four hundred thousand Dollars ($2,400,000), less (i) the deposit of $100,000 (the "Deposit") (and any interest accrued thereon), (ii) the Fee Basis Reduction Amount, and (iii) any management fees paid to the Seller subsequent to January 1, 2011 but prior to the Closing.

At the Closing, the Escrow Agent shall release the Deposit, and all interest accrued thereon, to the Seller.

(c)   **Allocation of Purchase Price**.   The Purchase Price shall be allocated among the Assets in the manner required by Section 1060 of the Internal Revenue Code as shown on the allocation schedule attached to the Purchase Agreement as Schedule 2.7.   After the Closing, the parties will make consistent use of the allocations set forth in such allocation schedule for all purposes, including for purposes of any Tax Returns required to be filed pursuant to Section 1060 of the Internal Revenue Code (including Internal Revenue Service Form 8594), or any comparable provision of state, local or foreign law.   Concurrently with the Closing, the Proposed Purchaser will prepare and deliver to Seller Internal Revenue Service Form 8594 to be filed with the Internal Revenue Service.   The Proposed Purchaser and the Seller agree that the form of the transactions, the consideration provided for in this Agreement and the allocation of the Purchase Price as provided above were arrived at on the basis of arm's length negotiation between the Proposed Purchaser and the Seller, and shall be respected by each of them and their respective Affiliates for federal, state, local and other tax reporting purposes, including filings on Internal Revenue Service Form 8594, and that none of them will assert or maintain a position inconsistent with the foregoing.

(d)   **Break-Up Fee and Expense Reimbursement.**   In the event each of the following occurs:   (i) the Purchase Agreement is terminated by the Proposed Purchaser pursuant to Section 7.1(d) of the Purchase Agreement, (ii) the Proposed Purchaser is not in material default under the Purchase Agreement (provided that this clause (ii) shall not be applicable in the event that Seller is also in material default under the Purchase Agreement), (iii) the Proposed Purchaser does not purchase the Assets, (iv) the Bankruptcy Court enters an order authorizing the sale or transfer of some or all the Assets to a party other than the Proposed Purchaser (a "Third Party Buyer"), and (v) the Assets are in fact sold to a Third Party Buyer,

the Proposed Purchaser shall be entitled to a break-up fee in an amount equal to $100,000 (the "Break-Up Fee")[4] and an expense reimbursement for the reasonable and documented out-of-pocket costs and expenses (incurred by the Proposed Purchaser or its Affiliates) in connection with negotiation, documentation and implementation of the Purchase Agreement up to a maximum amount of $75,000 (the "Expense Reimbursement"). The payment of the Break-Up Fee and Expense Reimbursement, if payable in accordance with the foregoing sentence, shall be made directly to the Proposed Purchaser solely from the proceeds of the sale to the Third Party Buyer (free and clear of any Encumbrance on such proceeds) within three (3) Business Days of the closing of the sale.

(e) **Termination of Purchase Agreement.** The Purchase Agreement may be terminated at any time before the Closing:

    i.     by mutual written consent of the Seller and the Proposed Purchaser;

    ii.     by the Seller, by notice to the Proposed Purchaser, if the Closing shall not have occurred on or before the date that is fifteen (15) days after the earlier of (1) the date upon which the Sale Order becomes final and not appealable and (2) the date upon which the Proposed Purchaser indicates its determination to proceed with the Closing notwithstanding the taking of an appeal or the request for a stay pending appeal (the "Drop Dead Date"), and the conditions set forth in Sections 6.1 and 6.2 of the Purchase Agreement (other than any condition that by its nature is to be satisfied by actions to be taken at the Closing by Seller if the Seller is prepared to take such actions as of such date) have been satisfied;

    iii.     by the Proposed Purchaser, by notice to the Seller, if the Closing shall not have occurred on or before the Drop Dead Date and the conditions set forth in Sections 6.1 and 6.3 of the Purchase Agreement (other than any condition that by its nature is to be satisfied by actions to be taken at the Closing by the Proposed Purchaser if the Proposed Purchaser is prepared to take such actions as of such date) have been satisfied;

    iv.     by the Proposed Purchaser, by notice to the Seller, if the Bankruptcy Court enters an order authorizing the sale or transfer of some or all of the CM Business to a Third Party Buyer; or

---

[4]     The Purchase Agreement defines the Break-Up Fee as the "Termination Fee" and the Proposed Purchaser as the "Buyer."

<blockquote>
v.     by the Proposed Purchaser or the Seller, by notice to the other party if the Drop Dead Date has not occurred on or prior to January 31, 2011.
</blockquote>

16.    In addition to the aforementioned salient features of the Purchase Agreement, in accordance with the *Amended Guidelines for the Conduct of Asset Sales* adopted by this Court's General Order M-383 on November 18, 2009, the Seller notes the following with respect to the Purchase Agreement:

(a)    **No Sale to an Insider:** The Proposed Purchaser is not an insider of the Seller or the other Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

(b)    **Agreements with Management:** The Proposed Purchaser is not offering employment to any employees of the Seller or its Affiliates.

(c)    **No Private Sale; Competitive Bidding:** As discussed above, the Seller intends to conduct an open bidding process for the Sale of the CM Business. Neither the Purchase Agreement nor any other agreement prohibits the Seller from soliciting competing offers for the CM Business and the Seller is not otherwise limited in marketing the CM Business.

(d)    **Closing and Other Deadlines:** As set forth in the Purchase Agreement, the closing is scheduled to occur one Business Day after each of the conditions to closing set forth in Article 6 of the Purchase Agreement have been satisfied or validly waived, at 10:00 a.m. (prevailing Eastern Time) in the offices of Hunton & Williams LLP in New York, New York, or on such other date or at such other time or place as is mutually agreed by the parties hereto. As set forth above, Seller or Proposed Purchaser may terminate the Purchase Agreement if Closing shall not have occurred and if the Drop Dead Date has not occurred on or prior to January 31, 2011.

(e)    **Good Faith Deposit:** The Purchase Agreement requires submission by the Proposed Purchaser of a good faith deposit in the amount of $100,000.

(f)    **No Interim Arrangements with the Proposed Purchaser**. The Purchase Agreement does not provide for any interim arrangements with the Proposed Purchaser.

(g)    **Use of Proceeds:** Section 6.1(g) of the Purchase Agreement provides that, to the extent any defaults under Executory Contracts to be assumed and assigned are not cured by the Seller, the Seller shall use proceeds of the Purchase Price to cure any and all defaults under the Executory Contracts that are required to be cured as a condition to assumption under

the Bankruptcy Code and pursuant to the Sale Order, so that the Executory Contracts may be assumed by the Seller and assigned to the Proposed Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code.

(h) **No Tax Exemption:** No provision of the Purchase Agreement addresses tax exemptions.

(i) **Record Retention:** There is no specific provision in the Purchase Agreement governing record retention; however, both the Seller and the Proposed Purchaser are registered investment advisers under the Advisers Act (or in the case of the Proposed Purchaser, will become a registered investment adviser on or prior to the Closing), and therefore, Rule 204-2 of the Advisers Act governs the recordkeeping requirements.

(j) **No Sale of Avoidance Actions:** The Purchase Agreement does not involve the sale of, or impose limitations on, any causes of action under Chapter 5 of the Bankruptcy Code.

(k) **Sale Free and Clear of Unexpired Leases:** Pursuant to Section 2.1(a) of the Purchase Agreement, the Proposed Purchaser shall acquire the Seller's CM Business free and clear of all Liens, with such Liens attaching to the proceeds with the same validity and priority.

17. Additionally, the proposed form of Sale Order contains the following provisions which the Guidelines require to be separately disclosed.

(a) **Requested Findings as to Successor Liability:** Pursuant to Section 2.1 of the Purchase Agreement, the Proposed Purchaser shall only be liable for the Assumed Liabilities, and not liable for any Excluded Liabilities, or any other obligation of any type or nature of any Debtor. Also, pursuant to section 6.1 of the Purchase Agreement, it is a condition of closing that this Court enter the Sale Order authorizing, among other things, the transfer of the Seller's CM Business to the Proposed Purchaser free and clear of all interests within the meaning of section 363(f) of the Bankruptcy Code, including free and clear of all Liens.

(b) **Relief from Bankruptcy Rules 6004(h):** The Seller is requesting relief from the 14-day stay imposed by Rules 6004(h).

(c) **Requested Findings as to Fraudulent Conveyance:** The Seller believes the consideration that will be provided by the Proposed Purchaser for the CM Business will constitute reasonably equivalent value for the CM Business under the Bankruptcy Code and other applicable law.

E.    **Bidding Procedures and the Auction**

18.    As noted above, to maximize the value of the CM Business the Seller seeks to implement Bidding Procedures for the Sale of the CM Business pursuant to the Purchase Agreement, to solicit higher or better offers for the CM Business.  The proposed Auction and Bidding Procedures are as follows:

(a)    **Assets to Be Sold:**  The assets to be sold consist of the Assigned Contracts, the Class E Securities, and the Ancillary Assets that comprise the CM Business.

(b)    **Confidentiality Agreements:**  Upon execution of a confidentiality agreement, in form and substance satisfactory to the Seller, any party that wishes to conduct due diligence in respect of the CM Business may be granted access to all material information that has been or will be provided to Proposed Purchaser and other bidders; *provided, however,* that prior to receipt by a party of any information from the Seller (including, but not limited to, the Purchase Agreement and its schedules and exhibits, business and financial information and access to representatives of the Seller), each such party will be required to deliver evidence reasonably satisfactory to the Seller establishing such party's financial capability to timely consummate a purchase of the CM Business.

The Administrative Agent shall be granted access to any such information provided to any bidders.

(c)    **Bid Deadline:**  Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before December 13, 2010 at noon (prevailing Eastern Time) (the "Bid Deadline") in writing, to (i) counsel to the Debtors, Hunton & Williams LLP, 200 Park Avenue, 53rd Floor, New York, New York, 10166-0136, Attention:  Peter S. Partee, Sr. and Scott H. Bernstein; (ii) C-BASS Investment Management LLC, 335 Madison Avenue, 19th Floor, New York, New York 10017, Attention:  General Counsel; (iii) counsel to the Administrative Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attention: Damian S. Schaible; and (iv) counsel to the Official Committee of Unsecured Creditors "Committee"), if one is appointed in these chapter 11 cases.

(d)    **Qualifying Bids:**  To participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder (other than the Proposed Purchaser) must submit a "Qualifying Bid" by the Bid Deadline.  The Purchase Agreement is deemed a Qualifying Bid and the Proposed

Purchaser is deemed a Qualifying Bidder. Otherwise, to constitute a Qualifying Bid, a bid must:

i.      be in writing and state that such bidder is prepared to enter into a legally binding asset purchase agreement or similar agreement for the acquisition of the CM Business on terms and conditions no less favorable to the Seller than the terms and conditions contained in the Purchase Agreement, and with a purchase price of no less than the Proposed Purchaser's purchase price plus the Break-Up Fee, the Expense Reimbursement, and $100,000;

ii.     provide details of any assumptions about the transaction that are key to the purchase price;

iii.    include a mark-up of the Purchase Agreement (a "<u>Modified Purchase Agreement</u>") reflecting the variations from the Purchase Agreement, and a clean and executed Modified Purchase Agreement;

iv.     otherwise include terms and conditions substantially the same in all respects to the Purchase Agreement (including with respect to the representations and warranties);

v.      provide that such bidder's offer is irrevocable until the closing of the purchase of the CM Business if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below);

vi.     state such bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement, and that there are no financing or due diligence contingencies for the bidder to consummate the Modified Purchase Agreement;

vii.    state such bidder is a registered investment adviser with the SEC;

viii.   provide that such bidder will close on the sale of the CM Business within the same time period provided for in the Purchase Agreement;

ix.     include such financial and other information that will allow the Seller to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement and evaluate bidder's demonstration of its experience as a fiduciary in the investment management business;

x.      include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained

prior to the bid. The bidder's bid and Modified Purchase Agreement should also highlight any governmental or third-party consents needed to consummate the acquisition of the CM Business to the extent they are not already contemplated in the Purchase Agreement;

xi. not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

xii. fully disclose the identity of each entity that will be bidding for the CM Business or otherwise participating in connection with such bid, and the complete terms of any such participation;

xiii. include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Purchase Agreement;

xiv. include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

xv. include the names of external advisors including financial, legal, and accounting firms, as well as industry consultants or other resources;

xvi. include any other information or factors that may be relevant to the Seller and its advisors in consideration of the bid; and

xvii. include a cash deposit by wire transfer equal to One Hundred Thousand Dollars ($100,000) (the "<u>Good Faith Deposit</u>").

The Seller shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Committee and the Administrative Agent, and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than one hour before the start of the Auction (as defined below);

(e) **<u>No Qualifying Bids</u>:** If no timely, conforming Qualifying Bids, other than the Purchase Agreement, are submitted by the Bid Deadline, the Seller shall not hold an Auction (as defined below) and, instead, shall request at the Sale Hearing that the Court approve the Purchase Agreement with the Proposed Purchaser.

(f) **<u>Right to Disseminate Information Relating to Bid.</u>** At any time, whether before or after the Auction, the Seller may share or not share, in its sole discretion, any bid for the CM Business with the other bidders.

(g)  **Auction:**  In the event the Seller timely receives one or more Qualifying Bids other than the Purchase Agreement, the Seller shall conduct the Auction with respect to the CM Business.  The Auction will be held at the offices of Hunton & Williams LLP, 200 Park Avenue, 53rd Floor, New York, New York, 10166-0136, on or before December 14, 2010, at 10:00 a.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualifying Bidders.   The Auction shall be governed by the following procedures (which may be amended, modified and waived, as applicable by the Seller at any time in its sole discretion after consultation with the Committee):

i.  The Proposed Purchaser and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

ii.  Only representatives of the Seller, the Proposed Purchaser, the Qualifying Bidders, counsel and other advisors selected by the Committee, the Administrative Agent and representatives from the Office of the U.S. Trustee shall be entitled to be present at the Auction;

iii.  Only the Proposed Purchaser and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

iv.  A subsequent bid by the Proposed Purchaser will not be deemed to waive its right to the Break-Up Fee or Expense Reimbursement;

v.  Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

vi.  Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction and such Bid shall be announced prior to the start of the Auction (the "Initial Highest Bid");

vii.  Qualifying Bidders may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be stated in an amount exceeding each prior bid by USD $100,000 in purchase price consideration;

viii.  The Seller may determine the order in which Qualifying Bidders shall bid at the Auction;

ix.  All Qualifying Bidders and the Proposed Purchaser shall be able to submit additional bids and make additional modifications to the Purchase Agreement or Modified Purchase Agreement, at the Auction as applicable, as determined by the Seller at any time in its sole discretion after consultation with the Committee and the Administrative Agent;

x.   The Auction may include individual negotiations with the Qualifying Bidders and the Proposed Purchaser and/or open bidding in the presence of all other Qualifying Bidders and the Proposed Purchaser;

xi.   The Seller may determine, in its sole discretion and after consulting with the Committee and the Administrative Agent, which portions of the Auction shall be transcribed on the record and which shall not be transcribed;

xii.   The Seller may, in its sole discretion and after consulting with the Committee and the Administrative Agent, discuss any Qualifying Bid with other Qualifying Bidders individually or together in any other group or groups of Qualifying Bidders, as determined by the Seller;

xiii.   The Auction shall continue until there is only one offer that the Seller determines, after consultation with the Committee and the Administrative Agent, and subject to Court approval, with respect to the CM Business, is the highest and/or best offer from among the Qualifying Bidders submitted at the Auction (the "Successful Bid"). In making this decision, the Seller may consider any factors it deems relevant, including without limitation, the amount of the purchase price, the form of consideration being offered, expense to the Seller of any obligation to pay the Break-Up Fee and Expense Reimbursement, the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof, the number, type, and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder, any contingencies relating to a Qualifying Bidder's offer, and the net benefit to the Seller's estate. The Proposed Purchaser or Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Purchase Agreement or Modified Purchase Agreement; and

xiv.   Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Seller.

(h) **Back-Up Bidder and Return of Good Faith Deposits:**

    i.    If an Auction is conducted, the Qualifying Bidder with the next highest or otherwise best Qualifying Bid, as determined by the Seller in the exercise of its business judgment at the Auction and in consultation with the Committee and the Administrative Agent, shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until 24 hours after the closing of the sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Seller will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

    ii.    Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Seller as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Seller until one (1) Business Day after the closing of the Sale transaction with the Successful Bidder for the CM Business.

## F.    Approval of the Bidding Procedures and the Auction

19.    Pursuant to Bankruptcy Rule 6004(f)(1), "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed R. Bankr P. 6004(f)(1). The Seller believes that the Sale of the CM Business pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *See In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate").

20.    The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Seller receives the best possible consideration for the CM Business. Bidding procedures should be approved when they provide a benefit to the estate by

maximizing the value of the assets and enhance competitive bidding. *See Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992) ("*Integrated Resources*") (bidding incentives are appropriate when, in the debtor's business judgment, they provide a benefit to the estate), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The Seller believes that the proposed Bidding Procedures are consistent with procedures previously approved in this district and other bankruptcy courts.

21. Although the Seller believes the value to be provided pursuant to the terms set forth in the Purchase Agreement is fair and reasonable, the Seller further believes that the Bidding Procedures and the Auction will ensure that the Seller's estate receives the most value possible by allowing the market to test the Purchase Price (as defined in the Purchase Agreement). The Seller thus requests the Court to approve the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids for the CM Business from other interested parties.

**G.    Approval of the Sale Hearing Schedule and Sale Hearing Notice**

22. Pursuant to the RFA, the Debtors are required to make their best efforts to obtain entry of an order approving the sale of the CM Business by December 31, 2010. The Senior Lenders have consented to the sale of the CM Business, subject to compliance with the RFA. Accordingly, the Seller requests that the Court schedule a Sale Hearing on or before December 22, 2010 at 10:00 a.m. (prevailing Eastern Time), but in no event later than December 29, 2010, to consider approval of the Purchase Agreement and the Sale contemplated thereby, or the approval of any higher or better offer, if any, resulting from an Auction.

23. Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with section

363(b)(2) of the Code." Fed. R. Bankr. P. 6004(a). Bankruptcy Rule 2002(a)(2) requires that Debtors give all creditors and certain other parties "at least 21 days' notice by mail" of the Sale. Fed. R. Bankr. P. 2002(a)(2). Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than seven days before the date set for the proposed action or within the time fixed by the court." Fed. R. Bankr. P. 6004(b).

24.     The Sale Hearing Notice contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding Auction procedures in the event a higher or better offer than the Purchase Agreement is received and an Auction is necessary. Therefore, the Seller requests that the Court approve the form and manner of the Sale Hearing Notice. The Seller proposes at least 21 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedure:

> The Seller shall serve, within 3 business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, copies of the Sale Hearing Notice upon: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the creditors holding the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, as identified on the Debtors' chapter 11 petitions; (d) counsel to the Proposed Purchaser; (e) any party who, in the past twelve (12) months, expressed to the Seller, in writing, an interest in acquiring the CM Business and who the Seller and its representatives reasonably and in good faith determine to potentially have the desire and financial wherewithal to effectuate the purchase; (f) counsel to the Administrative Agent; (g) all parties who are known to possess or assert a secured claim against the CM Business or any other Lien related to the CM Business; (h) the SEC; (i) the Internal Revenue Service; (j) all parties to any agreements sought to be assumed and assigned pursuant to the Purchase Agreement; (k) all parties that have filed a notice of appearance or request for service in these chapter 11 cases; and (l) counsel to Loreley Financing (Jersey) No. 22 Ltd. and Loreley Financing (Jersey) No. 28 Ltd., Stern & Kilcullen, LLC, 75 Livingston Avenue, Roseland, New Jersey 07068, Attention: Stephen M. Plotnick.

25.     The Seller submits that such notice shall constitute good and sufficient notice of the Auction and the Sale of the CM Business, and that no other or further notice is necessary.

Accordingly, the Seller requests the Court to approve the form and manner of the Sale Hearing Notice.

**H.    Approval of Procedures for Assumption and Assignment of Assigned Contracts**

26.    To facilitate the Sale and the assumption and assignment of the Assigned Contracts, the Seller will serve the Notice of Assumption and Assignment on all nondebtor parties to the Assigned Contracts according to the following procedures:

(a)    On or before the Mailing Deadline, the Seller (or its agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment upon all known nondebtor parties to the Assigned Contracts.  The Notice of Assumption and Assignment shall set forth (i) the intent of the Seller to assume the Assigned Contracts and assign them to Proposed Purchaser (or to any Successful Bidder), and (ii) applicable cure amounts (the "Cure Amounts"), if any.  The Notice of Assumption and Assignment shall identify the Assigned Contracts and the Cure Amounts that the Seller believes must be paid to cure all defaults under the Assigned Contracts.  If no amount is listed on the Notice of Assumption and Assignment, the Seller believes that there is no Cure Amount due.

(b)    Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as part of a plan, is governed by Rule 9014."  Any objections to (i) the assumption and assignment of an Assigned Contract, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assigned Contract (the "Claimed Cure Amount").

(c)    If an Assumption and/or Cure Objection is timely filed, the Seller requests that a hearing with respect to that objection shall be held before the Court at the Sale Hearing.  If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the applicable Assigned Contract will proceed without further notice at the Sale Hearing to approve the Sale of the CM Business.  The Seller also requests that parties failing to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts differing from those listed on the exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure Amount(s) listed on such contract with respect to their Assigned

Contract(s), shall be forever barred and estopped from asserting or claiming against the Seller, Proposed Purchaser, or any Successful Bidder that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assigned Contract.

(d)     If no Cure Amounts are due under the Assigned Contract, and the nondebtor party to the Assigned Contract does not otherwise object to the Seller's assumption and assignment of the Assigned Contract, no further action need be taken on the part of that nondebtor party. The Seller also requests that Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay the Seller's assumption and assignment of any Assigned Contracts. If a party objects solely to a Cure Amount, the Seller may, in its sole discretion, but in consultation with the Administrative Agent, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the Seller holds the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Seller can, without further delay, assume and assign the Assigned Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

27.     The Seller submits the aforementioned procedures provide good and sufficient notice to nondebtor parties to the Assigned Contracts and should be approved in all respects.

**I.     Approval of Objection Deadline**

28.     The Seller requests that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection") or an Assumption and/or Cure Objection (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, on or before 4:00 p.m. (prevailing Eastern Time) on December 15, 2010 (the "Objection Deadline"), or on such later date and time as the Debtors may agree; and (d) be served with a copy on: (i) counsel for the Debtors, Hunton & Williams LLP, Attention: Peter S. Partee, Sr. and Scott H. Bernstein, 200 Park Avenue, 53rd Floor, New York, New York, 10166-0136; (ii) counsel for the Proposed Purchaser, SNR Denton U.S. LLP, Attention: Louis Curcio and A. James Cotins, Two World Financial Center,

New York, New York 10281; (iii) the U.S. Trustee, Office of the United States Trustee for the Southern District of New York, Attention: Susan Golden, 33 Whitehall Street, 21st Floor, New York, New York 10004; (iv) counsel to the Administrative Agent, Davis Polk & Wardwell LLP, Attention: Damian S. Schaible, 450 Lexington Avenue, New York, New York 10017; (v) counsel to the Committee, if one has been appointed in these chapter 11 cases; and (vi) all parties that have filed a notice of appearance or have requested service in these chapter 11 cases.

## V. Basis for Requested Relief

### A. Approval of the Sale under Sections 363(b) and 105(a) of the Bankruptcy Code is Warranted.

29.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors-in-possession have "all the rights . . . of a trustee"). In addition, section 105(a) provides the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"). Although section 363(b) of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070-71 (2d Cir. 1983) ("*Lionel*") ("judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a

debtor's management decisions"). Courts have made it clear that a debtor-in-possession's showing of a sound business justification need not be duly exhaustive, but rather a trustee is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate . . . courts require the debtor to show that a sound business purpose justifies such actions"). Whether or not there is sufficient business reasons to justify the use of assets of the estates depends upon the facts and circumstances of each case. *See Lionel*, 722 F.2d at 1071.

30. Courts routinely hold that chapter 11 debtors may sell their assets pursuant to section 363(b) of the Bankruptcy Code prior to confirmation of a chapter 11 plan, provided that the debtors have sound business reasons. *See, e.g., Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it"); *Official Committee of Unsecured Creditors of LTV AeroSpace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 144 (2d Cir. 1992) (upheld the debtor's sale of its subsidiaries because the Court found a "good business reason" supporting the sale); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action").

31. The Seller submits that the proposed Sale of the CM Business in the proposed manner represents an exercise of Seller's sound business judgment and is for a valid business purpose. Both before and after the Petition Date, the Seller and the other Debtors have worked

diligently to explore alternatives to sell certain of their business assets where such sales would provide greater value to the estates, relieve the Seller of ongoing operational expenses, and mitigate any potential liability.

32.     As described in the Rickert Declaration, the Seller engaged in extensive prepetition marketing efforts. Ten (10) potential third-party bidders expressed interest in the CM Business, with nine (9) potential bidders (including the Proposed Purchaser) executing non-disclosure agreements to conduct extensive pre-bid diligence. The Seller's criteria for a potential acquirer of the CM Business included that the prospective acquirer possess a demonstrated high level of knowledge and expertise with respect to the mortgage market and CBOs and, more importantly, embrace the best practices of the investment adviser/fiduciary elements of the collateral management business as practiced by the Seller. The ten potential third-party bidders who expressed interest in the CM Business (inclusive of the nine parties who executed non-disclosure agreements) represented a cross-section of investment advisers, several of which are currently managers of other collateralized bond obligations. Three (3) formal written bids were received (including from the Proposed Purchaser), with the Proposed Purchaser's bid being the highest and best offer. Continued arm's-length negotiations with the Proposed Purchaser after receipt of its offer resulted in the execution of the Purchase Agreement.

33.     In addition, the Bidding Procedures contemplate an open auction process and are designed to ensure that the final purchase price of the CM Business is fair and reasonable, and the maximum amount possible for the CM Business. Thus, the Seller submits that the proposed Sale of the CM Business is within its sound business judgment. The Purchase Agreement was negotiated in good faith with a view towards maximizing the value of the Seller's Assets for the

estate's creditors. Nevertheless, the Purchase Agreement is subject to Bidding Procedures designed to ensure that the highest or otherwise best offer has been or will be received.

**B.**     <u>Sale of the CM Business Free and Clear of Interests is Warranted.</u>

34.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Dundee Equity Corp.*, Case No. 89-B-10233 (FGC), 1992 Bankr. LEXIS 436, at \*12 (Bankr. S.D.N.Y. Mar. 6, 1992) (a "sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) is written in disjunctive; therefore, the court may approve a sale "free and clear" provided at least one of those subsections are met).

35.     The Debtors believe one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the proposed Sale of the CM Business. The CM Business Assets are encumbered by a first priority lien in favor of the Senior Lenders under the Senior Credit Facility, and by certain subordinate liens pursuant to the Override Agreement. The Override Agreement, however, is subject to the Intercreditor Agreement which confers exclusive

authority on the Senior Lenders to enforce liens against or consent to dispositions of the CM Business, and the Senior Lenders, representing more than 80% of the outstanding debt, have consented to the Sale of the CM Business in accordance with the procedures set forth herein.

36.     Because the section 363(f) requirements have been met, Proposed Purchaser should not be liable, as a successor to the CM Business or otherwise, for any of the Seller's pre-petition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. Courts within the Second Circuit have held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See, e.g., In re GMC*, 407 B.R. 463, 505 (Bankr. S.D.N.Y. 2009) (recognizing that, in the Second Circuit, section 363(f) may appropriately be invoked to sell free and clear of successor liability claims).

**C.      Assumption and Assignment of Executory Contracts is Warranted.**

37.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts in certain circumstances, subject to court approval, provided any default under such contracts are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(a). The standard applied by the Second Circuit in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. *See Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir 1993) ("[T]he process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one"); *see also NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523 (1984) (describing the business judgment test as "traditional").

38. Section 365(f) of the Bankruptcy Code further authorizes the assignment of executory contracts notwithstanding provisions in those contracts or applicable law that prohibit, restrict or condition assignment. *See* 11 U.S.C. § 365(f)(1). The Assigned Contracts contain provisions (the "<u>Assignment Restrictions</u>") which prohibit the assignment of the Assigned Contracts without consent of certain parties and without satisfaction of certain conditions.[5] Pursuant to section 365(f), the Assigned Contracts may be assigned notwithstanding the Assignment Restrictions, unless precluded under section 365(c) of the Bankruptcy Code. *See In re Schick*, 235 B.R. 318, 322 (Bankr. S.D.N.Y. 1999) (holding that a partnership agreement could be assumed and assigned pursuant to section 365(f)(1) notwithstanding a restriction on assignment contained in the partnership agreement, unless section 365(c) precludes it).

39. Section 365(c) is not applicable to the Assigned Contracts, and therefore does not prohibit the assignment of the Assigned Contracts. Section 365(c)(1) provides an exception to the general rule permitting assignments where "applicable law" excuses a counterparty to a contract from "accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties." 11 U.S.C. §365(c)(1)(A). The type of applicable laws covered by section 365(c) are "generally applicable laws which restrict or prohibit transfer of rights or duties under contracts *independent of any restriction contained within the contract itself*." *In re Adelphia Commns. Corp.*, 359 B.R. 65, 77 (Bankr. S.D.N.Y. 2007) ("<u>*Adelphia*</u>")

---

[5]     Section 18 of the Investment Management Contracts generally provides that "[A]ny assignment of this Agreement by operation of law or otherwise to any Person, in whole or in part, by the Collateral Manager shall be deemed null and void unless such assignment is consented to in writing by the Issuer . . . and the Holder of Notes of   the Controlling Class . . . and satisfies the Rating Condition."  Section 13 of the Collateral Administration  Agreements similarly provides that the "Agreement may not be assigned by the Collateral Administrator unless such assignment is previously consented to in writing by the Issuer, subject to receipt of Rating Agency Confirmation."

(citation omitted) (emphasis in original). For example, "personal service" contracts are typically nondelegable even where a contract is silent, and therefore remain nondelegable in bankruptcy. *See id.* at 73. The exception to the general rule allowing assignment is to be narrowly construed. *See In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1012 (Bankr. E.D.N.Y. 1986) ("The law is abundantly clear that Section 365(c)(1)(A) must be narrowly construed").

40.     The Assigned Contracts are clearly not "personal services" contracts which would be rendered nondelegable under generally applicable law. A personal services contract is one entered into on the basis of the "character, reputation, taste, skill, or discretion of the party that is to render performance." *Metropolitan Airports Comm'n v. Northwest Airlines (In re Midway Airlines)*, 6 F.3d 492, 495 (7th Cir. 1993) (citation omitted); *see also In re Compass Van & Storage Corp.*, 65 B.R. at 1010 ("It is the *sui generis* attributes of a contract that place it in the context of a personal service contract which interdict its assignment and render it nondelegable"). First, the Assigned Contracts do not call for the discretion of the Seller, but require that the Seller perform in strict compliance with the terms of the Assigned Contracts. *See In re Compass Van & Storage Corp.*, 65 B.R. at 1012 (holding that agency agreement which required the debtor to perform in strict compliance with the principal's rules and regulations was not a personal services contract for purposes of section 365). Second, the Assigned Contracts do not identify any of the Seller's employees to perform any particular duties. *See In re Rooster, Inc.*, 100 B.R. 228, 234 (Bankr. E.D. Pa. 1989) (finding significant that "there were no contractual terms requiring the personal performance of any identified employee for a particular duty" in holding that sublicensing agreement was not a personal services contract for purposes of section 365).

41.     Moreover, no other generally applicable law renders the Assigned Contracts nondelegable independent of any contractual provisions.  Section 205 of the Advisers Act provides that no investment adviser shall enter into any investment advisory contract if it "fails to provide that no assignment of the contract shall be made by the investment adviser without the consent of the other party to the contract."  15 U.S.C. §80b-5(a)(2).  Although the Assigned Contracts include the Assignment Restrictions as required by the Advisers Act, these Assignment Restrictions are made part of the Assigned Contracts, and do not restrict assignment "independent of any restriction contained within the contract itself," as required under the analysis promulgated by this Court in *Adelphia*.  Moreover, in a No-Action Letter, the staff of the Securities and Exchange Commission acknowledged that the Adviser's Act does not prohibit an adviser's assignment of an investment advisory contract without client consent.  It "merely provides that the contract must contain the specified [non-assignment] provision."  *American Century Companies, Inc./J.P. Morgan & Co. Incorporated* (No-Act Letter December 23, 1997) at page 7, a true and complete copy of which is annexed hereto as **Exhibit D**.  Accordingly, the Advisers Act does not prohibit the Court from approving the assignment of the Assigned Contracts in accordance with Section 365(f) of the Bankruptcy Code.

42.     To facilitate and effect the Sale of the CM Business, the Proposed Purchaser has agreed to take assignment of and assume the Seller's obligations under the Assigned Contracts.  The Proposed Purchaser is a registered investment adviser under the Advisers Act, or will become a registered investment adviser under the Advisers Act on or prior to the closing of the proposed Sale.  The Seller has evaluated the financial wherewithal of the Proposed Purchaser and, in its sound business judgment, believes that selling the CM Business and assuming and assigning the Assigned Contracts to Proposed Purchaser is in the best interests of its estate.

Moreover, as noted above, each nondebtor party to an Assigned Contract will receive notice of the proposed assumption and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

### D.    Finding of Good Faith is Warranted.

43.    Bankruptcy Code section 363(m) provides that a purchaser of property of a debtor's estate is protected from the effects of reversal on appeal of authorization to the debtor to sell such property as long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale order.[6]  Bankruptcy Code section 363(m) "affords finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids."  *In re Chateaugay Corp.*, Case No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993) (internal quotation marks and citation omitted); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)… provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

44.    The Bankruptcy Code does not define "good faith," but courts have adopted various definitions.  A good faith purchaser is "one who buys property…for value, without knowledge of adverse claims."  *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993).  The requirement that a purchaser act in good faith speaks to the integrity of the

---

[6]    Section 363(m) of the Bankruptcy Code provides that:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

purchaser's conduct in the course of the sale proceeding. *See In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Gucci*, 126 F.3d at 390 (a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citations omitted). The Seventh Circuit, in *In re Andy Frain Serv., Inc.,* held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986).

45.     The terms of the Purchase Agreement were negotiated at arm's-length, without collusion or fraud, in good faith, and all of the terms of the Purchase Agreement have been disclosed. The Proposed Purchaser is an entity unrelated to the Debtors. The terms of the Purchase Agreement do not personally benefit any insider of the Debtors. These negotiations have involved substantial time and energy by the parties and their respective professionals, and the Purchase Agreement reflects give-and-take and compromise by both sides. Accordingly, the Seller requests that the Court determine that the Proposed Purchaser (or alternatively, the Successful Bidder in the event it is not the Proposed Purchaser, who will have then been required to participate in the Auction in accordance with the Court-approved Bidding Procedures) has acted in good faith, has bought for value and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code. *See In re United Press Int'l, Inc.*, Case No. 91-B-13955 (FGC), 1992 Bankr. LEXIS 842, at **3, 10 (Bankr. S.D.N.Y. May 18, 1992).

### E. The Purchase Agreement Does Not Dictate the Terms of a Plan of Reorganization.

46.      The Purchase Agreement does not dictate the terms of a plan of reorganization, as it does not attempt to restructure the rights of creditors and equity security holders.  The Seller recognizes that a sale of assets may not be approved where such a sale dictates the terms of a plan of reorganization, thereby denying creditors and equity security holders the procedural protections of the plan process.  In the instant case, however, there are no conditions in the Purchase Agreement that determine the contours of a plan.  The sole impact of the consummation of the transactions under the Purchase Agreement is to convert a portion of the Seller's assets to cash.  *See In re Naron & Wagnor, Charted*, 88 B.R. 85, 88 (Bankr. D. Md. 1988) ("sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure the rights of creditors").

### F. The Proposed Bid Protections are Reasonable and Appropriate.

47.      Bidding incentives, such as the Break-Up Fee and Expense Reimbursement, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers."  *In re Marrose Corp.*, Case Nos. 89-B-12171-12180 (CB), 1991 Bankr. LEXIS 2177, at **13-14 (Bankr. S.D.N.Y. Feb. 14, 1991) (stating that "these strategies may be necessary to convince a party to become the initial bidder"); *see also In re 995 Fifth Ave. Assoc. L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a 'white

knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

48.     The Seller proposes that if overbidding occurs at the Auction, the Proposed Purchaser shall have the right, but not the obligation, to participate in overbidding subject only to the limitations provided by the Bidding Procedures.  However, to compensate the Proposed Purchaser for serving as a "Stalking Horse," thereby subjecting its bid to higher or otherwise better offers, the Seller seeks authority to pay to the Proposed Purchaser the Break-Up Fee equal to $100,000, to be paid directly to the Proposed Purchaser from the proceeds of the sale of the CM Business to a Third Party Buyer as an administrative expense claim in the Seller's chapter 11 case pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

49.     The Seller submits that the Break-Up Fee (a) represents a sound exercise of its business judgment, (b) is the product of extensive arm's-length negotiations, (c) is fair and reasonable, given the benefits to the estate of having a definitive Purchase Agreement and the risk to the Proposed Purchaser that a third-party offer may ultimately be accepted, and (d) is necessary to preserve the value of the Seller's estate.

50.     The Seller further submits that approval of break-up fees and other forms of bid protections in connection with the sale of a debtor's property pursuant to section 363 of the Bankruptcy Code is an established practice in chapter 11 cases.  *See, e.g.*, *Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003) (noting that "[b]reakup fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders"); *Integrated Resources*, 147 B.R. at

659 (stating that "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets").

51.      When analyzing the appropriateness of a break-up fee and other forms of bid protection, bankruptcy courts consider whether such bid protections serve any of three possible useful functions:  (a) to attract or retain a potentially successful bid, (b) to establish a bid standard or minimum for other bidders to follow, or (c) to attract potential bidders.  *See Integrated Resources*, 147 B.R. at 662.  As part of the analysis regarding bid protections, courts consider three questions:  "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?"  *Id*. at 657.

52.      The first prong of the analysis requires the Court to examine the relationship between the Seller and the Proposed Purchaser.  The Seller's decision to provide the Proposed Purchaser with the Break-Up Fee was reached by independent and disinterested managers.  *See Integrated Resources*, 147 B.R. at 657-58.  Thus, the "business judgment rule," which proscribes judicial second guessing of the actions of a company's board of directors taken in good faith in the exercise of honest judgment, applies.  *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28. The Seller was not self-tainted when it formulated the Break-Up Fee.  The Seller and the Proposed Purchaser negotiated the amount of the Break-Up Fee at arm's-length, with the assistance of financial and legal advisors.

53.      To satisfy the second prong of the analysis, the Court must determine that the Break-Up Fee will not hamper bidding.  As mentioned above, courts have found that break-up fees and expense reimbursements are necessary to create an incentive for a "stalking horse

bidder" to spend the requisite time and money investigating a debtor's assets before entering into an agreement to purchase those assets. *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28 (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

54.     Here, the Break-Up Fee already has encouraged competitive bidding in that the Proposed Purchaser is unwilling to commit to hold open its offer to purchase the CM Business under the terms of the Purchase Agreement unless the Break-Up Fee is approved. The mere existence of the Break-Up Fee permits the Seller to insist that competing bids for the CM Business be materially higher or otherwise better than the Proposed Purchaser's initial bid, an unquestionable benefit to the Seller's estate. Moreover, the amount of the Break-Up Fee is reasonably calculated to compensate the Proposed Purchaser (a) for the time to perform due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in a competitive auction process, and (c) for serving as a "stalking horse" to encourage the submission of other bids. Such efforts by the Proposed Purchaser are substantial regardless of the base purchase price.

55.     To meet the final prong of analysis, the break-up fee should constitute a "fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Resources*, 147 B.R. at 662. Although there are no specific rules relating to how large a break-up fee can be before it is considered unreasonable, courts regularly approve break-up fees approximating 2-4% of the consideration to be paid pursuant to the underlying transaction. *See, e.g., In re Cabrini Med. Ctr.*, Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving $3,000,000 (3.75%)

break-up fee on $80,000,000 purchase price); *In re Musicland Holding Corp.*, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Mar. 3, 2006) (approving $3,124,800 (3.0%) break-up fee plus expense reimbursement on $104,160,000 purchase price); *Allegiance Telecom Inc.*, Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2004) (approving $8,000,000 (2%) break-up fee plus $5,000,000 expense reimbursement on $390,000,000 purchase price). Given the relatively small purchase price at issue in this sale, the Break-Up Fee of $100,000 (4.17%) is justified and should be approved.

56.     The Bidding Procedures, including the Break-Up Fee, have enabled the Seller to assure a Sale to a contractually committed bidder at a price the Seller believes is fair and reasonable, while providing the Seller with the opportunity to obtain even greater benefits for its estate through an auction process. Thus, approval of the Break-Up Fee may lead to further compensation and the establishment of a baseline against which higher or otherwise better offers will be measured. If an auction ensues, the Break-Up Fee is reasonably calculated to encourage higher or otherwise better bids. If no auction ensues, the Break-Up Fee is still appropriate in that it has encouraged the Proposed Purchaser to act as a Stalking Horse Bidder and to guarantee a minimum amount within the range of reasonably anticipated values for the CM Business. The Bidding Procedures, including the Break-Up Fee, satisfy all three prongs of the standard set forth in *Integrated Resources* and should be approved.

## VI.    Relief From Fourteen-Day Waiting Periods is Warranted

57.     The Seller requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) and order that, if and when entered, the Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

58.    The purpose of these Rules is to provide sufficient time for an objecting party to appeal before an order is effective.  *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d).  Although these Rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the fourteen-day stay period, *Collier on Bankruptcy* suggests the fourteen-day stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure."  10 *Collier on Bankruptcy* ¶ 6004.10 (15th Ed. Rev. 2008).  Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

## VII.    <u>Notice</u>

59.    Notice of this Motion has been provided to (a) the U.S. Trustee; (b) counsel to the Administrative Agent; (c) counsel to the Proposed Purchaser; (d) the creditors holding the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, as identified on the Debtors' chapter 11 petitions[7]; (e) all parties who are known to possess or assert a secured claim against the CM Business or any other Lien related to the CM Business; (f) all parties to any agreements sought to be assumed and assigned pursuant to the Purchase Agreement; (g) all parties that have filed a notice of appearance or have requested service in these chapter 11 cases; and (h) counsel to Loreley Financing (Jersey) No. 22 Ltd. and Loreley Financing (Jersey) No. 28

---

[7]    If a Creditors Committee is appointed in these chapter 11 cases, counsel to the Creditors Committee will be served with notice of this Motion.

Ltd., Stern & Kilcullen, LLC, 75 Livingston Avenue, Roseland, New Jersey 07068, Attention: Stephen M. Plotnick.  The Debtors submit that no other or further notice need be provided.

## VIII.   No Previous Request

60.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Seller respectfully requests (a) entry of the proposed Bidding Procedures Order; (b) at the completion of the Sale Hearing, entry of the Sale Order approving the Sale of the CM Business to the Proposed Purchaser, or, in the event of a higher or better offer received at an Auction, the Successful Bidder; and (c) such other and further relief as the Court may deem just and appropriate.

Dated:  New York, New York          Respectfully submitted,
        November 12, 2010

                                    */s/ Peter S. Partee, Sr.*
                                    Peter S. Partee, Sr.
                                    Jack A. Molenkamp
                                    Andrew Kamensky (to be admitted *pro hac vice*)
                                    Scott H. Bernstein
                                    HUNTON & WILLIAMS LLP
                                    200 Park Avenue, 53rd Floor
                                    New York, New York 10166-0136
                                    (212) 309-1000

                                    *Proposed Attorneys for Debtors
                                     and Debtors-in-Possession*