Peter S. Partee, Sr.
Jack A. Molenkamp
Andrew Kamensky (to be admitted *pro hac vice*)
Scott H. Bernstein
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

*Proposed Attorneys for Debtors*
 *and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, <u>et al.</u>, | Case No. 10-16040 (ALG) |
| Debtors.[1] | Joint Administration Requested |

## <u>NOTICE OF FILING OF RESTRUCTURING FACILITATION AGREEMENT</u>

**PLEASE TAKE NOTICE** that annexed hereto as <u>**Exhibit 1**</u> is true and complete copy

of the *Restructuring Facilitation Agreement*, dated September 20, 2010.

Dated:   New York, New York
     November 15, 2010

                    **HUNTON & WILLIAMS LLP**

                    /s/ *Scott H. Bernstein*
                    Peter S. Partee, Sr.
                    Jack A. Molenkamp
                    Andrew Kamensky (to be admitted *pro hac vice*)
                    Scott H. Bernstein
                    200 Park Avenue, 53rd Floor
                    New York, New York 10166-0136
                    (212) 309-1000

                    *Proposed Attorneys for the Debtors*
                     *and Debtors-in-Possession*

---

[1]   The other Debtors are C-BASS CBO Holding LLC, C-BASS Credit Corp., C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC, and Sunfish Management Group LLC.

# EXHIBIT 1

# RESTRUCTURING FACILITATION AGREEMENT

## RESTRUCTURING FACILITATION AGREEMENT

This Restructuring Facilitation Agreement dated as of September 20, 2010 (this "**Agreement**") is hereby entered into among Credit-Based Asset Servicing and Securitization LLC ("**C-BASS**"), the undersigned C-BASS subsidiaries (together with C-BASS, the "**C-BASS Entities**"), JPMorgan Chase Bank, N.A., as administrative agent under the Senior Credit Facility (as defined below) (in such capacity, the "**Administrative Agent**"), and the lenders under the Senior Credit Facility signatory hereto (collectively, the "**Participant Lenders**").

This Agreement refers to (i) the Fifth Amended and Restated Credit Agreement dated as of June 25, 2007 among C-BASS, certain subsidiaries of C-BASS named therein, the lenders party thereto from time to time (collectively, the "**Senior Lenders**") and the Administrative Agent (as such agreement has been and may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Senior Credit Agreement**" and, together with all security and other ancillary documents entered into in connection therewith, the "**Senior Credit Facility**"), (ii) the Seventh Amended and Restated Security and Custodial Agreement dated as of December 19, 2007 among C-BASS and certain of its subsidiaries, the Administrative Agent and the other parties thereto (as such agreement has been and may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security and Custodial Agreement**"), (iii) the Override Agreement dated as of November 13, 2007 among C-BASS and certain of its subsidiaries, the Administrative Agent and the other parties thereto (as such agreement has been amended, amended and restated, supplemented or otherwise modified from time to time, the "**Override Agreement**") and (iv) the Sixth Forbearance and Standstill Agreement dated as of January 15, 2010 among C-BASS and certain of its subsidiaries, the Administrative Agent and the Senior Lenders party thereto (as such agreement has been and is hereby amended, amended and restated, supplemented or otherwise modified from time to time, the "**Forbearance Agreement**").

## <u>RECITALS</u>

A.    The C-BASS Entities are obligors under the Senior Credit Facility.

B.    Various defaults and events of default exist as of the date hereof under the terms of the Senior Credit Facility, including, without limitation, events of default on account of the C-BASS Entities' failure to make certain payments to the Senior Lenders under the Senior Credit Facility and/or on account of cross-default provisions (collectively, the "**Events of Default**").

C.    The Maturity Date (as defined in the Senior Credit Agreement) has occurred, and therefore the principal balance of outstanding loans and interest accrued but unpaid thereon and all other amounts payable by the C-BASS Entities under the Senior Credit Facility are due and payable in accordance with Paragraphs 10(l) and 16 of the Senior Credit Agreement.

D.    In connection with, and subject to the terms of, that certain Second Forbearance and Standstill Agreement dated as of August 7, 2007 (as amended by Amendment No. 1 to the Second Forbearance and Standstill Agreement dated as of August 20, 2007), that certain Third

Forbearance and Standstill Agreement dated as of August 25, 2007 and that certain Fourth Forbearance and Standstill Agreement dated as of September 13, 2007, and in exchange for certain agreements set forth therein, the C-BASS Entities granted to the Administrative Agent for the benefit of the Senior Lenders certain additional collateral (the "**Tranche F New Collateral**").

E.       In connection with, and subject to the terms of, the Override Agreement, and in exchange for certain agreements set forth therein, the C-BASS Entities granted to the Administrative Agent for the benefit of the Senior Lenders a first lien on all unencumbered assets of the C-BASS Entities, including those listed on Schedule E of the Override Agreement (the "**Override Agreement New First Lien Collateral**" and together with the Tranche F New Collateral and the existing collateral under the Senior Credit Facility, the "**Senior Credit Facility First Lien Collateral**") and a junior lien on (i) all of the C-BASS Entities' rights in, under and to all master repurchase agreements or similar agreements (including the Secured CDS (as defined in the Override Agreement) held by any counterparty to the Override Agreement) and (ii) all amounts on deposit in the Repurchase Agreement Cash Accounts (as defined in the Override Agreement).

F.       The C-BASS Entities and the Senior Lenders, among others, are party to the Override Agreement, pursuant to which, among other things, the Senior Lenders agreed to forbear from taking certain actions or exercising certain rights under the Senior Credit Facility during the period from November 13, 2007 to January 15, 2010 at 11:59 p.m. (prevailing Eastern Time) (the "**Override Period**").

G.       In the Forbearance Agreement, the Senior Lenders agreed to forbear from exercising any and all rights and remedies under the Senior Credit Facility or applicable non-bankruptcy law relating to any or all of the Events of Default for a period of time as set forth in the Forbearance Agreement and on the terms and conditions set forth therein. In the Forbearance Agreement, the C-BASS Entities and the Participant Lenders acknowledged and agreed that (i) the Override Period expired with respect to the Senior Lenders, and a Senior Credit Facility Termination Event (as defined in the Override Agreement) was deemed to have occurred and is continuing and (ii) the Override Period had not expired with respect to certain Active Counterparties, including, without limitation, the Junior Creditors (as such terms are defined in the Override Agreement) and that the C-BASS Entities continue to owe certain obligations, as set forth in the Override Agreement, to such Active Counterparties.

H.       The C-BASS Entities and the Participant Lenders have agreed that the Senior Lenders may consensually foreclose on certain Senior Credit Facility First Lien Collateral and take certain other actions on the terms and conditions set forth herein.

I.       Paragraph 17 of the Senior Credit Agreement authorizes the Administrative Agent, as agent for the Senior Lenders, to take actions on behalf of the Senior Lenders and to exercise all powers and duties set forth in the Security and Custodial Agreement.

J.       The Participant Lenders hold at least 51% in principal amount of the outstanding loans under the Senior Credit Facility, and are therefore required lenders under the Security and Custodial Agreement (the "**Required Lenders**").

2

K.     Because the Events of Default have occurred and are continuing, neither the giving of any direction by the Participant Lenders nor any other action authorized by this Agreement is prohibited by or in any way violates the Senior Credit Facility.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the promises, mutual covenants, releases and agreements herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     *Extension of the Forbearance Period and Amendments to the Forbearance Agreement.*

(a)     The reference to "October 15, 2010" in Paragraph 1 of the Forbearance Agreement shall be replaced with "November 15, 2010."

(b)     Through 11:59 p.m. (prevailing Eastern Time) on November 15, 2010, each of the Participant Lenders shall and hereby agrees to forbear from exercising any of its rights or remedies under the Senior Credit Facility, the Senior Hedge Claims (as defined in the Override Agreement) or applicable non-bankruptcy law in respect of the Events of Default and any and all other defaults under the Senior Credit Facility or the Senior Hedge Claims subject to the terms and conditions in the Forbearance Agreement, as modified by the terms and conditions set forth in this Agreement.

(c)     On October 7, 2010, the C-BASS Entities shall transfer from the Senior Credit Facility Cash Account (as defined in the Forbearance Agreement) to the Operating Account (as defined in the Override Agreement) $1,134,400 minus the balance of the Operating Account at the opening of business on such date (net of any outstanding checks to the extent such checks are on account of expenditures incurred in accordance with the Agreed Budget (as defined in the Forbearance Agreement) through the month of September 2010), so long as the amount of cash in the Operating Account on October 7, 2010 (before giving effect to the transfer referenced in this clause (c)) is less than or equal to $1,134,400. If the amount of cash in the Operating Account on October 7, 2010 is greater than $1,134,400, such difference shall be the "**Operating Account Surplus.**"

(d)     On October 16, 2010, the C-BASS Entities shall transfer from the Senior Credit Facility Cash Account to the Operating Account $4,048,600 minus any Operating Account Surplus. Any amounts remaining in the Senior Credit Facility Cash Account after such transfer shall be immediately paid to the Administrative Agent to be applied pursuant to the waterfall set forth in Paragraph 3 of the Forbearance Agreement beginning with clause *Third.*

(e)     As of the effective date of this Agreement, clause *Second* of the waterfall set forth in Paragraph 3 of the Forbearance Agreement shall be deemed deleted in its entirety and replaced with the following:

*Second*, (i) until October 6, 2010, to the cash collateral account (account no. 765904594) that was maintained under the Override

3

Agreement to hold such amounts (the "**Senior Credit Facility Cash Account**") until the balance of the Senior Credit Facility Cash Account is equal to $5,183,000 and (ii) solely from October 7, 2010 until October 15, 2010, to the Senior Credit Facility Cash Account until the balance of the Senior Credit Facility Cash Account is equal to $4,048,600 minus the Operating Account Surplus (as defined in the Restructuring Facilitation Agreement dated as of September 20, 2010 among C-BASS, the C-BASS subsidiaries signatory thereto, JPMorgan Chase Bank, N.A., as administrative agent and the lenders signatory thereto). After October 15, 2010, this clause *Second* shall be ignored for all purposes, and no additional amounts shall be deposited into the Senior Credit Facility Cash Account.

(f)     Paragraph 15 of the Forbearance Agreement shall be deemed deleted and shall be of no further force or effect.

(g)     After October 15, 2010, any provision in the Forbearance Agreement requiring the C-BASS Entities to make expenditures in accordance with the Agreed Budget (as defined in the Forbearance Agreement), including Paragraphs 8(b) and 9(a) of the Forbearance Agreement, shall be of no further force and effect.

2.     *Chapter 11 Proceedings.*

(a)     *Adequate Protection Stipulation.*  Subject to the terms and conditions of this Agreement including section 9 hereof, the Administrative Agent is hereby authorized and directed to enter into a stipulation (an "**Adequate Protection Stipulation**") with the C-BASS Entities (i) pursuant to which the C-BASS Entities may use cash that is collateral under the Senior Credit Facility in an amount not to exceed in the aggregate $8,200,000 (the "**Cash Collateral**"), during the time period beginning on October 16, 2010 through the duration of any cases filed by the C-BASS Entities under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**" and such a case, a "**Bankruptcy Case**"), (ii) that is fully consistent with the terms set forth on Exhibit A hereto and (iii) that contains such other terms and conditions as the Administrative Agent, the Oversight Committee (as defined in the Forbearance Agreement and which shall act through the consent of a majority in number of its members, which members shall include, for the avoidance of doubt, the Administrative Agent, the "**Majority OC Members**") and the C-BASS Entities may agree; *provided* that the Adequate Protection Stipulation shall terminate automatically upon the occurrence of a Termination Event (as defined below); *provided, further,* that C-BASS shall provide written reports, in form and substance substantially the same as those provided under the Forbearance Agreement, to the Oversight Committee no less frequently than the first day of each month for the duration of the Bankruptcy Cases detailing the amount of the Cash Collateral used by each of the C-BASS Entities over the previous monthly period and the uses therefor. Each Participant Lender agrees neither to object to, nor to support any objection to, any motion to approve the Adequate Protection Stipulation, including, but not limited to, on the grounds that it fails to provide adequate protection to such Participant Lender under section 361 of the Bankruptcy Code.

4

(b)     *Chapter 11 Plan.*  Upon the commencement of any of the Bankruptcy Cases, the C-BASS Entities agree promptly to file and diligently to pursue the confirmation of a plan of liquidation for the C-BASS Entities that (i) is proposed by the C-BASS Entities, (ii) acceptable to the Administrative Agent and the Majority OC Members in their reasonable discretion, (iii) provides for customary releases, exculpations and injunctions for, *inter alia,* all officers and directors of the C-BASS Entities who hold those positions at any time during the Bankruptcy Cases from the C-BASS Entities' estates, all creditors that do not exercise the election to "opt-out" of such release (such creditors, the "**Releasing Creditors**") and the Senior Lenders, (iv) provides for customary releases, exculpations and injunctions for the Administrative Agent and the Senior Lenders that are acceptable to the Administrative Agent and the Majority OC Members in their reasonable discretion and in their respective capacities, from the C-BASS Entities' estates and the Releasing Creditors and (v) provides for an aggregate distribution to general unsecured creditors that are Releasing Creditors in an amount to be decided by the C-BASS Entities in their sole discretion that, together with all other Cash Collateral used by the C-BASS Entities on and after October 16, 2010, shall not exceed $8,200,000 in the aggregate (the "**Aggregate Cap**") *plus* amounts realized from the Look-Back Rights (as defined below) and any avoidance actions (against parties other than the Administrative Agent and any Senior Lender in any capacity) and provides for no distribution to general unsecured creditors that are not Releasing Creditors (any such plan, a "**Supportable Plan**").

(c)     *Plan Support Obligations.*  Subject to the terms and conditions of this Agreement including section 9 hereof, each Participant Lender hereby agrees, solely in its capacity as a Senior Lender and with respect to a Supportable Plan, (i) to vote in favor of and not to object to such Supportable Plan (*provided* that such Participant Lender is properly solicited) and not to vote in favor of or otherwise support any plan other than a Supportable Plan, (ii) to waive its right to participate in distributions to Releasing Creditors on account of its claims under the Senior Credit Facility up to the amounts set forth in clause (v) of section (b) hereof and (iii) to release, and, each Participant Lender hereby authorizes and directs the Administrative Agent to release, upon the effective date of such Supportable Plan all pre-petition and post-petition liens under the Senior Credit Facility on (1) all avoidance actions under chapter 5 of the Bankruptcy Code against any party other than the Administrative Agent or any Senior Lender in any capacity, (2) all payments on or proceeds received by the C-BASS Entities for the assignment of their rights under the agreements associated with the entities listed on Schedule 1 hereto (collectively, the "**CBO Management Rights**") and the Class E Securities (as defined below), (3) all payments on and proceeds received by the C-BASS Entities on account of Starfish Mortgage Fund, Ltd. and Sunfish Mortgage Fund, Ltd. (together, the "**Fish Funds**"), (4) the Class E Securities resulting from C-BASS CBO XIV and C-BASS CBO XVII (collectively, the "**Class E Securities**"), (5) all payments on and proceeds received by the C-BASS Entities on account of the sale of any miscellaneous intellectual property and furniture, fixtures and equipment set forth on Schedule 2 hereof (the "**Miscellaneous Personalty**"), (6) the C-BASS Entities' interests in receivables for any unused portion of retainers held by Protiviti and Hunton & Williams LLP and (7) all cash on hand in the Operating Account (as defined in the Override Agreement) on the Petition Date; *provided* that such release shall only apply to payments and proceeds up to the Aggregate Cap; *provided further* that any proceeds or payments received by any of the C-BASS Entities in excess of the Aggregate Cap shall be indefeasibly remitted to the Administrative

Agent within three business days of the receipt thereof (the obligations of the Participant Lenders set forth in this section 2(c) collectively, the "**Plan Support Obligations**").

(d) *Sale Consents*. (i) Subject to the terms and conditions of this Agreement, including section 9 hereof, the Administrative Agent is hereby authorized and directed to consent, and hereby consents, to the C-BASS Entities' sale during the Bankruptcy Cases, free and clear of the Senior Lenders' liens and security interests, pursuant to section 363 of the Bankruptcy Code of (A) the CBO Management Rights, (B) the Class E Securities, (C) the Fish Funds and (D) the Miscellaneous Personalty; *provided* that (x) all such sales shall be on an arms-length basis after a full and reasonable auction process for fair market value, which auction process shall be acceptable to the Administrative Agent in its reasonable discretion, (y) the Senior Lenders' liens and security interests with respect to such collateral shall attach to the proceeds of such collateral to the same extent and with the same validity and priority and (z) the Administrative Agent is authorized to credit bid on behalf of the Senior Lenders for such assets.

3. *Timeline*. The Participant Lenders and the C-BASS Entities hereby agree to use their respective best efforts to comply with the following timeline:

(a) provide drafts of the chapter 11 petitions, a Supportable Plan, a disclosure statement, a motion to approve a claims bar date, other customary first-day motions, the schedules of assets and liabilities, schedules of executory contract counterparties and a statement of financial affairs to the Administrative Agent by October 4, 2010;

(b) negotiate and finalize a "stalking horse" purchase agreement for sale of CBO Management Rights by November 5, 2010;

(c) send draft first day papers to the U.S. trustee for review in advance of the filing of the bankruptcy cases by November 5, 2010;

(d) file the chapter 11 petitions, liquidating plan, disclosure statement, bar date motion, first-day motions, schedules of assets and liabilities, schedules of executory contract counterparties and statement of financial affairs with the Bankruptcy Court in the Southern District of New York (the "**Bankruptcy Court**") by November 8, 2010 in each case in form and substance acceptable to the Administrative Agent in its reasonable discretion;

(e) schedule and hold a First Day Hearing on or about November 9, 2010;

(f) obtain entry of an order approving bidding and auction procedures for sale of the CBO Management Rights by November 22, 2010;

(g) obtain entry of an order approving the Adequate Protection Stipulation on a final basis (the "**Adequate Protection Order**") from the Bankruptcy Court by November 29, 2010;

(h) obtain entry of an order from the Bankruptcy Court authorizing the abandonment of real estate investment trust shares and related owner trust certificates and effectuate abandonment thereof by December 13, 2010;

6

(i)    obtain entry of an order from the Bankruptcy Court approving sale of the CBO Management Rights and the Class E Securities (if desired by the purchaser of the CBO Management Rights) by December 31, 2010;

(j)    conduct a Disclosure Statement hearing by December 31, 2010;

(k)    obtain entry of an order from the Bankruptcy Court scheduling the voting deadline and deadline to object to a Supportable Plan for February 8, 2011;

(l)    conduct a hearing for confirmation of a Supportable Plan by February 15, 2011; and

(m)    Supportable Plan to become effective pursuant to its terms by February 28, 2011.

4.    *Consensual Foreclosure.*  Notwithstanding any provision of the Forbearance Agreement to the contrary, the C-BASS Entities hereby agree to allow, authorize and cooperate, and, pursuant to Paragraph 17 of the Senior Credit Agreement, Paragraph 19 of the Security and Custodial Agreement and applicable law, the Participant Lenders hereby direct, the Administrative Agent, in its sole discretion but in consultation with the Oversight Committee, to exercise any and all rights and remedies under the Senior Credit Facility, Security and Custodial Agreement or applicable law with respect to any of the assets listed on Schedule 3 hereto and any other Senior Credit Facility First Lien Collateral as may be agreed among the Administrative Agent, the Majority OC Members and the applicable C-BASS Entities (collectively, the "**Auction Assets**") on substantially such terms and in substantially such manner as set forth in Exhibit B attached hereto (the "**Sale Procedures**") or on such other terms and/or in such other manner as may be agreed among the Administrative Agent, the Majority OC Members and the applicable C-BASS Entities.

5.    *Look-Back Rights.*  Subject to the terms and conditions set forth in this Agreement, including section 9 hereof, each Participant Lender hereby agrees that, to the extent that during the period from the date hereof to the third anniversary of the date hereof such Participant Lender receives, in the aggregate, payments or proceeds in respect of (i) any amounts owing to the Senior Lenders under the Senior Credit Facility or (ii) the Auction Assets in an amount in excess of the principal amount outstanding under the Senior Credit Facility as of the date hereof, such Participant Lender shall indefeasibly release and remit, or shall cause to be indefeasibly released and remitted, 50% of such excess payments or proceeds to C-BASS (or to any liquidating trust established under a Supportable Plan) for distribution to the C-BASS Entities' creditors whose claims were allowed during the chapter 11 process (the "**Look-Back Rights**").

6.    *Credit Bidding.*  Pursuant to Paragraph 17 of the Senior Credit Agreement, Paragraph 19 of the Security and Custodial Agreement and applicable law, the Participant Lenders hereby authorize and direct the Administrative Agent, without limiting any and all other rights and remedies under the Senior Credit Facility, Security and Custodial Agreement and applicable law available to the Administrative Agent and the Senior Lenders, to:

7

(a)     set reserve prices, determined by the Administrative Agent and the Majority OC Members in their sole discretion but after consultation with the C-BASS Entities, for the Auction Assets and any other Senior Credit Facility First Lien Collateral;

(b)     submit on behalf of all Senior Lenders a credit bid under the Senior Credit Facility up to, but not in excess of, the reserve prices for each Auction Asset for which the Administrative Agent and the Majority OC Members, in their sole discretion, decide to submit such a credit bid (each such bid, a "**Foreclosure Credit Bid**") and take any and all other actions necessary or desirable, in the sole discretion of the Administrative Agent, to otherwise effect the Foreclosure Credit Bids in accordance with the Sale Procedures or on such other terms and/or in such other manner as may be agreed among the Administrative Agent, the Majority OC Members and the applicable C-BASS Entities;

(c)     credit bid at prices determined by the Administrative Agent and the Majority OC Members in their sole discretion but after consultation with the C-BASS Entities for any Senior Credit Facility First Lien Collateral proposed to be sold in the Bankruptcy Cases pursuant to section 363 of the Bankruptcy Code, (each such bid, a "**Section 363 Credit Bid**");

(d)     tender the appropriate dollar amount of claims under the Senior Credit Facility in exchange for the right to receive such Auction Assets, which right shall be contributed to NewCo (as defined below) if the Administrative Agent's Foreclosure Credit Bid or Section 363 Credit Bid is the highest bid for any Auction Assets;

(e)     irrevocably waive the right to credit bid on each Auction Asset as to which the Administrative Agent and the Majority OC Members decide not to establish a reserve price; and

(f)     take any and all other actions necessary and/or appropriate, in the Administrative Agent's sole discretion, to effectuate and further the auction referenced in section 4 hereof and/or the realization of value on account of the Auction Assets.

7.     *Authorization to Form LLC.* (a) The Participant Lenders hereby authorize and direct the Administrative Agent to form CB Senior Lender, LLC ("**NewCo**"), a Delaware limited liability company, pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18- 101, *et seq.*), owned initially by the Senior Lenders in proportion to each Senior Lender's pro rata share of the principal amount of debt outstanding under the Senior Credit Facility on the date of formation, in order to effectuate certain of the transactions contemplated in this Agreement and to take or cause to be taken any other actions necessary or desirable, as determined by the Governance Committee (as defined below), to hold, maintain, service, transfer, sell and/or operate any assets transferred or assigned thereto in connection with a Foreclosure Credit Bid or Section 363 Credit Bid or otherwise, including to:

(i)     cause an initial contribution to be contributed to NewCo on behalf of the Senior Lenders in an amount to be determined by the Administrative Agent and the Majority OC Members, in their sole discretion, from the amounts held back by the Administrative Agent pursuant to clause *Third* of Paragraph 3 of the Forbearance Agreement (the "**Holdback**");

8

(ii)    cause a limited liability company agreement, in a form acceptable to the Administrative Agent and the Majority OC Members, in their sole discretion, to be filed with the applicable governmental agencies (the "**LLC Agreement**") and take such other steps as may be necessary or desirable to maintain the existence of NewCo, including establishing a governance committee comprised of certain Senior Lenders that (A) each hold more than 8% of the principal amount of debt outstanding under the Senior Credit Facility and (B) deliver to the Administrative Agent a notice indicating such Senior Lender's willingness to serve on such governance committee, which will make governance decisions for NewCo and will require a majority in number of members to vote for certain such decisions (the "**Governance Committee**");

(iii)    execute, in consultation with the Oversight Committee, an agreement pursuant to which Auction Assets to be purchased on behalf of the Senior Lenders through a Foreclosure Credit Bid or a Section 363 Credit Bid will be contributed to NewCo; and

(iv)    participate in the dissolution of NewCo if prior to 30 days after the effective date of a Supportable Plan no assets have been purchased or otherwise received and held in NewCo on behalf of the Senior Lenders.

(b)    To the extent that NewCo will actually take title to any assets, the Participant Lenders hereby authorize and direct the Governance Committee of NewCo to:

(i)    if and when desirable, as determined by the Governance Committee in its sole discretion, select and appoint a third party to serve as independent servicer of NewCo (the "**Independent Servicer**") and cause NewCo to enter into a servicing agreement with such Independent Servicer and delegate any action that the Governance Committee may take to such Independent Servicer;

(ii)    pay and discharge (whether from the Holdback or from distributions from NewCo) all taxes, fees and other reasonable, documented expenses that the Administrative Agent and/or the Governance Committee incurs in connection with the formation or operation of NewCo, and reimburse all professionals for all other reasonable, documented fees or expenditures made by them in such connection therewith;

(iii)    cause NewCo to make distributions to the Senior Lenders in accordance with the terms of the LLC Agreement;

(iv)    cause any additional capital contributions to be contributed from the Holdback to NewCo that the Governance Committee determines is necessary or desirable; and

(v)    cause NewCo to take such other actions as the Governance Committee determines is advisable to hold, maintain, service, transfer, sell and/or operate any assets held by NewCo.

9

8. *Indemnification of Administrative Agent.* The Participant Lenders hereby confirm and agree on behalf of the Senior Lenders as a whole that Paragraph 17 of the Senior Credit Agreement (including the indemnity contained in Paragraph 17(g)(4) of the Senior Credit Agreement (the "**Continuing Indemnity**")) shall apply to this Agreement and any further directions made to the Administrative Agent by the Required Lenders, and all actions taken or not taken by the Administrative Agent or any Related Party (as defined in the Senior Credit Agreement) in accordance herewith or therewith. It is further acknowledged and agreed that, for the avoidance of doubt, no action taken in good faith by the Administrative Agent or any Related Parties (each, an "**Indemnified Party**") in accordance with this Agreement shall be deemed to constitute "gross negligence" or "willful misconduct" as such terms are used in the Continuing Indemnity.

In addition to the Continuing Indemnity, the Participant Lenders hereby agree to cause NewCo to indemnify and hold harmless the Indemnified Parties on demand from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, which may be imposed on, incurred by or asserted against any Indemnified Party or any of them in any way to the extent relating to or arising out of any actions contemplated by or taken under this Agreement (collectively, the "**Covered Claims**"); *provided* that this indemnity shall not apply to any claim (and any such claim shall not be a Covered Claim) resulting from such Indemnified Party's gross negligence or willful misconduct (it being acknowledged and agreed that, for the avoidance of doubt, no action taken in good faith by the Indemnified Parties in accordance with this Agreement shall be deemed to constitute "gross negligence" or "willful misconduct" as such terms are used in this paragraph).

9. *Termination Events.* (a) Any of the following shall constitute a termination event with respect to this Agreement and, except for Section 9(a)(i), the Adequate Protection Stipulation (each, a "**Termination Event**"):

    (i)    the termination of the Forbearance Agreement in accordance with its terms prior to the expiration of the Forbearance Period (as defined in the Forbearance Agreement);

    (ii)    any of the Administrative Agent or the Senior Lenders is at any time the subject of any litigation, objections or similar action brought by or on behalf of any C-BASS Entity or any of their bankruptcy estates, whether by any C-BASS Entity, any committee that is appointed or designated in the Bankruptcy Cases or any other party with standing to do so (*provided* that any party that files a motion seeking such standing shall be deemed to have commenced such litigation, objections or similar action at the time such standing motion is filed);

    (iii)    the filing of any Bankruptcy Case prior to the completion and settlement of the sale of Auction Assets as set forth in section 4 hereof;

    (iv)    the filing of any Bankruptcy Case prior to the completion and settlement of the sale of substantially all Whole Loans (as defined in the Forbearance Agreement)

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

and real estate owned property that is Senior Credit Facility First Lien Collateral in accordance with the Forbearance Agreement;

(v)    appointment of an interim or permanent trustee or an examiner with expanded powers relating to the operations of or overseeing the Bankruptcy Cases;

(vi)    dismissal of any Bankruptcy Case or conversion of any Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code;

(vii)    the failure by any C-BASS Entity to comply with its obligations under this Agreement;

(viii)    any C-BASS Entity pays, or makes or supports a motion to pay, directors, officers or employees of any C-BASS Entities salary or bonus amounts that, in the aggregate among all C-BASS Entities, exceeds $2,061,000, exclusive of amounts reimbursed by third parties not affiliated with any C-BASS Entity;

(ix)    (1) the failure for whatever reason of the Bankruptcy Court to approve and give effect to the Adequate Protection Stipulation pursuant to an order in form and substance acceptable to the Administrative Agent and the Majority OC Members and the C-BASS Entities each in their reasonable discretion, on or before the date that is 20 calendar days after C-BASS files its Bankruptcy Cases, (2) the reversal, or vacatur, or amendment, or supplement or other modification without the prior consent of the Administrative Agent and the Majority OC Members of such order or (iii) the failure of C-BASS to comply in any material respect with the Adequate Protection Stipulation;

(x)    any C-BASS Entity proposing, supporting and/or filing with the Bankruptcy Court a plan of reorganization or liquidation that (1) is not a Supportable Plan or (2) is in any way inconsistent with the terms and conditions of this Agreement;

(xi)    failure to consummate a Supportable Plan by the date that is 150 days after the petition date of the Bankruptcy Cases; or

(xii)    the occurrence and continuation of any "Events of Default" under Paragraph 16(h) or (j) of the Senior Credit Agreement.

(b)    Any and all obligations of the Administrative Agent or the Participant Lenders for the benefit of any C-BASS Entities, including, but not limited to, those set forth in sections 2 and 5 hereof (but not any obligations, authorizations or directions by the Participant Lenders to the Administrative Agent), shall terminate automatically and such obligations shall be of no further force and effect upon the occurrence of any of the Termination Events listed in clauses (i), (iii), (iv), (v), (vi) and (xi) of section 9(a) hereof.

(c)    Any and all obligations of the Administrative Agent or the Participant Lenders for the benefit of any C-BASS Entities, including, but not limited to, those set forth in sections 2 and 5 hereof (but not any obligations, authorizations or directions by the Participant Lenders to the

Administrative Agent), shall terminate automatically five days after the occurrence of any of the Termination Events listed in clauses (ii), (vii), (viii), (ix), (x) and (xii) of section 9(a) hereof and such obligations shall be of no further force and effect; *provided*, that if the Adequate Protection Stipulation has been approved by the Bankruptcy Court, is then in full force and effect and amended authorizes the sending of such notice, such obligations shall not terminate until five days after notice of such occurrence has been provided by the Administrative Agent to the C-BASS Entities.

10. *Involuntary Bankruptcy.* Notwithstanding any provision of this Agreement to the contrary, the commencement of any involuntary bankruptcy case against one or more of the C-BASS Entities under section 303 of the Bankruptcy Code by a creditor or creditors without the support, assistance or encouragement of any of the C-BASS Entities or any of their respective officers, directors or managers (an "**Involuntary Case**") shall not in itself constitute a Termination Event under this Agreement so long as (a) the sales of the Auction Assets referenced in section 4 hereof and the sale of all Whole Loans (as defined in the Forbearance Agreement) and real estate owned property that is Senior Credit Facility First Lien Collateral (in accordance with the Forbearance Agreement) have been concluded and have settled and (b) within thirty (30) calendar days after its commencement, such Involuntary Case is either (x) dismissed or (y) converted to a voluntary case under Chapter 11 of the Bankruptcy Code.

11. *Representations and Warranties of the C-BASS Entities.* Each C-BASS Entity represents and warrants as follows:

(a) *Scope of Agreement.* Each of the C-BASS Entities understands that no provision hereof shall, directly or indirectly, be construed or deemed to create any obligation on the part of, or to require, any Senior Lender to expand or extend any of the terms hereof.

(b) *Organization.* Each C-BASS Entity is a corporation, limited liability company or partnership duly organized, validly existing and in good standing under the laws of its state of incorporation or formation, and is duly qualified as a foreign entity authorized to do business and is in good standing in each other jurisdiction where the failure to do so would materially impair its ability to conduct its business as presently constituted.

(c) *ERISA.* As of the Effective Date, each of the C-BASS Entities is in compliance in all material respects with the requirements of the Employee Retirement Income Security Act of 1974, as the same may from time to time be supplemented or amended ("**ERISA**"), and no reportable event (as defined in Title IV of ERISA, except actions of general applicability by the Secretary of Labor under section 110 of ERISA) has occurred under any pension plan that is covered by Title IV of ERISA in respect of which, as applicable, a C-BASS Entity or any affiliate is an "employer" as defined in section 3(5) of ERISA (an "**ERISA Plan**") maintained by any such entity that is likely to result in the termination of any ERISA Plan for purposes of Title IV of ERISA.

(d) *Authorization; No Conflict.* The execution, delivery and performance by each C-BASS Entity of this Agreement is within its powers, has been duly authorized by

12

all necessary corporate, limited liability company or partnership action, as applicable, and does not contravene (i) its organizational documents, (ii) any law, rule, regulation (including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to it or (iii) any indenture, loan agreement, credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its respective properties may be bound or affected.

(e) *Additional Approvals.* No authorization or approval or other action by, and no notice to or filing with, any governmental authority, regulatory body or any other person is required to be obtained or made by any C-BASS Entity for the due execution, delivery and performance by it of this Agreement.

(f) *Validity and Binding Nature.* This Agreement is the valid and binding obligation of each C-BASS Entity, enforceable against each C-BASS Entity in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally and subject to the availability of equitable remedies.

12.    *Representations and Warranties of the Participant Lenders.* Each Participant Lender represents and warrants, as to itself only, severally and not jointly, that such Participant Lender is duly authorized to execute, deliver and perform under this Agreement and, upon due authorization, execution and delivery hereof by each of the other parties hereto, this Agreement shall constitute valid and binding obligations of such Participant Lender, enforceable against such Participant Lender in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally and subject to the availability of equitable remedies.

13.    *Representations and Warranties by All Parties.* Each of the parties hereto hereby represents and warrants, as to itself only, severally and not jointly, that each of the following statements is true, accurate and complete as to such party as of the date hereof:

(a) such party has carefully read and fully understands all of the terms and conditions of this Agreement;

(b) such party has consulted with, or had a full and fair opportunity to consult with, an attorney regarding the terms and conditions of this Agreement;

(c) such party has had a full and fair opportunity to participate in the drafting of this Agreement;

(d) such party is freely, voluntarily and knowingly entering into this Agreement; and

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

(e) in entering into this Agreement, such party has not relied upon any representation, warranty, covenant or agreement not expressly set forth herein.

14.    *Conditions Precedent.*  The effectiveness of this Agreement shall be conditioned on it being duly executed and delivered by the C-BASS Entities and the Required Lenders.

15.    *Limitation on Liability.*  (a) In consideration of, among other things, the Plan Support Obligations and Look-Back Rights provided for herein, each of the C-BASS Entities, on behalf of itself and its successors and assigns, jointly and severally releases, acquits and forever discharges the Administrative Agent and each of the Senior Lenders, and their respective subsidiaries, parents, affiliates, officers, directors, managers, employees, agents, advisors, attorneys, successors and assigns, both present and former (collectively, the "**Released Parties**") from any and all manner of actions, causes of action, suits, debts, controversies, damages, judgments, executions, rights, claims (including, without limitation, crossclaims, counterclaims and rights of set-off and recoupment) and demands whatsoever, whether known or unknown, whether now existing or hereafter arising, whether asserted or unasserted, in contract, tort, law or equity which C-BASS or any of the C-BASS Entities has or may have against the Administrative Agent, any of the Senior Lenders and/or any of the other Released Parties by reason of any action, failure to act, matter or thing whatsoever arising from or based on facts occurring prior to the date hereof that relate to this Agreement, the Senior Credit Facility or the transactions contemplated hereby or thereby, including but not limited to any such claim or defense to the extent that it relates to (i) the making or administration of the Loans (as defined in the Senior Credit Agreement), including, without limitation, any such claims and defenses based on fraud, mistake, duress, usury or misrepresentation, or any other claim based on so-called lender liability theories, (ii) any covenants, agreements, duties or obligations set forth in the Senior Credit Facility, (iii) any actions or omissions of the Administrative Agent, any of the Senior Lenders and/or any of the other Released Parties in connection with the initiation or continuing exercise of any right or remedy contained in the Senior Credit Facility or at law or in equity with respect to the Senior Credit Facility, (iv) lost profits, (v) loss of business opportunity, (vi) increased financing costs, (vii) increased legal or other administrative fees or (viii) damages to business reputation.

(b)    In entering into this Agreement, the C-BASS Entities have consulted with and been represented by counsel and expressly disclaim any reliance on any representations, acts or omissions by the Administrative Agent, any of the Senior Lenders or any of the other Released Parties and hereby agree and acknowledge that the validity and effectiveness of the release set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity thereof.  The provisions of this section 15 shall survive the termination of this Agreement.

16.    *Release of Participant Lenders by Participant Lenders.*  Each Participant Lender hereby agrees to release the Administrative Agent and the other Participant Lenders party hereto in their capacity as Senior Lenders, as applicable, from any and all actions, causes of action, suits, debts, controversies, damages, judgments, executions, rights, claims (including, without limitation, crossclaims, counterclaims and rights of set-off and recoupment) and demands whatsoever, whether known or unknown, whether now existing or hereafter arising, whether

14

asserted or unasserted, in contract, tort, law or equity, on account of, arising under or in any way relating to the Senior Credit Facility, this Agreement or any transactions or other documents contemplated herein or therein in exchange for the release received by such Participant Lender. Nothing in this section 16 shall in any way affect the obligations found in section 8 above.

17. *Confidentiality.* Each of the Administrative Agent and the Participant Lenders agrees to maintain the confidentiality of Information (as defined in the Senior Credit Agreement) received pursuant to this Agreement in accordance with Paragraph 18(s) of the Senior Credit Agreement.

18. *Acknowledgement of Amounts Outstanding Under Senior Credit Facility.* C-BASS and the Participant Lenders acknowledge and agree that, as of September 16, 2010, the principal amount outstanding under the Senior Credit Facility is $238,525,339.99 and the accrued and unpaid interest under the Senior Credit Facility other than Senior Credit Facility Unpaid Interest (as defined in the Forbearance Agreement) is $201,244.08.

19. *Waivers and Amendments.* No amendment to, or waiver of, any term or condition of this Agreement shall be effective except pursuant to an agreement or agreements in writing entered into by the C-BASS Entities and the Required Lenders.

20. *Further Authorization and Direction.* Each of the Participant Lenders hereby authorizes the Administrative Agent to deliver and release all documents and liens, remit all proceeds and take any and all other actions necessary or desirable in furtherance of the provisions of this Agreement.

21. *No Admissions.* Except as set forth in the recitals hereto, which are incorporated into, and made part of, this Agreement, by negotiating, entering into and performing its obligations under this Agreement, none of the parties hereto is making any admission on any issue relating to the Events of Default, including, without limitation, any admission with respect to what constitutes "adequate protection" within the meaning of 11 U.S.C. § 361.

22. *Governing Law.* This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York, notwithstanding its conflict of laws principles or any other rule, regulation or principle that would result in the application of any other jurisdiction's law.

23. *Jurisdiction.* By its execution and delivery of this Agreement, each of the parties hereto irrevocably and unconditionally agrees that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement (including specific performance) of any judgment rendered in any such action, suit or proceeding shall be brought in the federal district court or appropriate state court in each case located within the State of New York and County of New York. By its execution and delivery of this Agreement, each of the parties hereto irrevocably accepts and submits itself to the jurisdiction of the federal and state courts in each case located within the State of New York and County of New York for such purposes.

24. *Waivers of Jury Trial.* EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FROM ANY COUNTERCLAIM THEREIN.

25. *No Third-Party Beneficiaries.* Nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties hereto (and, to the extent contemplated hereby, the Indemnified Parties and the Released Parties), nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action over or against any party to this Agreement.

26. *Severability.* A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Agreement to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

27. *Entire Agreement.* This Agreement constitutes the entire agreement of the parties hereto with respect to the transactions provided for herein (including the terms and conditions thereof), and it supersedes all prior and contemporaneous agreements and understandings relating to the same.

28. *Paragraph Headings.* Paragraph headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

29. *Counterparts.* This Agreement may be executed in counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile. Any facsimile signatures shall have the same legal effect as manual signatures.

30. *Further Assurances.* The C-BASS Entities agree to execute and deliver all such other documents and to take all such other action as may be reasonably requested by the Administrative Agent from time to time, without further consideration, in order to effectuate the terms hereof and the transactions contemplated hereby, including with respect to the transfer and servicing of any Senior Credit Facility First Lien Collateral to NewCo during any transition period. The parties shall cooperate fully with each other and with their respective counsel in connection with any steps required to be taken as part of their respective obligations under this Agreement.

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

C-BASS hereby confirms and agrees to the terms and conditions set forth in this Agreement.

CREDIT-BASED ASSET SERVICING
AND SECURITIZATION LLC

By: _____
Name:  Shari Kushner
Title:  EVP


C-BASS CBO HOLDING LLC

By: _____
Name:  Shari Kushner
Title:  EVP


C-BASS INVESTMENT
MANAGEMENT LLC

By: _____
Name:  Shari Kushner
Title:  EVP


NIM I LLC

By: _____
Name:  Shari Kushner
Title:  EVP


PLEDGED PROPERTY II LLC

By: _____
Name:  Shari Kushner
Title:  EVP


STARFISH MANAGEMENT
GROUP LLC

By: _____
Name:  Shari Kushner
Title:  EVP


[Signature Page to the Restructuring Facilitation Agreement]

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**BANK OF AMERICA, N.A., solely in its capacity as a Senior Lender**

By: _Tyler D Levings_

Name:

Title:  **TYLER D. LEVINGS
SENIOR VICE PRESIDENT**

[Signature Page to the Restructuring Facilitation Agreement]

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**BARCLAYS BANK PLC, solely in its capacity as a Senior Lender**

By: _____

Name: Robert Silverman
Title: Director

[Signature Page to the Restructuring Facilitation Agreement]

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**BNP PARIBAS, solely in its capacity as a Senior Lender and solely in connection with its rights and obligations under the Senior Credit Facility and not in respect of any other rights or obligations**

By: _____
Name: KATHRYN B. QUINN
Title: MANAGING DIRECTOR

and

By: _____
Name: Kristie Pellecchia
Title: Vice President

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**CITIGROUP GLOBAL MARKETS REALTY CORP., solely in its capacity as a Senior Lender**

By: _____

Name:

Title:

**Bobbie Theivakumaran**
Authorized Agent
Citigroup Global Markets Realty Corp.

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**DEUTSCHE BANK AG, NEW YORK BRANCH,** solely in its capacity as a Senior Lender

By: _____

By _____

RANDAL JOHNSON
DIRECTOR

Name: _____
Title: RYAN M. ST... DIRECTOR

**DB STRUCTURED PRODUCTS, INC.,** solely in its capacity as a Senior Lender

By: _____

By _____

RANDAL JOHNSON
DIRECTOR

Name: _____
Title: RYAN M. STARK DIRECTOR

[Signature Page to the Restructuring Facilitation Agreement]

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**JPMorgan Chase Bank, N.A., solely in its capacity as a Senior Lender**

By: _____
    Name: Ann Kurinskas
    Title:  Managing Director

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**MERRILL LYNCH MORTGAGE CAPITAL INC.**, solely in its capacity as a Senior Lender

By: _____

    Name:      **TYLER D. LEVINGS**

    Title:       **SENIOR VICE PRESIDENT**

[Signature Page to the Restructuring Facilitation Agreement]

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**NATIXIS, NEW YORK BRANCH (f/k/a NATEXIS BANQUES POPULAIRES, NEW YORK BRANCH), solely in its capacity as a Senior Lender**

By: _____
    Name:
    Title:

Raymond D. Meyer
Managing Director
Natixis

Patrick J. Owens
Managing Director
Natixis

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

THE ROYAL BANK OF SCOTLAND
**N.V., solely in its capacity as a**
**Senior Lender**

By: _____
Name: PARKER DOUGLAS
Title: MANAGING DIRECTOR

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**THE ROYAL BANK OF SCOTLAND PLC, solely in its capacity as a Senior Lender**

By: _____

Name: BRUCE BUCHANAN

Title: MANAGING DIRECTOR

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**SOCIETE GENERALE, solely in its capacity as a Senior Lender**

By: _____
Name: William Ashton
Title: Director

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

THE BANK OF NEW YORK
MELLON (f/k/a THE BANK OF
NEW YORK), solely in its capacity
as a Senior Lender

By: _____

Name: EDWARD J. DeSALVIO
Title: MANAGING DIRECTOR

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as a Senior Lender**

By: _____
Name: SAQIB KHAWAJA
Title: VICE PRESIDENT

We, as a Senior Lender, hereby confirm and agree to the provisions of this Agreement, including the directions and instructions to and indemnification of the Administrative Agent set forth in this Agreement.

**WESTLB AG NEW YORK BRANCH,**
**solely in its capacity as a Senior Lender**

By: _____
Name: CHRISTIAN GRAVE
Title: EXECUTIVE DIRECTOR

and

By: _____
Name:   Petra Fishert
Title:   Executive Director

We, solely in our capacity as Administrative Agent and in no other capacity, hereby confirm and agree to the directions and instructions to the Administrative Agent set forth in this Agreement and acknowledge receipt thereof.

**JPMorgan Chase Bank, N.A., solely in its capacity as Administrative Agent**

By: _____
Name: Ann Kurinskas
Title: Managing Director

## Schedule 1
## CBO Management Agreements

1.  C-BASS CBO IV LTD

2.  C-BASS CBO V LTD

3.  C-BASS CBO VI LTD

4.  C-BASS CBO VII LTD

5.  C-BASS CBO VIII LTD

6.  C-BASS CBO IX LTD

7.  C-BASS CBO X LTD

8.  C-BASS CBO XI LTD

9.  C-BASS CBO XII LTD

10. C-BASS CBO XIII LTD

11. C-BASS CBO XIV LTD

12. C-BASS CBO XV LTD

13. C-BASS CBO XVI LTD

14. C-BASS CBO XVII LTD

15. C-BASS CBO XVIII LTD

16. C-BASS CBO XIX LTD

17. ABACUS 2005-CB1, LTD

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

# Schedule 2

# Miscellaneous Intellectual Property and Furniture, Fixtures & Equipment

C-BASS et al
Intellectual Property Summary

| Intellectual Property | Description |
|---|---|
| Credit/Prepay Analysis | This consists of a series of programs that contain C-BASS's proprietary prepayment and credit models. The focus is on analyzing subprime loans, whether newly originated or seasoned, whether performing, reperforming or defaulted. The component programs are: |
| • Credit Model | Segments loans into prime, Alt A, subprime, and seller financed as well as performing, non-performing and second lien based on loan characteristics. Forecasts frequency, severity and loss timing. |
| • Prepay Model | Forecasts prepayments based on loan and product characteristics. |
| • Cashflow Engine | Runs scenarios defined by the user for securities. |
| • Intex Collateral Generator | Provides input to Intex from actual collateral rather than rep lines. (Buyer responsible for licensing Intex) |
| Non-Performing Loan Pricer | There are two levels of this model: (i) A full blown non-performing loan pricing model that requires many inputs and difficult to implement; and (ii) Standard CAS export files available to ease this process. |
| Due Diligence | A proprietary Marlin system that edits and tracks due diligence on loan pools. Designed to handle performing, reperforming and non-performing loans. Operates from a laptop. Can be deployed with or without Internet connectivity. Checks state, local and federal High Cost Mortgage Loan and other regulatory compliance (current through early 3rd quarter 2007 law changes and adaptable for new changes as they occur). |
| Loader/Fetcher | Downloads remittance reports on MBS/ABS securities from trustee sites. Parses the information and loads in a database. Adaptable for integration with any trading platform. |
| HPI Model | Projects Housing Price Indices at zip code, MSA, county and state levels (depending on data availability) by housing price band. Buyer is however responsible for licensing MRAC data to the extent that C-BASS would be required to separately license such data. |
| CLIPPS | Proprietary claims tracking system. |
| Domain Name | http://www.c-bass.com |

S-2-1

C-BASS et al
Intellectual Property

| | Estimated Amount |
|---|---|
| **Analytics \ Research** | |
| CATS | Unknown |
| CDM | Unknown |
| MARLIN | Unknown |
| CLIPS | Unknown |
| Radar Viewer | Unknown |
| Servicing Valuation Model | Unknown |
| Remit Loader | Unknown |
| Remit Fetcher | Unknown |
| MAH | Unknown |
| Feeds, rating agencies, bloomberg etc | Unknown |
| | |
| **Credit & Cash Flow Models** | |
| Cashlang - structuring | Unknown |
| Credit Model | Unknown |
| Prepayment Model | Unknown |
| Cashflow Engine | Unknown |
| DRMA model | Unknown |
| Tax Model | Unknown |
| | |
| **Analytics Infrastructure** | |
| HPI Model | Unknown |
| Intex CDI/CDU Generator | Unknown |
| | |
| **Database Content** | |
| Unified Loan File format | Unknown |
| C-BASS cmo format | Unknown |
| Database table structures, procedures, packages, functions | Unknown |
| | |
| **Other** | |
| Domain name | Unknown |
| | |
| | Unknown |

|  | Estimated Amount |
| --- | --- |
| **Desktop Equipment** | |
| Desktop PC's | $ 5,000 |
| PC Monitors | 1,100 |
| Avaya phone sets | - |
| Laptop PC's | 500 |
| Misc laptop/desktop, etc parts | - |
|  | 6,600 |
| **Phone systems** | |
| Avaya Prologix PBX phone system | 2,000 |
| Avaya Definity Audix | 200 |
| Voicelogger | - |
|  | 2,200 |
| **SAN (storage) devices** | |
| EMC CX-700 SAN | 4,000 |
| EMC CX-700 Disk units | 3,000 |
| Cisco MDS-9120 PC switches | 2,000 |
| Netapp FAS3020c SAN/Filer | 8,000 |
| Netapp FAS3020c Disk storage units | 8,000 |
| Sun 3100 | - |
| NexSAN Atabeast | 5,000 |
| Nexsan Ataboy | 1,000 |
|  | 31,000 |
| **Tape libraries** | |
| Sun/STK SL500 LTO-3 | 5,000 |
| AIT-3 library | 500 |
| Exabyte Mammoth-2 library | - |
| Dell LTO-3 library | 1,000 |
|  | 6,500 |

C-BASS et al
IT Hardware

|  | Estimated Amount |
|---|---:|
| Servers | |
| HP DL380/385 | 12,000 |
| HP DL360/320 | 5,000 |
| Dell servers | - |
| IBM servers | 500 |
| Sun v120 | - |
| Sun v240 | 1,000 |
| Sun v480 | 1,000 |
| HP DL580/585 | 2,500 |
| HP ML570 | - |
| | 22,000 |
| Network | |
| Cisco Catalyst 6000 | - |
| Cisco VPN concentrator | 500 |
| Aventail SSL VPN appliance | 500 |
| RSA authentication appliance | - |
| F5 load balancer | 3,000 |
| Nokia Firewall | 400 |
| Cisco 3550 switches | 2,000 |
| Raritan console devices | 500 |
| | 6,900 |
| | $ 75,200 |

S-2-4

## Schedule 3

## Auction Assets

| No. | Position | CUSIP |
|-----|----------|-------|
| 1. | PBHE 1999-03 (1) X1 | PBHE993X1 |
| 2. | PBHE 2000-01 (1) X1 | PBHE001X1 |
| 3. | PBHE 2000-02 (ALL) X1 | PBHE002X1 |
| 4. | LBMLT 2004-1 (ALL) C | — |
| 5. | CBASS-CBO VII-LTD (0) E | 12496CAA7 |
| 6. | PBHE 1999-03 (3) X3 | PBHE993X3 |
| 7. | CBASS 2004-CB1 (1) AF-1 | 04542BFH0 |
| 8. | CBASS 2005-B (0) M5 | 124860FU6 |
| 9. | RAAC 2005-RP2 (0) M5 | 76112BXT2 |
| 10. | PBHE 2000-01 (2) X2 | PBHE001X2 |
| 11. | PBHE 2000-02 (ALL) X2 | PBHE002X2 |
| 12. | CSFB 2005-AGE1 (0) M6 | 225458PA0 |
| 13. | EFLOT 1998-01 (0) R | — |
| 14. | EFLOT 1997-03 (0) R | — |
| 15. | CBASS 2005-RP2 (ALL) B-2 | 124860GP6 |
| 16. | EFLOT 1998-02 (0) R | — |
| 17. | CBASS 2005-RP1 (ALL) B2 | 124860FF9 |
| 18. | FPLUS 1998-05 (0) R | — |
| 19. | PBHE 1998-04 (2) X2 | PBE984X12 |
| 20. | PBHE 1998-04 (1) X1 | PBE984X11 |
| 21. | PBHE 1999-03 (2) X2 | PBHE993X2 |
| 22. | CBASS 2002-CB4 (ALL) X | CBS02CB4X |
| 23. | CBASS 2005-C (0) B | 124860GB7 |
| 24. | CBASS 2006-A (0) B1 | 1248A8AB1 |
| 25. | CSB 1988-07 (0) A2 | 200380BJ1 |
| 26. | DLJMA 1995-QE03 (0) A1 | 23321PSM1 |
| 27. | GSAA 2006-1N (ALL) CERT | 3623413X5 |
| 28. | GSRPM 2006-01 (0) B2 | 362334NY6 |
| 29. | GSAMP 2006-NC1 (0) C | 362334EN0 |
| 30. | GSAMP 2006-HE2 (0) CE | BCCOPRL83 |
| 31. | RASC 2002-KS2 (1) MI2 | 76110WNL6 |
| 32. | FPLUS 1997-04 (0) B1 | 337937AB2 |
| 33. | CBAC 2006-02 (0) M6 | 14983CAG0 |
| 34. | CSB 1988-07 (0) A1 | 200380BH5 |
| 35. | SBMSI 2001-01 (1) OCF | 7956469C4 |
| 36. | CHASE 2003-S13 (0) B5 | 16162WDL0 |
| 37. | FNW 1999-W01 (0) B5 | 31359VHG1 |
| 38. | GSL 1989-09 (0) A | 40145CAV7 |
| 39. | FHLT 2002-02 (ALL) C | — |
| 40. | CWL 2002-03 (ALL) X | CWHE0203X |
| 41. | CBASS 2006-B (0) B3 | 1248A9AC7 |
| 42. | RAAC 2005-RP2 (0) SB | 76112BXV7 |
| 43. | CBASS 2002-CB2 (ALL) X | CBS02CB2X |
| 44. | SURF 2004-BC2 (ALL) B1 | 84751PCN7 |
| 45. | GSAMP 2005-WMC2-NIM (0) NOTES | 362341F79 |

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

| No. | Position | CUSIP |
|---|---|---|
| 46. | RFMSI 2004-S04 (0) 2B3 | 76111XJL8 |
| 47. | CBASS 2005-RP2 (ALL) X | BCC0MILU7 |
| 48. | MMLT 2003-1 (ALL) C | BCC0DLVG0 |
| 49. | CWL 2002-5 (ALL) X | 126671WQ5 |
| 50. | GSAMP 2005-WMC1 (0) B4 | 362341QD4 |
| 51. | CWHL 2003-3 (0) B5 | 12669DR26 |
| 52. | GSRPM 2006-01 (0) B3 | 362334NZ3 |
| 53. | GSAMP 2005-WMC3 (ALL) B3 | 362341M63 |
| 54. | SBM7 2002-WMC2 (ALL) CE | BCC089ZV6 |
| 55. | FHLT 2004-1 (ALL) C | — |
| 56. | CSB 1987-01 (0) B | CFS87001B |
| 57. | FHLT 2003-1 (ALL) C | — |
| 58. | AMSI 2002-AR1 (ALL) CE | AM02AR1CE |
| 59. | RFMSI 2006-S10 (2) IIB2 | 74958DBB3 |
| 60. | OOMLT 2002-05 (0) C | — |
| 61. | FINA 2003-1 (ALL) C | — |
| 62. | GSAMP 2006-HE1 (ALL) B3 | 3623415G0 |
| 63. | CBASS 1999-CB2 (1) IAPO | 12489WAT1 |
| 64. | CSB 1988-01 (0) B | CFS88001B |
| 65. | CBASS 1999-CB1 (1) IAPO | 12489WAC8 |
| 66. | CWHL 2002-18 (0) B5 | 12669C8E3 |
| 67. | CBASS-CBO XII-LTD (0) E | — |
| 68. | ABFCN 2001-AQ1 (0) EQUIT | — |
| 69. | ABFCN 2001-AQ1 (0) N | 04542JAA3 |
| 70. | ABFCN 2002-SB1 (0) X | — |
| 71. | ABFCN 2004-AHL1 (0) OTC | — |
| 72. | ACE 2004-FM2 (ALL) CE | — |
| 73. | ACE 2004-FM2 (ALL) P | — |
| 74. | ACE 2004-RM2 (0) B-5 | 004421KH5 |
| 75. | AMSI 2002-AR1 (ALL) P | AMQ02AR1P |
| 76. | AMSI 2003-07 (0) CE | — |
| 77. | AMSI 2003-07 (0) P | — |
| 78. | ARNIM 2004-WN5 (0) PS | ARN04W5PS |
| 79. | ARSC 1998-1 (ALL) S | AMRS9801S |
| 80. | ARSC 1998-2 (ALL) S | AMRS9802S |
| 81. | ARSI 2003-W1 (ALL) CE | ARS03W1CE |
| 82. | ARSI 2003-W1 (ALL) P | ARS03W01P |
| 83. | ARSI 2003-W3 (ALL) P | BCC0CDBC0 |
| 84. | ARSI 2003-W4 (ALL) CE | — |
| 85. | ARSI 2003-W4 (ALL) P | — |
| 86. | ARSI 2004-W7 (0) CE | — |
| 87. | ARSI 2004-W7 (0) P | — |
| 88. | BSSP 2000-01 (5) 5G | 07383UCA1 |
| 89. | CBASS 1997-01 (ALL) RES-FUND | — |
| 90. | CBASS 1998-01 (1) 1H | BC0223729 |
| 91. | CBASS 1999-CB1 (1) IB3 | 12489WAP9 |
| 92. | CBASS 1999-CB2 (1) IB3 | 12489WBE3 |
| 93. | CBASS 2002-CB1 (ALL) X | CBS02CB1X |
| 94. | CBASS 2002-CB3 (ALL) ARR | — |
| 95. | CBASS 2002-CB3 (ALL) X | 7966459H4 |
| 96. | CBASS 2002-CB5 (ALL) ARR | — |
| 97. | CBASS 2002-CB5 (ALL) X | CBS02CB5X |

| No. | Position | CUSIP |
|---|---|---|
| 98. | CBASS 2002-CB6 (ALL) X | CBS2CB6XV |
| 99. | CBASS 2003-CB5 (ALL) ARR | — |
| 100. | CBASS 2003-CB6 (ALL) ARR | — |
| 101. | CBASS 2003-RP1 (0) ARR | — |
| 102. | CBASS 2004-CB3 (ALL) ARR | — |
| 103. | CBASS 2004-CB3 (ALL) N | CT04CB3OC |
| 104. | CBASS 2004-CB4 (0) ARR | — |
| 105. | CBASS 2004-CB4 (0) N | 12489WJZ8 |
| 106. | CBASS 2004-CB5 (0) ARR | — |
| 107. | CBASS 2004-CB6 (ALL) ARR | — |
| 108. | CBASS 2004-CB6 (ALL) N | 59020UJK2 |
| 109. | CBASS 2005-A (0) B | 124860FP7 |
| 110. | CBASS 2005-CB1 (ALL) ARR | — |
| 111. | CBASS 2005-CB2 (ALL) ARR | — |
| 112. | CBASS 2005-CB3 (ALL) ARR | — |
| 113. | CBASS 2005-CB4 (ALL) ARR | — |
| 114. | CBASS 2005-CB4-NIM (0) NIM | C5C4NNOTE |
| 115. | CBASS 2005-CB4-NIM (0) OTC | — |
| 116. | CBASS 2005-CB5 (ALL) ARR | — |
| 117. | CBASS 2005-CB6 (0) ARR | — |
| 118. | CBASS 2005-CB7 (ALL) ARR | — |
| 119. | CBASS 2005-CB8 (0) ARR | — |
| 120. | CBASS 2005-CB8 (0) B5 | 12489WQT4 |
| 121. | CBASS 2006-A (0) B3 | 1248A8AD7 |
| 122. | CBASS 2006-CB1 (ALL) ARR | — |
| 123. | CBASS 2006-CB1-NIM (0) NOTES | CBSGMR180 |
| 124. | CBASS 2006-CB2 (ALL) ARR | — |
| 125. | CBASS 2006-CB3 (0) ARR | — |
| 126. | CBASS 2006-CB4 (0) ARR | — |
| 127. | CBASS 2006-CB5 (0) ARR | — |
| 128. | CBASS 2006-CB6 (ALL) ARR | — |
| 129. | CBASS 2006-CB6-NIM (0) OTC | — |
| 130. | CBASS 2006-CB7 (ALL) ARR | — |
| 131. | CBASS 2006-CB8 (ALL) ARR | — |
| 132. | CBASS 2006-CB8-NIM (0) NOTES | CBSQUUY20 |
| 133. | CBASS 2006-CB8-NIM (0) OTC | — |
| 134. | CBASS 2006-CB9 (0) ARR | — |
| 135. | CBASS 2006-CB9 (0) B3 | 12465MAR5 |
| 136. | CBASS 2006-CB9-NIM (0) NOTES | 9ABSAL06 |
| 137. | CBASS 2006-CB9-NIM (0) OTC | 9ABSAL07 |
| 138. | CBASS 2006-MH1 (ALL) ARR | — |
| 139. | CBASS 2006-SC1 (0) ARR | — |
| 140. | CBASS 2006-SL1 (0) ARR | — |
| 141. | CBASS 2006-SL1 (0) B1 | 14983AAK5 |
| 142. | CBASS 2006-SL1 (0) B2 | 14983AAL3 |
| 143. | CBASS 2006-SL1 (0) B3 | 14983AAM1 |
| 144. | CBASS 2006-SL1 (0) B4 | 14983AAN9 |
| 145. | CBASS 2006-SL1 (0) B5 | 14983AAP4 |
| 146. | CBASS 2006-SL1 (0) CE | 14983AAQ2 |
| 147. | CBASS 2006-SL1 (0) M5 | 14983AAH2 |
| 148. | CBASS 2006-SL1 (0) P | 14983AAR0 |
| 149. | CBASS 2007-CB1 (0) ARR | |

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

| No. | Position | CUSIP |
|---|---|---|
| 150. | CBASS 2007-CB2 (ALL) ARR | — |
| 151. | CBASS 2007-CB2-NIM (0) NOTES | 1248MFAA4 |
| 152. | CBASS 2007-CB3 (0) ARR | — |
| 153. | CBASS 2007-CB4 (ALL) ARR | — |
| 154. | CBASS 2007-CB4-NIM (0) OTC | — |
| 155. | CBASS 2007-CB5 (0) ARR | — |
| 156. | CBASS 2007-CB5-NIM (0) OTC | 9ABSCU023 |
| 157. | CBASS 2007-CB6 (0) ARR | 1248RHAU1 |
| 158. | CBASS 2007-MX1 (0) ARR | — |
| 159. | CBASS 2007-RP1 (0) CE | — |
| 160. | CBASS 2007-RP1 (0) P | — |
| 161. | CBASS 2007-SL1 (ALL) ARR | — |
| 162. | CBASS 2007-SP1 (0) ARR | — |
| 163. | CBASS 2007-SP2 (0) ARR | — |
| 164. | CBASS-CBO IV-LTD-RES (0) IO | |
| 165. | CBASS-CBO VII-LTD (0) PREF | 12496C208 |
| 166. | CBASS-CBO XII-LTD (0) PREF | — |
| 167. | CBASS-CBO XV-LTD (0) PREF | 12467M201 |
| 168. | CMALT 2006-A4 (ALL) B4 | 17309VAW3 |
| 169. | CMALT 2006-A4 (ALL) B5 | 17309VAX1 |
| 170. | CMALT 2006-A4 (ALL) B6 | 17309VAY9 |
| 171. | CMALT 2006-A5 (ALL) B5 | 18974BBB4 |
| 172. | CMALT 2006-A5 (ALL) B6 | 18974BBC2 |
| 173. | CMALT 2006-A7 (ALL) B4 | 12566TAW7 |
| 174. | CMALT 2006-A7 (ALL) B5 | 12566TAX5 |
| 175. | CMALT 2006-A7 (ALL) B6 | 12566TAY3 |
| 176. | CMLT 2004-02 (0) B5 | 17307GNB0 |
| 177. | CMLT 2004-02 (0) B6 | 17307GNC8 |
| 178. | CSAB 2006-1 (0) B | 22943HAP1 |
| 179. | CWABS 2002-BC3 (0) X | 126671RK4 |
| 180. | CWABS 2005-BC4-NIM (0) OTC | — |
| 181. | CWABS 2006-BC1 (ALL) B | 126670XZ6 |
| 182. | CWABS 2007-BC1 (ALL) B | 12668TAR5 |
| 183. | CWALT 2003-06T2 (0) B5 | 12669EDZ6 |
| 184. | CWALT 2003-17T2 B5 | 12669EB21 |
| 185. | CWALT 2006-27CB (0) B3 | 02147YAV7 |
| 186. | CWALT 2006-27CB (0) B4 | 02147YAW5 |
| 187. | CWALT 2006-27CB (0) B5 | 02147YAX3 |
| 188. | CWALT 2006-33CB (ALL) B3 | 02148BAK0 |
| 189. | CWALT 2006-33CB (ALL) B4 | 02148BAL8 |
| 190. | CWALT 2006-33CB (ALL) B5 | 02148BAM6 |
| 191. | CWALT 2006-42 (ALL) B3 | 02148YAR5 |
| 192. | CWALT 2006-42 (ALL) B4 | 02148YAS3 |
| 193. | CWALT 2006-42 (ALL) B5 | 02148YAT1 |
| 194. | CWALT 2007-02CB (ALL) B3 | 02149HBN9 |
| 195. | CWL 2002-02 (0) X | 126671RA6 |
| 196. | CWL 2002-5 (ALL) N | 126671WP7 |
| 197. | CWL 2005-10NIM (0) NIM | 126670DS4 |
| 198. | CWL 2005-10NIM (0) OTC | 126670DT2 |
| 199. | DVI 2003-1 (0) C2 | 23335NAJ6 |
| 200. | FHLT 2002-01 (ALL) C | BCC08DBB7 |
| 201. | FHLT 2002-01 (ALL) P | BCC08DCQ3 |

| No. | Position | CUSIP |
|---|---|---|
| 202. | FHLT 2002-02 (ALL) P | — |
| 203. | FHLT 2003-1 (ALL) PEN | — |
| 204. | FHLT 2004-1 (ALL) P | — |
| 205. | FINA 2003-1 (ALL) P | — |
| 206. | FINAN 2004-1 (ALL) B | 80382SCH9 |
| 207. | FINAN 2004-1 (ALL) OTC | — |
| 208. | FMIC 2004-3 (ALL) M8 | 31659TBV6 |
| 209. | FMIC 2004-4 (ALL) M6 | 31659TCG8 |
| 210. | FMIC 2004-4 (ALL) M7 | 31659TCH6 |
| 211. | FMIC 2004-5 (ALL) M6 | 31659TCU7 |
| 212. | FMIC 2004-5 (ALL) M7 | 31659TCV5 |
| 213. | FMIC 2005-1 (ALL) M10 | 31659TDM4 |
| 214. | FMIC 2005-2 (ALL) M10 | 31659TED3 |
| 215. | FMIC 2005-3 (ALL) M10 | 31659TET8 |
| 216. | FMIC 2005-3 (ALL) M11 | 31659TEU5 |
| 217. | FMIC 2005-3 (ALL) M12 | 31659TEV3 |
| 218. | FMIC 2005-3 (ALL) M13 | 31659TEW1 |
| 219. | FMIC 2005-3 (ALL) M9 | 31659TES0 |
| 220. | FMIC 2006-1 (0) M10 | 31659TFK6 |
| 221. | FMIC 2006-1 (0) M11 | 31659TFL4 |
| 222. | FMIC 2006-2 (ALL) M10 | 31659EAP3 |
| 223. | FMIC 2006-2 (ALL) M11 | 31659EAQ1 |
| 224. | FMIC 2006-3 (ALL) M10 | 316599AQ2 |
| 225. | FMIC 2006-S1 (0) B1 | 31659XAH9 |
| 226. | FMIC 2006-S1 (0) B2 | 31659XAJ5 |
| 227. | FMIC 2006-S1 (0) B3 | 31659XAK2 |
| 228. | FMIC 2006-S1 (0) M6 | 31659XAG1 |
| 229. | FPLUS 1997-02 (0) B1 | 337925BQ3 |
| 230. | FRENT 2005-2 (0) PREF | — |
| 231. | GEWMC 2005-01 (ALL) B5 | 367910AQ9 |
| 232. | GEWMC 2005-01NIM (0) OTC | GEWN051PS |
| 233. | GEWMC 2005-02 (ALL) B5 | 367910BG0 |
| 234. | GSAMP 2005-HE5-NIM (0) OTC | 362431108 |
| 235. | GSAMP 2006-HE2 (0) ARR | — |
| 236. | GSAMP 2006-HE2 (0) B5 | 362334LY8 |
| 237. | GSAMP 2006-HE2 (0) P | BCCOPRL91 |
| 238. | GSAMP 2006-HE6 (0) ARR | — |
| 239. | GSAMP 2006-HE6 (0) B-3 | 36245AAP1 |
| 240. | GSAMP 2006-HE6 (0) CE | 36245AAR7 |
| 241. | GSAMP 2006-HE6 (0) P | 36245AAS5 |
| 242. | GSAMP 2006-HE7 (ALL) B1 | 36245EAW8 |
| 243. | GSAMP 2006-HE7 (ALL) B2 | 36245EAX6 |
| 244. | GSAMP 2006-NC1 (0) ARR | — |
| 245. | GSAMP 2006-NC1 (0) B5 | 362334ET7 |
| 246. | GSAMP 2006-NC1 (0) P | 362334EP5 |
| 247. | GSRPM 2006-01 (0) C | 362334QY3 |
| 248. | JPMAC-NIM 2005-FRE1 (0) OTC | — |
| 249. | LBMLT 2004-1 (ALL) P | — |
| 250. | MMLT 2003-1 (ALL) P | BCC0DLVH8 |
| 251. | MSAB 2002-HE3 (ALL) P | — |
| 252. | MSAB 2003-NC8 (ALL) P | — |
| 253. | MSDW 2002-AM2 (ALL) P | — |

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

| No. | Position | CUSIP |
|---|---|---|
| 254. | MSDW 2002-AM3 (ALL) P | — |
| 255. | MSDW 2002-NC1 (ALL) P | — |
| 256. | MSDW 2002-NC2 (ALL) P | — |
| 257. | MSDW 2002-NC4 (ALL) P | — |
| 258. | MSDW 2002-NC5 (ALL) P | — |
| 259. | MSDW 2003-NC2 (ALL) P | — |
| 260. | MSDW 2003-NC3 (ALL) P | — |
| 261. | MSDW 2003-NC4 (ALL) P | — |
| 262. | OMTS 2006-OTI (0) B4 | 88156AAH7 |
| 263. | OMTS 2006-OTI (0) B5 | 88156AAJ3 |
| 264. | OMTS 2006-OTI (0) CE | 88156AAK0 |
| 265. | OMTS 2006-OTI (0) P | 88156AAL8 |
| 266. | OOMLT 2002-05 (0) P | — |
| 267. | OWNIT 2004-1 (ALL) C | 691215AQ0 |
| 268. | OWNIT 2004-1 (ALL) P | 691215AP2 |
| 269. | OWNIT 2005-04 (ALL) B3B | 69121PBP7 |
| 270. | OWNIT 2005-04 (ALL) B4B | 69121PBQ5 |
| 271. | OWNIT 2005-05 (ALL) B3 | 69121PCC5 |
| 272. | OWNIT 2005-05 (ALL) M6 | 69121PBZ5 |
| 273. | OWNIT 2005-NIM2 (0) N | 691216AB1 |
| 274. | OWNIT 2005-NIM3 (0) OTC | 5903MAP6 |
| 275. | OWNIT 2005-NIM4 (0) OTC | MLN05O4OT |
| 276. | OWNIT 2005-NIM5 (0) OTC | — |
| 277. | OWNIT 2006-01 (ALL) ARR | — |
| 278. | PBHE 1998-02 (ALL) R | — |
| 279. | PBHE 1998-03 (ALL) R | — |
| 280. | PBHE 1998-04 (1) RSV1 | — |
| 281. | PBHE 1998-04 (2) R | — |
| 282. | PBHE 1998-04 (2) RL | — |
| 283. | PBHE 1998-04 (2) RSV2 | — |
| 284. | PBHE 1999-03 (1&2) RSV1&2 | — |
| 285. | PBHE 1999-03 (3) RSV3 | — |
| 286. | PBHE 2000-01 (1) RESERVE1 | — |
| 287. | PBHE 2000-01 (2) RESERVE2 | — |
| 288. | PBHE 2000-02 (1) RSV1 | — |
| 289. | PBHE 2000-02 (2) RSV2 | — |
| 290. | PPSI 2005-WLL1 (0) M11 | 70069FHG5 |
| 291. | PPT 2004-01 (0) ARR | — |
| 292. | RALI 2004-QA03 (0) B2 | 76110HXY0 |
| 293. | RALI 2004-QA03 (0) B3 | 76110HXZ7 |
| 294. | RALI 2004-QS03 (0) B2 | 76110HRJ0 |
| 295. | RALI 2004-QS03 (0) B3 | 76110HRK7 |
| 296. | RALI 2005-QS04 (0) B2 | 76110H4B2 |
| 297. | RALI 2005-QS12 (0) B2 | 761118EL8 |
| 298. | RALI 2005-QS12 (0) B3 | 761118EM6 |
| 299. | RALI 2005-QS16 (0) B-1 | 761118MV7 |
| 300. | RALI 2005-QS16 (0) B-2 | 761118MW5 |
| 301. | RALI 2005-QS16 (0) B-3 | 761118MX3 |
| 302. | RALI 2005-QS17 (0) B2 | 761118QK7 |
| 303. | RALI 2005-QS17 (0) B3 | 761118QL5 |
| 304. | RALI 2006-QS2 (1) 1B2 | 761118VT2 |
| 305. | RALI 2006-QS2 (1) 1B3 | 761118VU9 |

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

| No. | Position | CUSIP |
|---|---|---|
| 306. | RALI 2006-QS7 (0) B1 | 748940AN3 |
| 307. | RALI 2006-QS7 (0) B2 | 748940AP8 |
| 308. | RALI 2006-QS7 (0) B3 | 748940AQ6 |
| 309. | RALI 2007-QS1 (2) IIB1 | 74922KBM6 |
| 310. | RALI 2007-QS1 (2) IIB2 | 74922KBN4 |
| 311. | RALI 2007-QS1 (2) IIB3 | 74922KBP9 |
| 312. | RALI 2007-QS8 (0) B1 | 74922UBB8 |
| 313. | RALI 2007-QS8 (0) B2 | 74922UBC6 |
| 314. | RALI 2007-QS8 (0) B3 | 74922UBD4 |
| 315. | RFMSI 2005-S02 (0) B3 | 76111XUF8 |
| 316. | RFMSI 2005-S04 (0) B2 | 76111XVC4 |
| 317. | RFMSI 2005-S04 (0) B3 | 76111XVD2 |
| 318. | RFMSI 2005-S8 (0) B2 | 76111XD75 |
| 319. | RFMSI 2005-S8 (0) B3 | 76111XD83 |
| 320. | RFMSI 2006-S10 (1) IB1 | 74958DAX6 |
| 321. | RFMSI 2006-S10 (1) IB2 | 74958DAY4 |
| 322. | RFMSI 2006-S10 (1) IB3 | 74958DAZ1 |
| 323. | RFMSI 2006-S10 (2) IIB3 | 74958DBC1 |
| 324. | SASC 2004-13 (0) B6 | 86359BVW8 |
| 325. | SBM7 2002-WMC2 (ALL) P | BCC089ZX2 |
| 326. | SHARPS-NIM 2004-RM2N (0) OTC | — |
| 327. | STALT 2005-1F (0) B4 | 86789MBB2 |
| 328. | STALT 2005-1F (0) B5 | 86789MBC0 |
| 329. | STALT 2005-1F (0) B6 | 86789MBD8 |
| 330. | STALT 2006-1F (0) B4 | 86800RAP6 |
| 331. | STALT 2006-1F (0) B5 | 86800RAQ4 |
| 332. | STALT 2006-1F (0) B6 | 86800RAR2 |
| 333. | SVHE 2003-1 (0) C | BCC0C6VF6 |
| 334. | SVHE 2006-01 (0) B | 83611MLL0 |
| 335. | SVHE 2006-A (0) C | 83612GAT7 |
| 336. | SVHE 2006-A (0) M6 | 83612GAG5 |
| 337. | SVHE 2006-A (0) M7 | 83612GAH3 |
| 338. | SVHE 2006-A (0) M8 | 83612GAJ9 |
| 339. | SVHE 2006-A (0) M9 | 83612GAK6 |
| 340. | SVHE 2006-A (0) P | 83612GAU4 |
| 341. | SVHE 2006-A (0) X2 | 83612GAX8 |
| 342. | SVHEN 2006-01 (0) N4 | 83611BAB8 |
| 343. | SVHEN 2006-01 (0) OTC | — |
| 344. | TMTS 2003-7SL (0) CE | — |
| 345. | TMTS 2007-6ALT (0) P | BCCCOZD5T5 |
| 346. | TMTS 2007-6ALT (0) X | BCCCOZD5S7 |
| 347. | WAMU 2004-CB3 (ALL) B6 | 92922FXZ6 |
| 348. | WMALT 2005-06 (0) B6 | 92922F2F4 |
| 349. | WMALT 2005-08 (ALL) B5 | 93934FDD1 |
| 350. | WMALT 2005-08 (ALL) B6 | 93934FDE9 |
| 351. | WMALT 2005-09 (ALL) B6 | 93934FFW7 |

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

# Exhibit A

## Adequate Protection Stipulation Required Terms[1]

| Term | Description |
| --- | --- |
| 1. C-BASS Entities' Stipulations | The C-BASS Entities[2] and the Administrative Agent will work in good faith to determine the amount owed to the Senior Lenders under the Senior Credit Facility on account of principal and interest as of the Petition Date. The C-BASS Entities shall stipulate (collectively, the "**C-BASS Stipulations**") that: |
| | &bull; such amount, plus any fees and expenses and other obligations owed thereunder (collectively, the "**Senior Credit Facility Debt**") are owed jointly and severally by the C-BASS Entities without defense, counterclaim or offset of any kind and that the Senior Credit Facility Debt constitutes the legal, valid and binding obligation of the C-BASS Entities enforceable in accordance with the terms of the Senior Credit Facility |
| | &bull; all liens and security interests granted pre-petition to the Administrative Agent on behalf of the Senior Lenders (collectively, the "**Pre-Petition Security Interests**") on the pre-petition lender collateral (collectively, the "**Senior Credit Facility Collateral**") pursuant to and in connection with the Senior Credit Facility, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the C-BASS Entities in favor of the Administrative Agent or any Senior Lender are (i) valid, binding, perfected and enforceable liens and security interests in the real and personal property described in the Senior Credit Facility and (ii) not, pursuant to the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code, the "**Claim**") of any kind |
| | &bull; no portion of the Senior Credit Facility Debt or any payments made to the Administrative Agent or the Senior Lenders (in their respective capacities) or applied to the obligations owed under the Senior Credit Facility prior to the date that any C-BASS Entity files a chapter 11 petition (such date, the "**Petition Date**") is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or Claim of any kind pursuant to the Bankruptcy Code or other applicable law |
| | &bull; each C-BASS Entity forever waives and releases any and all Claims, |

---

[1] All terms not defined herein have the meaning given to them in the Restructuring Facilitation Agreement.

[2] For the avoidance of doubt, the defined term C-BASS Entities does not include C-BASS Diamond LLC; *provided* that any transfers of Senior Credit Facility Collateral to and/or usage of Senior Credit Facility Collateral by or on behalf of C-BASS Diamond LLC shall count toward the Aggregate Cap.

A-1

| Term | Description |
|---|---|
| | counterclaims, causes of action, defenses or setoff rights against each of the Administrative Agent and each of the Senior Lenders (in their respective capacities) whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law |
| 2. Effect of the C-BASS Entities' Stipulations | Each stipulation, admission and agreement contained in the final Adequate Protection Stipulation, including, without limitation, in the C-BASS Stipulations, shall be binding upon the C-BASS Entities and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the C-BASS Entities) under all circumstances and for all purposes, and the C-BASS Entities are deemed to have irrevocably waived and relinquished all Lender Claims (as defined below) as of the date of execution of the Adequate Protection Stipulation. Each stipulation, admission and agreement contained in the final Adequate Protection Stipulation, including, without limitation, the C-BASS Stipulations, shall also be binding upon all other parties in interest, including, without limitation, any committee appointed pursuant to section 1102 of the Bankruptcy Code (each, a "**Committee**"), under all circumstances and for all purposes, except that with respect to the stipulations, admissions and agreements with respect to the Senior Credit Facility, the Senior Credit Facility Debt and the Pre-Petition Security Interests, including, the C-BASS Stipulations to the extent that (i) a party in interest has timely and properly filed an adversary proceeding or contested matter asserting a Lender Claim with respect to any of the C-BASS Stipulations by no later than 60 days after the entry of an order approving the Adequate Protection Stipulation on a final basis and (ii) there is a final order in favor of the plaintiff sustaining such Lender Claim (defined below).

The success of any particular Lender Claim shall not alter the binding effect on each party in interest of any stipulation or admission not subject to such Lender Claim. Except to the extent (but only to the extent) a timely and properly filed adversary proceeding or contested matter asserting a Lender Claim as provided in the immediately preceding paragraph is successful, (i) the Senior Credit Facility Debt shall constitute allowed claims, not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or other Claim of any kind pursuant to the Bankruptcy Code or other applicable law, for all purposes in any C-BASS Entity's chapter 11 case and any subsequent chapter 7 cases, (ii) the Senior Credit Facility Debt and the Pre-Petition Security Interests shall be deemed to have been, as of the Petition Date, legal, valid, binding perfected and enforceable liens and security interests not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or other Claim of any kind, (iii) the Senior Credit Facility Debt and the Pre-Petition Security Interests shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the C-BASS Entities' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the C-BASS Entities) and (iv) the obligations under the Senior Credit Facility shall not be subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or other Claim of any kind pursuant to |

| Term | Description |
|---|---|
| | the Bankruptcy Code or other applicable law, for all purposes in any C-BASS Entity's chapter 11 case and any subsequent chapter 7 cases. If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in the immediately preceding section shall nonetheless remain binding and preclusive on any Committee and on any other person or entity, except to the extent that such findings and admissions are expressly and successfully challenged in such adversary proceeding or contested matter.<br><br>Nothing in the Adequate Protection Stipulation vests or confers on any person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any cause of action belonging to the C-BASS Entities or their estates, including, without limitation, Lender Claims with respect to the Senior Credit Facility or the Senior Credit Facility Debt. Subject to the provisions of this section, nothing contained herein shall constitute an admission by any Committee or any party in interest other than the C-BASS Entities as to the value of the Senior Credit Facility Collateral or any other assets of the C-BASS Entities or their estates. |
| 3. Replacement Liens and Superpriority Claims | As adequate protection, *inter alia*, for the C-BASS Entities' use of the Senior Credit Facility Collateral, the Senior Lenders will be granted replacement liens for and equal in amount to the aggregate net post-petition diminution in value of the Senior Credit Facility Collateral upon all assets that secured the Senior Credit Facility Debt as of the Petition Date and any proceeds thereof with the same priority as the liens that secured the Senior Credit Facility Debt, and a first priority lien on the proceeds of any avoidance actions and administrative claims as provided for in section 507(b) of the Bankruptcy Code which shall be (i) allowed claims against each C-BASS Entity (jointly and severally) with priority over any and all administrative expenses and all other claims against the C-BASS Entities, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment and (ii) payable from and have recourse to all pre- and post-petition property of the C-BASS Entities. |
| 4. Modification of Automatic Stay | Upon entry of an order of the Bankruptcy Court approving the Adequate Protection Stipulation, the C-BASS Entities, the Administrative Agent and the Senior Lenders agree that the automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Adequate Protection Stipulation, including, without limitation, to permit the C-BASS Entities to incur the liabilities and obligations and grant security interests and liens to the Senior Lenders under the Adequate Protection Stipulation and to permit the Administrative Agent, on behalf of the Senior Lenders, to take any steps it may determine to be necessary or desirable to evidence the creation of or to perfect any such security interest and to deliver a notice of termination. |

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

| Term | Description |
|---|---|
| | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Administrative Agent and the Senior Lenders to exercise (i) immediately upon the occurrence of a Termination Event and the expiration of any required notice period, all rights and remedies under the Adequate Protection Stipulation and Senior Credit Facility other than those rights and remedies against the Senior Credit Facility Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of a Termination Event that requires the giving of notice to terminate the obligations of the Senior Lenders and upon the giving of such notice to the C-BASS Entities and the expiration of any required notice period (with a copy to counsel to any Committee and to the United States Trustee) to the extent provided for in the Adequate Protection Stipulation, all rights and remedies against the Senior Credit Facility Collateral provided for in the Adequate Protection Stipulation (including, without limitation, the right to set off against accounts maintained by the C-BASS Entities with the Administrative Agent or any Senior Lender or any affiliate thereof). In any hearing regarding any exercise of such rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, a Termination Event has occurred, and the C-BASS Entities hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of either the Administrative Agent or the Senior Lenders as set forth in the Adequate Protection Stipulation or the Senior Credit Facility. In no event shall the Administrative Agent or the Senior Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Senior Credit Facility Collateral. The delay or failure to exercise rights and remedies under the Adequate Protection Stipulation or the Senior Credit Facility by any of the Administrative Agent or Senior Lenders shall not constitute a waiver of any rights thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the Adequate Protection Stipulation or the Senior Credit Facility. |
| 5. Findings of Fact | The order approving the Adequate Protection Stipulation, *inter alia*, shall include the following findings of fact:<br><br>• The terms of the Adequate Protection Stipulation are fair and reasonable, and reflect the C-BASS Entities' exercise of prudent business judgment consistent with their fiduciary duties.<br><br>• The Adequate Protection Stipulation has been negotiated in good faith and at arm's length among the C-BASS Entities and the Administrative Agent pursuant to direction from the Senior Lenders.<br><br>• Absent granting the relief sought by such order, the C-BASS Entities' estates will be immediately and irreparably harmed. Consummation of the Adequate Protection Stipulation and authorization of the use of Senior Credit Facility Collateral in accordance with the Adequate Protection Stipulation is therefore in the best interests of the C-BASS Entities' estates consistent with their fiduciary duties. |
| 6. Limitation on Use of Senior | No Senior Credit Facility Collateral may be used for any of the following |

| Term | Description |
|---|---|
| Credit Facility Collateral | (each, a "**Lender Claim**"): (a) to object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under the Senior Credit Facility, or the liens or claims granted under the Adequate Protection Stipulation or the Senior Credit Facility, (b) to assert any claim or cause of action against any Senior Lender or its agents, affiliates, representatives, attorneys or advisors, (c) to prevent, hinder or otherwise delay the assertion, enforcement or realization by the Administrative Agent on any Senior Credit Facility Debt in accordance with the Adequate Protection Stipulation, (d) to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance claims or any other any Claims, counterclaims or causes of action, objections, contests or defenses against the Administrative Agent or any Senior Lender or their respective affiliates, representatives, attorneys or advisors in connection with matters related to the Senior Credit Facility, the Senior Credit Facility Debt or the Pre-Petition Security Interests or (e) to seek to modify any of the rights granted to the Administrative Agent thereunder or under the Senior Credit Facility; *provided* that any Committee may investigate the Pre-Petition Security Interests at an aggregate expense for such investigation not to exceed $100,000. |
| 7. Conversion to Chapter 7 or Dismissal | The C-BASS Entities shall not seek to (i) convert any of the C-BASS Entities' bankruptcy cases to a chapter 7 case, (ii) dismiss any of the C-BASS Entities' bankruptcy cases or (iii) modify the Adequate Protection Stipulation without written consent of the Administrative Agent. |
| 8. Waiver of section 506 | No expenses of administration of any of the C-BASS Entities' bankruptcy cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Senior Credit Facility Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the Administrative Agent and no such consent shall be implied from any other action, inaction, or acquiescence by the Administrative Agent or any Senior Lender. |
| 9. Binding Effect | The provisions of the Adequate Protection Stipulation shall be binding upon all parties in interest in the C-BASS Entities' bankruptcy cases, including, without limitation, the Administrative Agent, the Senior Lenders, any Committee appointed in any of the C-BASS Entities' bankruptcy cases, and the C-BASS Entities and their respective successors and assigns (including any chapter 7 or chapter 11 trustee appointed or elected for the estate of any of the C-BASS Entities, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the C-BASS Entities or with respect to the property of the estate of any of the C-BASS Entities) and shall inure to the benefit of the Administrative Agent, the Senior Lenders, and the C-BASS Entities and their respective successors and assigns, *provided, however*, that the Administrative Agent and the Senior Lenders shall have no obligation to permit the use of Senior Credit Facility Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the C-BASS Entities.<br><br>The terms and provisions of the Adequate Protection Stipulation shall |

A-5

| Term | Description |
|---|---|
| | continue in any superseding case under chapter 7 of the Bankruptcy Code, and all other rights and remedies of the Administrative Agent granted by the provisions of the Adequate Protection Stipulation shall continue in full force and effect. |
| 10. Preservation of Rights | If any or all of the provisions of the Adequate Protection Stipulation are reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect:<br><br>• the validity of any obligations of the C-BASS Entities under the Adequate Protection Stipulation incurred prior to the actual receipt of written notice by the Administrative Agent of the effective date of such reversal, stay, modification or vacatur, or the validity of any payments made in respect thereof; or<br><br>• the validity or enforceability of any priority authorized or created thereby or with respect to any obligations of the C-BASS Entities under the Adequate Protection Stipulation. Notwithstanding any such reversal, stay, modification or vacatur, any obligations of the C-BASS Entities under the Adequate Protection Stipulation incurred prior to the actual receipt of written notice by the Administrative Agent of the effective date of such reversal, stay, modification or vacatur and any payments made in respect of such obligations shall be governed in all respects by the original provisions of the Adequate Protection Stipulation, and the Administrative Agent and Senior Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in the Adequate Protection Stipulation with respect to all obligations of the C-BASS Entities under the Adequate Protection Stipulation. |
| 11. Effectiveness | The order approving the Adequate Protection Stipulation shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, the Adequate Protection Stipulation shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of the Adequate Protection Stipulation. |

A-6

## Exhibit B

## Foreclosure and Sale Procedures

*Pre-Public Sale Process.*

(a)     The Administrative Agent may, in its sole discretion, delegate its duties hereunder to any advisor retained by the Administrative Agent for such purpose (such advisor, the "**Liquidation Agent**").

(b)     The Administrative Agent, in its sole discretion, shall declare the dates on which bids shall be due for the Senior Credit Facility First Lien Collateral (each, a "**Bid Deadline**" and, collectively, the "**Bid Deadlines**"); however, the Administrative Agent reserves the right, in its sole discretion, to change or cancel any Bid Deadline at any time by notice to the Disposition Notice Parties (as defined below).

(c)     Twenty days prior to the Notification Date (as defined below), the Administrative Agent shall obtain information concerning financing statements indexed under C-BASS's name and certain of its subsidiaries' names.

(d)     At least 20 days (such date, the "**Notification Date**") before the earliest Bid Date, the Administrative Agent or the Liquidation Agent shall send, by first class mail or overnight courier, an authenticated notification of disposition, in a form decided on by the Administrative Agent in its sole discretion (a "**Disposition Notice**"), to each of the following persons (each, a "**Disposition Notice Party**"): (i) the C-BASS Entities, (ii) all parties to the Override Agreement, (iii) any other person from which the Administrative Agent has received, before the Notification Date, an authenticated notification of a claim of an interest in the Senior Credit Facility First Lien Collateral and (iv) any secured party or lienholder that, five days before the Notification Date, held a security interest in or other lien on the Senior Credit Facility First Lien Collateral, that was perfected by the filing of a financing statement that (A) identified the Senior Credit Facility First Lien Collateral, (B) was indexed under C-BASS's name or certain of its subsidiaries' names as of that date and (C) was filed in Delaware.

(e)     Following the Notification Date and for a period of three days, the Administrative Agent or the Liquidation Agent shall publish notice of the public sale in a form decided on by the Administrative Agent, in its sole discretion, in the *Wall Street Journal*, such days to be selected by the Administrative Agent or the Liquidation Agent.

(f)     The Administrative Agent or the Liquidation Agent shall prepare a general bid package (the "**Bid Package**") in a form decided on by the Administrative Agent in its sole discretion, including a formal bidding sheet, which (i) may specify that a reserve bid will be submitted by the Administrative Agent with respect to each mortgage-backed security and each Portfolio (as defined below) (each such bid, a "**Reserve Bid**"), (ii) shall invite qualified bidders to provide either (A) bids for individual mortgage-backed securities or (B) a single bid to purchase any of the portfolios of securities designated in the Bid Package as a sale (each, a

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc

"**Portfolio**") on an "All or None" basis in accordance with the procedures set forth below, (iii) shall require each bidder to represent that it is qualified to purchase each mortgage-backed security and each Portfolio for which it submits a bid and (iv) shall notify potential bidders that the public sale may be postponed, cancelled, recessed or reconvened at any time by the Administrative Agent or the Liquidation Agent.

(g)     Subject to the terms and conditions set forth herein, all of the Senior Credit Facility First Lien Collateral will be offered and sold strictly on an "AS IS AND WHERE IS" BASIS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY ANY SECURED PARTY, THE ADMINISTRATIVE AGENT, OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE ADMINISTRATIVE AGENT, AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST ANY SUCH PERSON AND WITH NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT OR THE LIKE IN CONNECTION WITH THE DISPOSITION OF THE SECURITIES, and each Disposition Notice and each Bid Package will clearly reflect that the securities are being sold on this basis.

(h)     For purposes of conducting the public sale, at least 20 days before the earliest Bid Deadline, the Administrative Agent or the Liquidation Agent shall deliver a Bid Package to (i) each Disposition Notice Party, (ii) potential qualified bidders set forth on a list prepared by the Administrative Agent or the Liquidation Agent and (iii) any other person that the Participant Lenders identify to the Administrative Agent or the Liquidation Agent in writing prior to the Notification Date to receive a Bid Package.

*Public Sale Process.*

(a)     Bids must be delivered to the Administrative Agent or the Liquidation Agent by the relevant Bid Deadline. Bids may be submitted by e-mail to the Liquidation Agent at the addresses specified in the Bid Package. The Administrative Agent may deliver a Reserve Bid for each mortgage-backed security on behalf of the Lenders, either through an individual bid or as part of a bid for a Portfolio, on the relevant Bid Deadline for such mortgage-backed security in an amount to be decided by the Administrative Agent in its sole discretion subject to non-objection by the Majority OC Members. The Administrative Agent may in its sole discretion determine whether each bidder is qualified to bid in the auctions conducted hereunder, including but not limited to whether the bidder: (i) is a "qualified institutional buyer" as such term is defined in Rule 144A(a)(i) promulgated under the Securities Act of 1933, as amended and (ii) has sufficient financial ability and net worth to bear the economic risks involved in an investment in such securities.

(b)     Each bid must use the bidding sheet contained in the Bid Package. Each bid shall be for the sale to one bidder of either (a) individual mortgage-backed securities or (b) a Portfolio on an "All or None" basis.

(c)     Each bid for a mortgage-backed security or a Portfolio shall be in a positive amount in U.S. dollars rounded to the nearest cent and shall be an offer by such bidder to purchase such mortgage-backed security or Portfolio, as applicable, upon payment by or credit to such bidder of such amount.

B-2

(d)     The winning bids shall be determined by the Administrative Agent or the Liquidation Agent as follows:

(i)     if one or more qualified bids (including any Reserve Bid) is submitted for a Portfolio and the highest qualified bid for such Portfolio is greater than the sum of the highest qualified bids with respect to each mortgage-backed security included in such Portfolio, then the winning bid with respect to each mortgage-backed security included in such Portfolio shall be such highest qualified bid for such Portfolio; and

(ii)     otherwise, the winning bid for each mortgage-backed security shall be the highest qualified bid or bids, if any (including any Reserve Bid) for each such mortgage-backed security;

*provided* that, in the case of both (i) and (ii) above, the Administrative Agent may at any time (including after the applicable Bid Deadline) withdraw any previously submitted Reserve Bid.

(e)     Winning bidders for each mortgage-backed security and Portfolio, as applicable, shall be notified by the Administrative Agent or the Liquidation Agent within a reasonable period of time following the relevant Bid Deadline on the relevant Bid Date.

(f)     The full purchase price in cash or by certified or cashier's check or wire transfer for each mortgage-backed security or Portfolio, as applicable, is due from winning bidders by the close of business (*i.e.* 5:00 p.m. prevailing Eastern time) on the settlement date, which shall occur within a reasonable period of time after the conclusion of the bidding, but in no event later than three business days after the relevant Bid Date; *provided* that if the Administrative Agent on behalf of the Senior Lenders is a winning bidder, the Administrative Agent shall be entitled to credit the outstanding Obligations (as defined in the Senior Credit Agreement) owed to the Senior Lenders against the good faith deposit and full purchase price payable. No sale will be completed until the successful bidder completes its purchase as provided herein and, in the case of any failure to complete a purchase, including due to the Administrative Agent withdrawing a previously submitted Reserve Bid, the Administrative Agent may without further notice accept the next highest bid from a qualified bidder.

(NY) 27011/145/CH. 11/RESTRUCTURING FACILITATION AGREEMENT/Restructuring Facilitation Agreement.doc