UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) | Chapter 11 |

In re:                                                    )    Chapter 11
                                                          )
CREDIT-BASED ASSET SERVICING                              )    Case No. 10-16040 (ALG)
AND SECURITIZATION LLC, <u>et al.</u>,                    )
                                                          )    Jointly Administered
                          Debtors.[1]                     )
                                                          )

## DISCLOSURE STATEMENT WITH RESPECT TO
## THE DEBTORS' JOINT CHAPTER 11 PLAN

Dated: February 8, 2011               Peter S. Partee, Sr.
      New York, New York        Jack A. Molenkamp
                                 Andrew Kamensky (admitted *pro hac vice*)
                                 HUNTON & WILLIAMS LLP
                                 200 Park Avenue, 53rd Floor
                                 New York, New York 10166
                                 Telephone: (212) 309-1000

                                 *Attorneys for Debtors and Debtors-in-Possession*

---

[1]      The other Debtors are the following:  C-BASS CBO Holding LLC, C-BASS Credit Corp., C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC, and Sunfish Management Group LLC.

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE DEBTORS' JOINT CHAPTER 11 PLAN. NEITHER ACCEPTANCES NOR REJECTIONS OF THE DEBTORS' JOINT CHAPTER 11 PLAN MAY BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION, AMENDMENT AND SUPPLEMENTATION.

## IMPORTANT NOTICE

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS' JOINT CHAPTER 11 PLAN (THE "PLAN") AND MAY NOT BE RELIED UPON OR OTHERWISE USED FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON OR ENTITY MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS HERETO AND THERETO BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST THE DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY

CODE) TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

**PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

# TABLE OF CONTENTS

**Page**

I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT ........................... 1

II. OVERVIEW OF THE PLAN ........................................................................... 2

III. SOLICITATION AND VOTING PROCEDURES .............................................. 5
    A. CHAPTER 11 GENERALLY ................................................................ 5
    B. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS ........................... 6
    C. SOLICITATION OF ACCEPTANCES OF THE PLAN ............................... 7
    D. VOTING ON THE PLAN ..................................................................... 8
    E. CREDITOR OPT-OUT ELECTION ....................................................... 9
    F. VOTING PROCEDURES ..................................................................... 10
    G. WITHDRAWAL OF VOTES ON THE PLAN ......................................... 10
    H. OTHER GENERAL INFORMATION ..................................................... 11

IV. GENERAL BACKGROUND REGARDING THE DEBTORS ............................. 12
    A. THE DEBTORS' BUSINESS AND CORPORATE STRUCTURE ................ 12
    B. THE DEBTORS' CAPITAL STRUCTURE ............................................. 13
    C. THE 2007 OUT-OF-COURT RESTRUCTURING .................................. 13
    D. EVENTS LEADING TO THE CHAPTER 11 FILING .............................. 15
    E. DESCRIPTION AND HISTORY OF CHAPTER 11 CASES ...................... 16

V. SUMMARY OF THE DEBTORS' JOINT CHAPTER 11 PLAN ........................ 21
    A. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS .................... 21
    B. SUBSTANTIVE CONSOLIDATION OF CERTAIN DEBTORS FOR PURPOSES OF
       VOTING, CONFIRMATION AND DISTRIBUTION ............................... 28
    C. FULL SATISFACTION, SETTLEMENT AND RELEASE .......................... 30
    D. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 30
    E. MEANS FOR IMPLEMENTATION OF THE PLAN .................................. 31
    F. RELEASES, EXCULPATIONS AND INJUNCTIONS AGAINST INTERFERENCE
       WITH THE PLAN ........................................................................... 36
    G. PLAN PROVISIONS GOVERNING DISTRIBUTIONS ............................. 38
    H. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE OF THE
       PLAN ............................................................................................ 40
    I. EFFECT OF PLAN CONFIRMATION .................................................. 41
    J. RETENTION OF JURISDICTION ........................................................ 43
    K. MISCELLANEOUS PROVISIONS OF THE PLAN .................................. 45

VI. CONFIRMATION OF THE PLAN ............................................................... 50
    A. CONFIRMATION HEARING .............................................................. 50
    B. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...... 50

VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 56

# TABLE OF CONTENTS

**Page**

A. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS ................56
B. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF
 CLAIMS AND INTERESTS................................................................................58

VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS ...................................60
 A. FAILURE TO RECEIVE REQUISITE ACCEPTANCES OF THE PLAN ..............................60
 B. FAILURE TO CONFIRM THE PLAN ...................................................................60
 C. FAILURE TO CONSUMMATE THE PLAN ...................................................................61
 D. DELAYS OF CONFIRMATION OR THE EFFECTIVE DATE ...........................................61
 E. RISK OF SUCCESSFULLY CREATING VALUE IN LIQUIDATION TRUST.......................61
 F. FORWARD LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT MAY
  PROVE TO BE INACCURATE ........................................................................61

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
 PLAN ................................................................................................................62
 A. LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE..............................62
 B. ALTERNATIVE PLAN(S) OF REORGANIZATION.........................................................62
 C. DISMISSAL OF THE CHAPTER 11 CASES ...................................................................63

X. CONCLUSION.................................................................................................63

# TABLE OF EXHIBITS

Exhibit A     Debtors' Joint Chapter 11 Plan

Exhibit B     Sources and Uses of Cash Analysis

Exhibit C     Restructuring Facilitation Agreement

# I.     PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Disclosure Statement (as it may be amended, modified and/or supplemented from time to time (the "Disclosure Statement") has been prepared pursuant to section 1125 of the Bankruptcy Code by Credit-Based Asset Servicing and Securitization LLC ("C-BASS") and certain of its direct and indirect subsidiaries, as debtors and debtors-in-possession in the above-captioned cases (together with C-BASS, the "Debtors") in connection with the Debtors' solicitation of votes to accept the *Debtors' Joint Chapter 11 Plan,* dated February 8, 2011 (as it may be altered, amended, modified or supplemented from time to time, the "Plan"), a true and complete copy of which is annexed hereto as **Exhibit A**. **Terms herein with an initial capital letter not required by standard capitalization rules are defined terms, and each term used but not parenthetically or otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.**

The purpose of the Disclosure Statement is to set forth information: (i) regarding the history of the Debtors and their businesses; (ii) describing the Debtors' chapter 11 cases (the "Chapter 11 Cases"); (iii) concerning the Plan and alternatives to the Plan; (iv) advising the Holders of Claims and Interests of their rights under the Plan; (v) assisting the Holders of Claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan; and (vi) assisting the Holders of Claims in Classes 4(a)(i), 4(a)(ii), 4(b), 5 and 6 in making an informed judgment regarding whether they should exercise the Release Opt-Out Election. The purpose of the Plan is to effect a restructuring of the Debtors' liabilities in a manner consistent with the Bankruptcy Code that will maximize recoveries by Creditors.

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.**

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Holders of Claims and Interests under the Plan (Section V.A., *Treatment of Classified Claims and Interests*);

- Describes the procedures for soliciting and casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);

- Describes the background and events leading to the Debtors' decision to commence the Chapter 11 Cases (Section IV, *General Background Regarding the Debtors*);

- Describes the Debtors' capital structure on the Petition Date (Section IV.B., *The Debtors' Capital Structure*);

- Describes how the Plan will be implemented (Section V.E., *Means for Implementation of the Plan*);

- Projects the total percentage recovery that each Class of Allowed Claims and Allowed Interests is likely to receive under the Plan (Section II, *Overview of the Plan*);

- Describes certain risk factors that may affect the feasibility of the Plan and potential distributions to Creditors (Section VIII, *Certain Risk Factors and Other Considerations*); and

- Evaluates the effects on Creditors of liquidation under Chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX, *Alternatives to Confirmation and Consummation of the Plan*).

## II. <u>OVERVIEW OF THE PLAN</u>

Among other things, the Plan provides for:

- Substantive consolidation of the Debtors' Estates, except for the Estate of Sunfish Management Group LLC;

- Payment in full of all Unclassified Claims;

- Payment in full of all Allowed Class 1 Priority Non-Tax Claims;

- Holders of Allowed Class 2 Senior Lender Claims shall receive all Cash that does not constitute Released Collateral and all other Remaining Collateral shall be transferred to CB Senior Lender, LLC, a Delaware limited liability company, on behalf of the Senior Lenders;

- Holders of Allowed Class 3 Claims shall receive, on the Effective Date or as soon thereafter as reasonably practicable, (A) Cash that constitutes Released Collateral in the amount of such Allowed claim; (B) turnover of the Assets that constitute collateral security for such Allowed claim, solely to the extent that such Assets (1) constitute Released Collateral or (2) are not Cash, and the Holder of such Allowed claim has a valid, perfected and enforceable first-priority Lien on such Assets, or (C) such other, less favorable treatment as may be agreed upon by the Holder of such claim;

- Holders of Allowed Class 4(a)(i) Senior Unsecured Claims Against Sub-Con Debtors **that <u>do</u> <u>not</u>** exercise the Release Opt-Out Election shall receive on the Effective Date or as soon thereafter as reasonably practicable, the sum of (i) such Holder's Fully Diluted Class 4(a) Ratable Portion of the Liquidation Trust Interests, (ii) such Holder's Base Class 4(a)(i)(1) Ratable Portion of the Class 5 Ratable Portion of the Liquidation Trust Interests, and (iii) such Holder's Base Class 4(a)(i)(1) Ratable Portion of the Class 6 Ratable Portion of the Liquidation Trust Interests;

- Holders of Allowed Class 4(a)(ii) Trade Debt and Employee Claims Against Sub-Con Debtors **that** **do** **not** exercise the Release Opt-Out Election shall receive on the Effective Date or as soon thereafter as reasonably practicable, such Holder's Fully Diluted Class 4(a) Ratable Portion of the Liquidation Trust Interests;

- Holders of Allowed Class 4(b) General Unsecured Claims Against Sunfish Management Group LLC **that** **do** **not** exercise the Release Opt-Out Election shall receive on the Effective Date or as soon thereafter as reasonably practicable, such Holder's Ratable Portion of the Sunfish Management Group Distribution Fund;

- Holders of Allowed Class 5 Subordinated Debt Claims and Allowed Class 6 TruPs Claims shall be deemed to transfer their Liquidation Trust Interests to the Holders of Allowed Class 4(a)(i)(1) Claims in accordance with the contractual subordination provisions in the documents under which the Subordinated Debt Claims and TruPs Claims arise, respectively, and section 510(a) of the Bankruptcy Code;

- Holders of Allowed Class 4(a)(i) Senior Unsecured Claims, Class 4(a)(ii) Trade Debt and Employee Claims, and Class 4(b) General Unsecured Claims **that** **do** exercise the Release Opt-Out Election shall receive no property or distributions under the Plan;

- All Allowed Class 7 Securities Litigation Claims shall receive no property or distribution under the Plan in accordance with the effect of Section 510(b) of the Bankruptcy Code; and

- The indefeasible cancellation of all Allowed Class 8 Interests in the Debtors.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified under the Plan. Similarly, Professional Fees Claims are not classified under the Plan. Section V.A.1. below describes the treatment of Allowed Unclassified Claims. The following table briefly summarizes the treatment of Allowed Classified Claims and Allowed Interests.

| *Class and Description* | *Treatment Under the Plan and Entitlement to Vote* | *Estimated Amount of Allowed Claims* | *Estimated Recovery* |
|---|---|---|---|
| **Class 1**<br><br>Priority Non-Tax | Unimpaired: Conclusively deemed to have accepted the Plan. Not entitled to vote. | $_____ | 100% |

| Class and Description | Treatment Under the Plan and Entitlement to Vote | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Claims | | | |
| **Class 2**<br><br>Senior Lender Claims Against Sub-Con Debtors | Impaired: Entitled to Vote. | $196[2] million | _____% |
| **Class 3**<br><br>Other Secured Claims Against the Debtors | Unimpaired: Conclusively deemed to have accepted the Plan. Not entitled to vote. | $_____ | 100% |
| **Class 4(a)(i)**<br><br>Senior Unsecured Claims Against Sub-Con Debtors | Impaired: Entitled to vote. | $_____ | _____% |
| **Class 4(a)(ii)**<br><br>Trade Debt and Employee Claims Against Sub-Con Debtors | Impaired: Entitled to vote. | $_____ | _____% |
| **Class 4(b)**<br><br>General Unsecured Claims Against Sunfish Management Group LLC | Impaired: Entitled to vote. | $_____ | _____% |
| **Class 5**<br><br>Subordinated Debt Claims Against Sub-Con Debtors | Impaired: Entitled to vote. | $_____ | 0% |
| **Class 6**<br><br>TruPs Claims Against Sub-Con Debtors | Impaired: Entitled to vote. | $_____ | 0% |

---

[2]  This amount does not include, *inter alia*, all fees and expenses owed under the Senior Credit Facility.

| Class and Description | Treatment Under the Plan and Entitlement to Vote | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 7**<br><br>Securities Litigation Claims Against the Debtors | Impaired. Conclusively deemed to have rejected the Plan. Not entitled to vote. | $0 | 0% |
| **Class 8**<br><br>Interests in the Debtors | Impaired: Conclusively deemed to have rejected the Plan. Not entitled to vote. | N/A | 0% |

The Debtors' estimate of Allowed Claims in the chart above and the sources and uses of cash analysis ("Sources and Uses of Cash Analysis") annexed hereto as **Exhibit B**, form the basis of projected recoveries for Holders of Allowed Claims in such Classes.

*Notwithstanding the Debtors' efforts in developing the Allowed Claims estimates above and the Sources and Uses of Cash Analysis, the preparation of such estimates is inherently uncertain, and, accordingly, there is no assurance that such estimates accurately will predict the actual amount of Allowed Claims in the Chapter 11 Cases. As a result, the actual amount of Allowed Claims in Classes 1, 2, 3, 4, 5, 6 and 7 may differ materially from the Debtors' estimates contained herein.*

## III.  SOLICITATION AND VOTING PROCEDURES

### A.  Chapter 11 Generally

Under chapter 11 of the Bankruptcy Code, a debtor reorganizes its business or sells its assets for the benefit of its creditors, interest holders (such as shareholders, partners or members), and other parties in interest. The culmination of a chapter 11 case is the confirmation and consummation of a plan of reorganization, which specifies the treatment to be afforded to holders of claims against or interests in the debtor in exchange for the discharge and cancellation of such claims and interests. A plan of reorganization is implemented only after it has been confirmed by the bankruptcy court. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of the debtor. Subject to certain limited exceptions, confirmation of the plan releases the debtor from any debt that arose before the date of confirmation of the plan in exchange for the consideration specified under the confirmed plan. Thus, following confirmation, creditors and interest holders are deprived of their pre-bankruptcy rights and entitlements and instead are limited solely to the rights and entitlements specified by the plan.

In these Chapter 11 Cases, the Plan specifies the payments, distributions and other treatment to be afforded to Holders of Allowed Claims and Allowed Interests in the Debtors. Certain Holders of Allowed Claims, as specified in the Plan, are entitled to vote on the Plan. To confirm the Plan, certain voting requirements and statutory tests must be satisfied. The statutory tests are designed in large measure to protect the interests of Holders of Claims or Interests in the Debtors that either are not entitled to vote on the Plan or that vote to reject the Plan, but nevertheless will be bound by the provisions of the Plan if it is confirmed. For a more complete description of the requirements of such tests and how the Plan satisfies such tests, see Section VI.B. of this Disclosure Statement.

**B.      Notice to Holders of Claims and Interests**

This Disclosure Statement is being transmitted to Holders of certain Claims against and Interests in the Debtors. The primary purpose of this Disclosure Statement is to provide those Holders of Claims voting on the Plan with adequate information to make an informed decision on whether to vote to accept or reject the Plan.

On March __, 2011, the Bankruptcy Court entered an order Docket No. [___] approving this Disclosure Statement, finding that it contains information of a kind and in sufficient detail to enable the Holders of Claims against the Debtors that are entitled to vote to make an informed judgment about the Plan.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, NOR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

**IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE ANY DISTRIBUTIONS OF PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO, THE PLAN, AND ANY EXHIBITS TO THE PLAN CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

**CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BY ITS NATURE IS FORWARD LOOKING OR CONTAINS OR MAY CONTAIN ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.**

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur after the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct or complete as of any time after the date hereof.

## C.  Solicitation of Acceptances of the Plan

Under the Plan, all Claims and Interests that are required to be designated in Classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code have been placed in various Classes based on the nature and priority of the Claim or Interest. Each Class is either Impaired or Unimpaired under the Plan. A Class of Claims or Interests that is Unimpaired is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote on the Plan. Accordingly, acceptances of the Plan are being solicited only from Holders of Claims in Classes 2, 4(a)(i), 4(a)(ii), 4(b), 5 and 6. Holders of Claims in Classes 1 and 3 are Unimpaired under the Plan, and therefore conclusively are presumed to have accepted the Plan. Holders of Allowed Claims and Interests in Classes 7 and 8 will receive no distribution under the Plan and, therefore, are deemed to have rejected the Plan.

The Bankruptcy Code provides that a Class of Impaired Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code as described below) of at least two-thirds (2/3) in amount of Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Pursuant to section 1126(c) of the Bankruptcy Code, a vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, after notice and a hearing, that such an acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. For a more complete description of the requirements of confirmation of the Plan, see Section VI.B. of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan does not accept the Plan, the Debtor reserves the right to amend the Plan or to request confirmation of the Plan (or both) pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of the Plan by one or more Impaired Classes of Claims. Under that section of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court, if among other things, the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class. For a more complete description of the requirements of confirmation of a nonconsensual plan, see Section VI.B. of this Disclosure Statement.

The Debtors are requesting Confirmation of the Plan with respect to Classes 7 and 8 pursuant to section 1129(b) of the Bankruptcy Code. In the event that a Class of Claims entitled to vote does not vote to accept the Plan, the Debtors' determination as to whether to request confirmation of the Plan with respect to such Class, pursuant to section 1129(b) of the Bankruptcy Code, will be announced at the Confirmation Hearing.

### D. Voting on the Plan

The Voting Deadline is April __, 2011 at 5:00 p.m. (prevailing Eastern Time). To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided. The Debtors reserve the right, in their sole discretion, to extend the Voting Deadline, in which case the term "Voting Deadline" will mean the latest date on which a Ballot will be accepted. To the extent the Voting Deadline is extended by the Debtors, the Debtors will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote. The notice may state that a Debtor is extending the Voting Deadline for a specified period of time or on a daily basis until 5:00 p.m., prevailing Eastern Time, on the date on which the Debtor has received sufficient acceptances to seek Confirmation of the Plan.

If you are entitled to vote to accept or reject the Plan, enclosed is a Ballot for the acceptance or rejection of the Plan and a pre-addressed return envelope for the return of the Ballot.

> **BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF IMPAIRED CLAIMS IN CLASSES 2, 4(a)(i), 4(a)(ii), 4(b), 5 AND 6 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Please use only the official Ballot or Ballots that accompany this Disclosure Statement. All votes to accept or reject the Plan must be cast by using that Ballot. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by Donlin, Recano & Company, Inc. (the "Voting Agent"), at one of the addresses indicated on the Ballot, by no later than the Voting Deadline. If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions on the Ballot, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

If you are the Holder of a Claim in Class 2, 4(a)(i), 4(a)(ii), 4(b), 5 or 6 and did not receive a Ballot, received a damaged or illegible Ballot or lost your Ballot, of if you are a party in interest and have any questions concerning this Disclosure Statement, the Plan or the voting procedures in respect thereof, please contact the Voting Agent at telephone no.: (212) 771-1128

After carefully reviewing this Disclosure Statement, the Plan and the exhibits annexed hereto and thereto, please indicate on the enclosed Ballot your vote with respect to the Plan and, for Holders of Claims in Class 4(a)(i), 4(a)(ii), 4(b), 5 and 6, whether you accept the Third-Party

Releases set forth in section 10.1(b) of the Plan, and transmit the Ballot to the Voting Agent in accordance with either of the following two methods:

**By Hand or Overnight Delivery:**
**Donlin, Recano & Company, Inc.**
**Attn: C-BASS**
**419 Park Avenue South, Suite 1206**
**New York, New York 10016**

**By Mail:**
**Donlin, Recano & Company, Inc.**
**Attn: C-BASS**
**P.O. Box 2034, Murray Hill Station**
**New York, New York 10156**

> **FAILURE TO COMPLY WITH THE REQUIREMENTS OF EITHER OF THESE METHODS MAY RESULT IN YOUR VOTE NOT BEING COUNTED. YOU MUST RETURN YOUR BALLOT TO THE VOTING AGENT BY THE VOTING DEADLINE.**
>
> **THE DEBTORS BELIEVE THAT PROMPT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES AND ALL HOLDERS OF CLAIMS. THE DEBTORS STRONGLY URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

**E.     Creditor Opt-Out Election**

Holders of Allowed General Unsecured Claims and Allowed Rejection Claims that are classified in Classes 4(a)(i), 4(a)(ii), 4(b), 5 and 6 will have the right to make the "Creditor Opt-Out Election." The Plan contemplates that all Holders of Allowed General Unsecured Claims and Allowed Rejection Claims in Classes 4(a)(i), 4(a)(ii) and 4(b) will be entitled to receive 100% of their Ratable Portion of certain recoveries from the Liquidation Trust in exchange for, among other things, granting the Third-Party Releases set forth in section 10.1(b) of the Plan. The Plan further contemplates that all Holders of Allowed General Unsecured Claims in Classes 5 and 6 have the option of granting the Third Party Releases set forth in Section 10.1(b) of the Plan, which election will have no impact on their respective recoveries from the Liquidation Trust. ***By making the Creditor Opt-Out Election, Holders of Allowed General Unsecured Claims and Allowed Rejection Claims are electing <u>NOT</u> to grant a release of all rights, claims or causes of action that arise as a result of, or are related to, such Holder's relationship with the Debtors or to the "Released Parties" and to receive <u>NO</u> recovery from the Liquidation Trust provided in the Plan for Holders of Allowed General Unsecured Claims and Allowed Rejection Claims in Classes 4(a)(i), 4(a)(ii) and 4(b). <u>HOLDERS OF GENERAL UNSECURED CLAIMS AND REJECTION CLAIMS IN CLASSES 4(a)(i), 4(a)(ii) AND 4(b) THAT MAKE THE CREDITOR OPT-OUT ELECTION WILL RECEIVE NOTHING UNDER THE PLAN.</u>*** To make the Creditor Opt-Out Election, Holders of Claims in Classes

4(a)(i), 4(a)(ii), 4(b), 5 and 6 must indicate their intent to make the Creditor Opt-Out Election in accordance with the instructions on the Ballot.

On the other hand, as consideration for not making the Creditor Opt-Out Election, the Holders of Allowed General Unsecured Claims and Allowed Rejection Claims in Classes 4(a)(i), 4(a)(ii), and 4(b) will have the right to receive 100% of their Ratable Portion of the distribution provided for under the Plan to members of those Classes. A full description of the treatment of Claims and Interests under the Plan is set forth in Section V.A.

If you have questions concerning the procedure for voting, the option to make the Creditor Opt-Out Election or the terms of this Disclosure Statement and/or the Plan, please contact counsel for the Debtors indicated on the first page of this Disclosure Statement. If you did not receive the appropriate Ballot or Ballots, or if you received a damaged Ballot or have lost your Ballot, please contact the Voting Agent at telephone no.: (212) 771-1128.

## F.     <u>Voting Procedures</u>

Failure by a Holder of a Claim to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan. Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your executed Ballot to indicate whether you accept or reject the Plan. Any executed Ballots that are timely received but do not indicate either an acceptance or a rejection of the Plan or indicate both an acceptance and a rejection of the Plan will not be counted.

Submission of all Ballots must be made directly to the Voting Agent in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

## G.     <u>Withdrawal of Votes on the Plan</u>

The solicitation of acceptances of the Plan will expire on the Voting Deadline. A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent at one of the addresses set forth on the Ballot at any time prior to the Voting Deadline. Thereafter, withdrawal of a properly submitted Ballot may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must:

- specify the name of the Claim Holder who submitted the vote on the Plan to be withdrawn;

- contain the description of the Claim; and

- be signed by the Claim Holder in the same manner as on the Ballot.

The Debtors expressly reserve the absolute right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to the withdrawal of a properly executed Ballot as specified above, any Claim Holder who has previously submitted a properly executed Ballot to the Voting Agent on or prior to the Voting Deadline, may revoke and change its vote by submitting to the Voting Agent on or prior to the Voting Deadline a subsequent properly executed Ballot. If more than one properly executed Ballot is received from an individual Creditor with respect to the same Claim prior to the Voting Deadline, only the last properly executed Ballot received by the Voting Agent on or prior to the Voting Deadline will be deemed to reflect the Claim Holder's intent and will supersede and revoke all prior Ballot(s) submitted in connection with such Claim.

## H.    Other General Information

The Debtors believe that the Plan provides equal or greater value to Creditors than other available alternatives. The Debtors believe that acceptance of the Plan is in the best interests of each and every Creditor entitled to vote on the Plan and recommend that each Creditor vote to accept the Plan. This Disclosure Statement contains good faith estimates and assumptions which are based on facts currently known to the Debtors and which may be materially different from actual future results.

> **EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL GOVERN.**

General information regarding the Debtors, their businesses and material events leading to the commencement of the Chapter 11 Cases and the history of the Chapter 11 Cases is set forth in Article IV of this Disclosure Statement. Except where otherwise noted, this information is provided by the Debtors and their management. The statements as to the Debtors' financial condition contained in this Disclosure Statement are made as of November 12, 2010 (except as otherwise specified), and there is no representation or implication that the information contained herein will not have changed as of any time subsequent to that date, nor will you receive any notice of such changes.

Certain risk factors and other considerations are described in Article VIII below. Alternatives to confirmation and consummation of the Plan are described in Article IX below.

> **THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE DEBTORS AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.**

## IV. GENERAL BACKGROUND REGARDING THE DEBTORS

### A. The Debtors' Business and Corporate Structure

C-BASS is a Delaware limited liability company the outstanding membership interests of which are owned (i) 45.5% by MGIC Mortgage and Consumer Asset I, LLC, a wholly-owned subsidiary of MGIC Investment Corporation ("MGIC"), (ii) 45.5% by Residual Interest Investments LP, a wholly-owned subsidiary of Radian Group, Inc. ("Radian"), and (iii) 9% by non-debtor C-BASS Holding LLC, which is owned by certain current and former members of C-BASS's senior management. Each of MGIC and Radian is a publicly-traded mortgage insurance and reinsurance company.

C-BASS owns 100% of the outstanding membership interests in Debtors C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC, and Sunfish Management Group LLC. C-BASS also owns 100% of the outstanding common membership interests in Debtor C-BASS CBO Holding LLC. The outstanding preferred membership interests in Debtor C-BASS CBO Holding LLC are held by 125 unaffiliated individuals. C-BASS also owns 100% of the outstanding common stock of C-BASS Credit Corp.

From its founding in 1996, C-BASS was a leading issuer, servicer, and investor specializing in credit-sensitive residential mortgage assets. These assets included performing subprime and "Alt A," non-performing, re-performing, and second-lien residential mortgage loans and small commercial mortgage loans ("Whole Loans"), as well as subordinated and mezzanine residential mortgage-backed securities with prime, subprime, Alt A and high loan-to-value collateral ("RMBS"). C-BASS was a long-term investor in this sector of the residential mortgage market and generally either held purchased assets in its portfolio or securitized them and retained the most subordinate or "first-loss" tranches of issued securities as well as servicing rights for the securitized assets.

C-BASS serviced the vast majority of its Whole Loans and the underlying collateral for its RMBS through Litton Loan Servicing, LP ("Litton"), which was a wholly-owned subsidiary of C-BASS until the Fall of 2007, when it was sold, along with the attendant servicing rights, to facilitate the transactions contemplated by the Override Agreement (as defined and discussed

below).  In part due to Litton's market-leading servicing techniques, C-BASS was able to maximize the value of its RMBS and Whole Loans.

C-BASS also sponsored a number of collateralized bond and debt obligation  issuances and retained management rights with respect to such issuances (the "<u>CBO Management Rights</u>") in Debtor C-BASS Investment Management LLC ("<u>CIM</u>").  CIM earns significant fees as a result of its ownership of the CBO Management Rights.

## B.     The Debtors' Capital Structure

The Debtors financed their prepetition activities through a variety of secured and unsecured debt as well as RMBS and Whole Loan repurchase agreements (collectively, the "<u>Repurchase Agreements</u>").  Substantially all of the Repurchase Agreements constituted repurchase agreements within the meaning of section 101(47) of the Bankruptcy Code and fell within the safe-harbor of section 559 of the Bankruptcy Code.

In the Summer of 2007, C-BASS was a party to (i) Whole Loan Repurchase Agreements with three different counterparties (collectively, the "<u>Whole Loan Repo Counterparties</u>") representing an aggregate repurchase obligation in excess of $750 million and (ii) RMBS Repurchase Agreements with 17 different counterparties (collectively, the "<u>RMBS Repo Counterparties</u>"; together with the Whole Loan Repo Counterparties, the "<u>Repo Counterparties</u>"), representing an aggregate repurchase obligation in excess of $730 million.

The Debtors' principal secured debt consisted of a $1,855,000,000 senior secured credit facility (the "<u>Senior Credit Facility</u>") syndicated among a number of lenders (the "<u>Senior Lenders</u>") and secured *inter alia* by first-priority liens on and security interests in substantially all of the Debtors' assets (the "<u>Senior Credit Facility Collateral</u>") other than (i) the assets covered by the Repurchase Agreements and (ii) the assets of Debtors Sunfish Management Group LLC and C-BASS Credit Corp., neither of which is an obligor under the Senior Credit Facility.

The Debtors' principal unsecured financing consisted of (i) four issuances by C-BASS of subordinated promissory notes totaling $115 million (collectively, the "<u>Sub-Debt</u>"), (ii) six issuances of C-BASS subordinated promissory notes as part of trust-preferred securities issuances totaling $285 million (collectively, the "<u>TruPs</u>"), and (iii) two promissory notes issued by C-BASS, each in the original principal amount of $50 million, one payable to MGIC and one to Radian ("<u>Parent Notes</u>").  The Sub-Debt and the TruPs are subordinate by their terms to the Debtors' debt obligations, including the Senior Credit Facility, the Parent Notes, and amounts owed under the Repurchase Agreements, but are not subordinate to certain claims held by current and former employees of the Debtors (collectively, the "<u>Employee Claims</u>") or to trade debt.

## C.     The 2007 Out-of-Court Restructuring

Until early 2007, C-BASS's vertical business strategy was extremely successful, causing C-BASS's net stockholders' equity to soar to over $700 million.

As calendar year 2007 progressed, however, what was then termed the "sub-prime mortgage crisis" in the domestic residential mortgage market worsened significantly, causing the

Repo Counterparties and the Senior Lenders to "mark-to-market" their respective collateral and to make numerous substantial margin calls on C-BASS. From January 2007 through June 2007, capital calls totaling in excess of $290 million were made upon and honored by C-BASS. In July 2007, additional capital calls in excess of $580 million were made upon C-BASS, of which C-BASS was able to honor approximately $285 million.

Consequently, during a harrowing period from July 2007 through early November 2007, the Debtors entered into large-scale forbearance and restructuring negotiations with all of the Repo Counterparties, the Senior Lenders, MGIC, Radian, holders of the Sub-Debt (the "Sub-Debt Holders"), holders of the TruPs (the "TruPs Holders"), various counterparties to hedging instruments (collectively, the "Hedge Counterparties"), and holders of the Employee Claims (collectively, the "Employee Claim Holders"; together with the Repo Counterparties, the Senior Lenders, the Sub-Debt Holders, the TruPs Holders, MGIC, Radian and the Hedge Counterparties, the "Override Parties").

During these negotiations, certain of the Debtors, the Senior Lenders and the Repo Counterparties entered into five separate forbearance agreements (collectively, the "Pre-Override Forbearance Agreements") that enabled the Debtors to preserve their assets while engaging in an expedited bidding and auction process for the sale of Litton as a going concern. Pursuant to the second of the Pre-Override Forbearance Agreements, the Debtors granted liens on and security interests in certain additional collateral to the Senior Lenders.

On September 27, 2007, the Debtors entered in an agreement for the sale of Litton to The Goldman Sachs Group, Inc. for $428 million in cash (the "Litton Sale Agreement"). At the same time, the Debtors prepared to file chapter 11 bankruptcy cases and obtained multiple commitments for highly negotiated multi-party debtor-in-possession financing.

With the Litton Sale Agreement in hand and the specter of bankruptcy looming, negotiations among the Debtors and the Override Parties culminated in the execution of that certain Override Agreement, dated as of November 13, 2007, by and among certain of the Debtors and literally all of the Override Parties (the "Override Agreement"). The Override Agreement represented a landmark achievement, effectively accomplishing a long-term forbearance agreement among all of the Override Parties in exchange for *inter alia* (i) an agreed-upon allocation of the Litton Sale Proceeds among the Repo Counterparties, the Senior Lenders and the Debtors, (ii) a temporary restructuring or "overriding" of the Override Parties' respective claims for the period covered by the Override Agreement, and (iii) broad releases among the Debtors and the Override Parties.

Pursuant to the Override Agreement, the Debtors also granted numerous liens and security interests, including without limitation (i) first-priority liens on and security interests in all unencumbered assets of certain of the Debtors to the Senior Lenders as additional collateral security for the Senior Credit Facility, (ii) second-priority liens on and security interests in the Senior Credit Facility Collateral as additional collateral security for all of the Repurchase Agreements, (iii) second-priority liens on and security interests in the RMBS or Whole Loans subject to each Repurchase Agreement as additional collateral security for all other Repurchase Agreements, and (iv) third-priority liens on and security interests in the RMBS and Whole Loans subject to the Repurchase Agreements as collateral security for the Senior Credit Facility. The

Debtors also agreed to grant "springing" liens on and security interests in their assets to unsecured Override Parties once secured Override Parties were paid in full.

Under the Intercreditor Agreement executed simultaneously with the Override Agreement (the "Intercreditor Agreement"), each Override Party with a first-priority lien on or security interest in collateral has the exclusive and unilateral right to enforce such lien and security interest against, and otherwise consent to dispositions of, such collateral, notwithstanding the junior liens granted on such collateral to the other Override Parties.

On December 10, 2007, C-BASS closed the sale of Litton to The Goldman Sachs Group, Inc. and distributed the sale proceeds in accordance with the Override Agreement, causing it to become effective.

## D.    **Events Leading to the Chapter 11 Filing**

At the time the Override Agreement became effective, the Debtors strongly believed that substantial equity existed in the assets serving as collateral for the Override Parties. As the domestic mortgage crisis spread beyond the "sub-prime" sector to encompass the entire residential mortgage market and deepened by an order of magnitude that no one could have predicted, however, it became clear that no such equity existed and that the Debtors would not be able to meet the requirements of the Override Agreement.

As a result, the Debtors entered into multiple amendments of the Override Agreement and one additional forbearance agreement with the Senior Lenders (the "Post-Override Forbearance Agreement"). Under the Post-Override Forbearance Agreement, the Senior Lenders agreed to forbear from exercising default remedies until October 15, 2010 in exchange for various operational and other covenants from the Debtors and broad releases from the Debtors to a defined group of releasees, including without limitation the Senior Lenders and the Administrative Agent (as defined below). In accordance with the Post-Override Forbearance Agreement, the vast majority of the collateral for the Senior Credit Facility has been sold and the proceeds thereof applied to reduce the balance of the Senior Credit Facility.

Similarly, the Debtors entered into forbearance and termination agreements with most of the Repo Counterparties. Pursuant to those agreements, the applicable Repurchase Agreements were terminated, the Debtors and the applicable Repo Counterparties exchanged broad releases, and the assets subject to such Repurchase Agreements were sold or retained by the applicable Repo Counterparties. Those Repo Counterparties who did not enter into forbearance and termination agreements with the Debtors have terminated their Repurchase Agreements and disposed of the related assets.

Pursuant to the Restructuring Facilitation Agreement, dated as of September 20, 2010 (the "RFA"), by and among the Debtors, JPMorgan Chase Bank, N.A., as administrative agent under the Senior Credit Facility (the "Administrative Agent"), and certain lenders under the Senior Credit Facility that are signatories to the RFA (collectively, the "Participant Lenders"), the Administrative Agent and Participant Lenders agreed, *inter alia,* to forbear from exercising default remedies through November 15, 2010 and to permit the Debtors to use up to $8.2 million of the cash proceeds of the Remaining Collateral in accordance with the terms of the RFA and,

after the Petition Date, in accordance with the agreed upon cash collateral and adequate protection order described below. The RFA also (i) specifies a timeline pursuant to which the Debtors are to use their respective best efforts to liquidate the Remaining Collateral, (ii) obligates the Senior Lenders to vote in favor of and otherwise support a chapter 11 plan satisfying certain specified criteria, (iii) obligates the Senior Lenders to release their liens on and security interests in certain collateral under a chapter 11 plan provided that certain specified conditions are satisfied, and (iv) provides broad releases to a defined group of releasees, including without limitation the Senior Lenders and the Administrative Agent.

The Senior Credit Facility Collateral remaining in the Debtors' possession and control as of the Petition Date (collectively, the "Remaining Collateral") consists principally of (i) various subordinated tranches of RMBS, (ii) the CBO Management Rights, (iii) certain Whole Loans, (iv) one "real estate owned" or "REO" property, (v) claims against various third parties, some of which are debtors in chapter 11 bankruptcies, (vi) deposits with surety bond providers, (vii) furniture, fixtures, equipment and various forms of intellectual property, (viii) receivables for the unused amount, if any, of professional retainers, and (ix) cash collateral on deposit in the Debtors' centralized cash operating account. The outstanding balance of the Senior Credit Facility as of the Petition Date is approximately $196 million—an amount well in excess of the current fair market value of the Remaining Collateral.

### E. Description and History of Chapter 11 Cases

#### 1. General Case Background

On the Petition Date, the Debtors voluntarily commenced the Chapter 11 Cases before the Bankruptcy Court. The Debtors are continuing in possession of their properties and continuing to operate and manage their business as a debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 16, 2010, the Bankruptcy Court entered an order [Docket No. 28] directing that the Debtors' Chapter 11 Cases be procedurally consolidated and jointly administered for procedural purposes only under Case No. 10-16040. The Honorable Allan L. Gropper, United States Bankruptcy Judge for the Southern District of New York, is presiding over the Debtors' Chapter 11 Cases.

On December 1, 2010, the United States Trustee for the Southern District of New York, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed [Docket No. 65] the Official Committee of Unsecured Creditors (the "Committee") to serve in the Chapter 11 Cases. Since the appointment of the Committee, the Debtors have consulted with the Committee on all matters material to the administration of the Chapter 11 Cases. The Debtors also have discussed their business operations with the Committee and have sought the concurrence of the Committee for actions and transactions outside of the ordinary course of business.

The Committee consists of three members:

1.  Wilmington Trust Company
    Rodney Square North
    110 Market Street
    Wilmington, DE  19890-1615
    Attn: Patrick H. Healy, Vice President

2.  Commerzbank AG, Grand Cayman Branch
    2 World Financial Center
    New York, NY  10281
    Attn:   Bruce Harris
            Robert Wolff
            Paul Koury

3.  Wells Fargo Bank, NA
    45 Broadway, 12th Floor
    New York, NY  10006
    Attn: James R. Lewis

No additional creditors have been appointed to the Committee.  No other statutory committees have been designated or appointed in the Chapter 11 Cases.

2.   Entry of the First Day Orders

On November 16, 2010, November 17, 2010, and December 6, 2010, the Bankruptcy Court entered certain "first day" orders granting the Debtors various forms of relief designed to stabilize, and minimize any disruption to, the Debtors' business operations, including:  (i) authorizing the joint administration of the Debtors' Chapter 11 Cases [Docket No. 28], (ii) authorizing the continued maintenance of the Debtors' bank accounts and continued use of existing business forms [Docket Nos. 33, 78], (iii) authorizing the Debtors to pay certain prepetition employee wage and benefit claims [Docket No. 29], and (iv) prohibiting utilities from altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of prepetition invoices, and establishing procedures for providing utilities with adequate assurance of future performance [Docket No. 81].

Contemporaneously therewith, the Bankruptcy Court entered final orders (i) approving interim compensation procedures for professionals employed by the Debtors and the Committee [Docket No. 79], (ii) approving the form and manner of notice of the commencement of the Chapter 11 Cases, authorizing the preparation of an electronic list of creditors in lieu of mailing matrix, and authorizing the filing of a consolidated list of the Debtors' top 30 unsecured creditors [Docket No. 30]; and (iii) authorizing payment of prepetition payroll taxes, withholdings and reimbursable expenses, authorizing continuation of employee benefit programs, and authorizing financial institutions to honor all related checks and electronic payment requests [Docket No. 29].

3.   Authorization to Use Cash Collateral

Pursuant to the Collateral Documents, the Senior Lenders assert security interests in, and liens on, substantially all of the Debtors' Assets, including what is termed "Cash Collateral"

arising from those Assets. Cash Collateral includes all income, receivables, proceeds received from or on account of the Debtors' prepetition or post petition business operations, and all other cash equivalents constituting Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code. In order to avoid irreparable harm to the Debtors' businesses that would have occurred if the Debtors were unable to utilize Cash Collateral to support their operations, the Debtors filed a motion [Docket No. 6] (the "Cash Collateral Motion") on November 12, 2010, seeking, among other things, authorization to use the Cash Collateral to pay the Debtors' actual, necessary, ordinary course operating expenses and the expenses of the Chapter 11 Cases in accordance with a budget. On November 19, 2010, the Bankruptcy Court entered an order [Docket No. 46] on an interim basis allowing the Debtors to use Cash Collateral in accordance with a budget agreed upon with the Senior Lenders.

On December 16, 2010, the Court approved the *Stipulation and Final Order Pursuant to Section 105(a), 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 Granting Adequate Protection to Pre-Petition Senior Lenders* [Docket No. 122] (the "Cash Collateral Order").

       4.       Retention of Professionals

       a.       Hunton & Williams LLP

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the Chapter 11 Cases, on December 6, 2010, the Debtors filed with the Bankruptcy Court an application [Docket No. 82] (the "Hunton & Williams Application") seeking entry of a final order authorizing the Debtors to retain Hunton & Williams LLP ("Hunton") as their lead counsel. On December 20, 2010, the Bankruptcy Court entered a final order [Docket No. 129] approving the Hunton & Williams Application.

       b.       Protiviti, Inc.

To assist them in carrying out their duties as debtors-in-possession, the Debtors, on December 1, 2010, filed with the Bankruptcy Court an application [Docket No. 67] (the "Protiviti Application") seeking entry of a final order authorizing the Debtors to retain Protiviti as their financial advisor. On December 20, 2010, the Bankruptcy Court entered a final order [Docket No. 131] approving the Protiviti Application.

       c.       Donlin, Recano & Company, Inc.

On the Petition Date, the Debtors filed with the Bankruptcy Court an application [Docket No. 18] (the "Donlin Recano Application") seeking entry of a final order authorizing the Debtors to retain Donlin, Recano & Company, Inc. as their noticing, claims and voting agent. On November 16, 2010, the Bankruptcy Court entered an order [Docket No. 32] approving the Donlin Recano Application. On November 19, 2010, the Bankruptcy Court entered an amended order authorizing the employment and retention of Donlin, Recano & Company, Inc. as noticing and claims agent for the Debtors [Docket No. 45].

####### d.    EmphaSys Technologies, Inc.

On December 21, 2010, the Debtors filed with the Bankruptcy Court an application [Docket No. 137] the ("EmphaSys Application"] seeking entry of a final order authorizing the Debtors to retain EmphaSys Technologies, Inc. to provide securitization related tax services *nunc pro tunc* to the Petition Date.  On January 14, 2011, the Bankruptcy Court entered a final order [Docket No. 179] approving the EmphaSys Application.

####### e.    Hahn & Hessen LLP

On January 18, 2011, the Committee filed with the Bankruptcy Court an application [Docket No. 186] (the "Hahn & Hessen Application") seeking entry of a final order authorizing the Committee to employ Hahn & Hessen LLP as counsel to the Committee *nunc pro tunc* to December 3, 2010.  On February 1, 2011, the Bankruptcy Court entered a final order [Docket No. 211] approving the Hahn & Hessen Application.

####### f.    J.H. Cohn LLP

On December 23, 2010, the Committee filed with the Bankruptcy Court an application [Docket No. 155] (the "J.H. Cohn Application") seeking entry of a final order authorizing the Committee to employ J.H. Cohn LLP as its financial advisors and forensic accountants *nunc pro tunc* to December 3, 2010.  On January 14, 2011, the Bankruptcy Court entered a final order [Docket No. 180] approving the J.H. Cohn Application.

##### 5.    Claims Process and Bar Date

On November 18, 2010, the Debtors each filed with the Bankruptcy Court a statement of financial affairs, and schedules of assets, liabilities and executory contracts and unexpired leases.

On November 12, 2010, the Debtors filed with the Bankruptcy Court a motion [Docket No. 16] seeking the entry of a final order establishing a deadline for filing prepetition proofs of claim in the Chapter 11 Cases.  On December 9, 2010, the Bankruptcy Court entered a final order [Docket No. 93] (the "Bar Date Order") establishing January 31, 2011 at 5:00 p.m. as the deadline for all Persons other than Governmental Units to file Proofs of Claim in the Chapter 11 Cases (the "General Bar Date").  Subject to certain limited exceptions contained in the Bankruptcy Code and in the Bar Date Order, all Proofs of Claim filed against the Debtors by Persons other than Governmental Units were required to be filed by the General Bar Date.  The Bar Date Order established May 11, 2011 as the Governmental Units Claims Bar Date.  Both the General Bar Date and the Governmental Units Claims Bar Date remain in full effect and have not been modified.

To date, approximately one hundred eighty-one (181) proofs of claim have been filed in the Chapter 11 Cases against the Debtors.

No order has been entered establishing a bar date for filing Administrative Claims.  The Debtors have generally been paying undisputed Administrative Claims in the ordinary course of business post-Petition Date.

> **UNDER THE PLAN, THE BAR DATE FOR FILING ADMINISTRATIVE CLAIMS, INCLUDING CLAIMS FOR PROFESSIONAL FEES, IS THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE EFFECTIVE DATE OF THE PLAN.**

6.      Rejection of Leases and Executory Contracts

On the Petition Date, the Debtors filed a motion [Docket No. 11] (the "Litton Rejection Motion") seeking entry of an order rejecting the Litton Servicing Agreement.  The Debtors filed the Litton Rejection Motion because substantially all of the Serviceable Assets had been sold or foreclosed upon by the applicable secured creditor.  The remaining Serviceable Assets are relatively immaterial, undesirable in many respects, and will be sold, abandoned or distributed to the applicable secured creditor under the Debtors' proposed  chapter 11 plan.  On February__, 2011, the Bankruptcy Court entered an order [Docket No. __] approving the Litton Rejection Motion.

On November 19, 2010, the Debtors filed a motion Docket No. 48 (the "Employment Agreement Rejection Motion") seeking entry of an order rejecting an employment agreement with former employees *nunc pro tunc* to November 16, 2010.  On December 6, 2010, the Bankruptcy Court entered an order [Docket No. 80] approving the Employment Agreement Rejection Motion.

> **UNDER THE PLAN, THE REJECTION CLAIMS BAR DATE IS THE LATER OF (i) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE CONFIRMATION DATE AND (ii) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE BANKRUPTCY COURT ENTERS AN ORDER APPROVING THE REJECTION OF THE EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT GIVES RISE TO THE REJECTION CLAIM.**

7.      The 341 Meeting

On January 19, 2011, 2:30 p.m. (prevailing Eastern Time), the United States Trustee convened a meeting of creditors (the "341 Meeting") pursuant to section 341(a) of the Bankruptcy Code.  Andrew Rickert, Executive Vice President, Treasurer and Assistant Secretary of C-BASS, attended the 341 Meeting on behalf of the Debtors.  The 341 Meeting was closed on January 19, 2011.

8.      Exclusivity

The Bankruptcy Code grants a debtor an initial period of 120 days after the commencement of the Chapter 11 Cases during which the debtor has an exclusive right to propose and file a plan of reorganization (the "Exclusive Filing Period").  If the debtor proposes and files a plan within the initial 120-day Exclusive Filing Period, then the debtor has until the end of the period ending on the 180th day after the commencement of the Chapter 11 Cases to solicit and to obtain acceptances of such plan (the "Exclusive Solicitation Period," and together

with the Exclusive Filing Period, the "<u>Exclusive Periods</u>").  The Exclusive Periods may be extended by an order of the Bankruptcy Court.

9.       The Sale of the Collateral Management Business

On the Petition Date, Debtor C-BASS Investment Management, LLC filed a motion [Docket No. 14] (the "<u>Sale Motion</u>") seeking entry of an order (i) approving bidding and auction procedures for the sale of its Collateral Management Business (the "<u>CM Business</u>"); (ii) authorizing the sale free and clear of all liens, claims, encumbrances and interests; and authorizing the assumption and assignment of related Collateral Management Contracts.  On December 8, 2010, the Bankruptcy Court entered an order [Docket No. 90] schedule an auction in connection with the sale of the CM Business, approving bidding procedures, approving a break-up fee, scheduling a sale hearing, establishing an objection deadline, and copying the sale hearing notice.  No qualifying bids were received by the bid deadline and no auction occurred.  On January 13, 2011, the Bankruptcy Court entered an order [Docket No. 178] authorizing the sale of the CM Business to FIG LLC, a Delaware limited liability company, for a purchase price of $2,400,000.

10.      The Sale and Abandonment of Equity Investments and Securities

On December 14, 2010, the Debtors filed a motion [Docket No. 109] (the "<u>Sale/Abandonment Motion</u>") seeking entry of an order authorizing the sale or, in the alternative, the abandonment of certain equity investments.  On December 23, 2010, the Bankruptcy Court entered an order [Docket No. 149] authorizing the abandonment of certain equity investments and other securities.  On the same date, the Bankruptcy Court entered an order [Docket No. 150] authorizing the sale of certain equity investments and certain additional securities to HBK Master Fund, L.P. for a cash purchase price of $1,056,251.51.

11.      Debtor C-BASS CBO Holding LLC's Abandonment of Trust Securities

On the Petition Date, the Debtors filed a motion [Docket No. 8] (the "<u>CBO Holding Abandonment Motion</u>") seeking entry of an order authorizing Debtor C-BASS CBO Holding LLC ("<u>CBO Holding</u>") to abandon its Trust Securities to the applicable Owner Trustees.  On December 20, 2010, the Bankruptcy Court entered an order [Docket No. 130] authorizing CBO Holding to abandon its Trust Securities.  On December 30, 2010, the Bankruptcy Court entered an amended order [Docket No. 159] authorizing CBO Holding to abandon its Trust Securities.

## V.      SUMMARY OF THE DEBTORS' JOINT CHAPTER 11 PLAN

**THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY THE PLAN AND ITS EXHIBITS, ALL OF WHICH ARE ANNEXED HERETO AS <u>EXHIBIT A</u>.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN SHALL GOVERN.**

**A.**     <u>Treatment of Classified Claims and Interests</u>

The categories of Claims and Interests listed below classify Claims and Interests that are required to be designated in Classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Classification of Claims and Interests in the Plan is for all purposes, including voting, confirmation and distribution pursuant to the Plan.

A Claim or an Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class only to the extent that any remainder of such a Claim or an Interest qualifies within the description of such different Class.

A Claim or Interest is placed in a particular Class only to the extent that such a Claim or an Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. Notwithstanding any distribution provided for in the Plan, no distribution on account of any Claim is required or permitted unless and until such a Claim becomes an Allowed Claim, as the case may be, if at all, until after the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in Article III of the Plan.

The Plan designates seven Classes of Claims, one Class of Interests in the Debtors and leaves certain Claims unclassified. The following sections describe more fully the classification and treatment of Claims and Interests under the Plan.

    1.    <u>Unclassified Claims -- Administrative Claims and Priority Tax Claims</u>

        (a)    <u>Administrative Claims</u>

Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Allowed Administrative Claim will be paid by the applicable Debtor or the Liquidation Trustee, as the case may be, in full, in Cash, upon the latest of (i) the Effective Date, (ii) the date upon which there is a final and non-appealable order of the Bankruptcy Court allowing such an Allowed Administrative Claim, and (iii) the date set forth in an agreement governing or documents evidencing such an Allowed Administrative Claim; <u>provided</u>, <u>however</u>, that Allowed Administrative Claims for goods or non-professional services provided to a Debtor during the Chapter 11 Cases in the ordinary course of such Debtor's business will be paid or performed in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims must be filed and served on the Debtors and their counsel no later than the Administrative Claims Bar Date. Any Person or Entity that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such a request shall be forever barred, estopped and enjoined from asserting such Claim against the Debtors or participating in distributions under the Plan on account thereof. Such request for payment of

Administrative Claims must include at a minimum (i) the name of each Debtor that is purported to be liable for the Administrative Claim, (ii) the name of the Holder of the Administrative Claim, (iii) the amount of the Administrative Claim, (iv) the basis of the Administrative Claim, and (v) supporting documentation for the Administrative Claim. FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND RELEASED.

On and after the Effective Date, the Liquidation Trustee, in his/her sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors or the Liquidation Trustee, as applicable, and any other party with standing shall have the right to object to any Administrative Claim by filing and serving on the appropriate parties, including the claimant, an objection to such an Administrative Claim on or before the Administrative Claims Objection Deadline. Unless the Debtors, the Liquidation Trustee or another party with standing objects to an Administrative Claim on or before the Administrative Claims Objection Deadline, such an Administrative Claim shall be deemed an Allowed Administrative Claim in the amount requested. In the event that the Debtors or another party with standing timely files and serves an objection to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, shall submit the matter to the Bankruptcy Court for a determination of whether an Administrative Claim should be allowed, and if so, in what amount.

The payments, distributions and other treatment afforded to Holders of Allowed Administrative Claims under this section shall be in full and complete satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claims.

> **UNDER THE PLAN, THE ADMINISTRATIVE CLAIMS BAR DATE IS THE DATE THAT IS THE FIRST BUSINESS DAY THIRTY (30) CALENDAR DAYS AFTER THE EFFECTIVE DATE OF THE PLAN. ALL REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS ARISING ON OR BEFORE THE EFFECTIVE DATE, EXCLUDING CLAIMS OF PERSONS AND ENTITIES THAT SUPPLIED GOODS OR RENDERED SERVICES TO THE DEBTORS IN THE ORDINARY COURSE OF BUSINESS, MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE LIQUIDATION TRUSTEE ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE OR BE FOREVER BARRED.**

(b)    Professional Fee Claims

Claims for Professional Fees are treated in all respects as Administrative Claims under the Plan and, thus, subject to both the Administrative Claims Bar Date and the Administrative Claims Objection Deadline. The Debtors and the Liquidation Trustee, as applicable, may pay, solely from Cash that constitutes Released Collateral, the charges incurred by any Professionals on or after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services (including fees and expenses related to the preparation of Professionals' fee applications) without application to, or approval of, the Bankruptcy Court.

           (c)       <u>Priority Tax Claims</u>

Priority Tax Claims are Claims asserted by Governmental Units that are entitled to priority under section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but requires that such Claims receive the treatment described below. At the sole option of the applicable Debtor, each Holder of an Allowed Priority Tax Claim shall receive (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) payment in full in Cash on the Effective Date, or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the applicable Debtor, in each case, from Cash that constitutes Released Collateral. The distributions and other treatment afforded to Holders of Allowed Priority Tax Claims under the Plan will be in full and complete satisfaction, settlement and release of, and in exchange for, such Allowed Claims. The Debtors believe the treatment afforded to Holders of Allowed Priority Tax Claims under the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

A Priority Tax Claim that is a Disputed Claim will not receive any distribution under the Plan unless and until such a Claim becomes an Allowed Priority Tax Claim. To the extent that some or all of a Secured Claim for taxes does not qualify as a Priority Tax Claim, but is a valid Secured Claim, it will be classified as a Class 3 Other Secured Claim.

      2.        <u>Class 1 -- Priority Non-Tax Claims</u>

           (a)       *Classification:* Class 1 consists of the Allowed Priority Non-Tax Claims against any of the Debtors.

           (b)       *Treatment*: The legal, equitable and contractual rights of Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. In full and complete satisfaction, settlement and release of, and exchange for, each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive, out of Cash that constitutes Released Collateral, one of the following treatments, at the sole election of the applicable Debtor:

                (i)       To the extent then due and owing on the Effective Date, such an Allowed Priority Non-Tax Claim shall be paid in full, in Cash, by the Debtor;

                (ii)      To the extent not due and owing on the Effective Date, such an Allowed Priority Non-Tax Claim shall be paid in full, in Cash, by the Liquidation Trustee when and as such Allowed Priority Non-Tax Claim becomes due and owing in the ordinary course of business in accordance with the terms thereof; or

                (iii)     Such other less favorable treatment as is agreed upon by the Debtor or the Liquidation Trustee, as applicable, and the Holder of such an Allowed Priority Non-Tax Claim.

(c)     *Voting*:  Class 1 is Unimpaired.  Holders of the Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.      Class 2 -- Senior Lender Claims Against Sub-Con Debtors

(a)     *Classification*:  Class 2 consists of the Allowed Senior Lender Claims against the Sub-Con Debtors.

(b)     *Treatment*:  The Class 2 Senior Lender Claims shall be Allowed Claims in the aggregate amount of not less than $195.8 million.  In full and complete settlement, satisfaction and release of the Allowed Class 2 Claims of the Senior Lenders, on the Effective Date, except as otherwise agreed by the Administrative Agent, (A) all Cash that does not constitute Released Collateral shall be remitted to the Administrative Agent for distribution to the Senior Lenders in accordance with the waterfall set forth in section 3 of the Forbearance Agreement; provided that clause "second" in section 3 of the Forbearance Agreement shall not apply, and (B) all other Remaining Collateral shall be transferred, free and clear of all Liens, Claims, Interests and all setoff and recoupment rights, to CB Senior Lender, LLC, a Delaware limited liability company, on behalf of the Senior Lenders.

(c)     *Voting*:  Class 2 is Impaired.  Holders of the Allowed Class 2 Claims against the Sub-Con Debtors are entitled to vote to accept or reject the Plan.

4.      Class 3 -- Other Secured Claims Against Debtors

(a)     *Classification*:  Class 3 consists of the Allowed Other Secured Claims against any of the Debtors.

(b)     *Treatment*:  The legal, equitable and contractual rights of Holders of Allowed Other Secured Claims against the Debtors are unaltered by the Plan.  In full and complete satisfaction, settlement and release of, and exchange for, each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim against the Debtors shall receive, on the Effective Date or as soon thereafter as reasonably practicable, one of the following treatments:  (A) Cash that constitutes Released Collateral in the amount of such Allowed Other Secured Claim against the Debtors, (B) turnover of the Assets that constitute collateral security for such Allowed Other Secured Claim against the Debtors, solely to the extent that such Assets (1) constitute Released Collateral or (2) are not Cash, and the Holder of such Allowed Other Secured Claim has a valid, perfected and enforceable first-priority Lien on such Assets, or (C) such other, less favorable treatment as is agreed upon by the Debtors or

the Liquidation Trustee, as applicable, and the Holder of such Allowed Other Secured Claim against the Debtors.

(c)     *Voting*:  Class 3 is Unimpaired.  Holders of the Allowed Class 3 Claims against any of the Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

5.     <u>Class 4(a)(i) -- Senior Unsecured Claims Against Sub-Con Debtors</u>

(a)     *Classification*:  Class 4(a)(i) consists of the Allowed Senior Unsecured Claims against the Sub-Con Debtors.  Holders of Allowed Class 4(a)(i) Claims that do not exercise the Release Opt-Out Election are classified as Class 4(a)(i)(1) Claims.  Holders of Allowed Class 4(a)(i) Claims that do exercise the Release Opt-Out Election are classified as Class 4(a)(i)(2) Claims.

(b)     *Treatment*:  Each Holder of an Allowed Class 4(a)(i)(1) Claim shall receive, in full and complete satisfaction, settlement and release of, and in exchange for, such Claim, on the Effective Date, or as soon thereafter as reasonably practicable, the sum of (i) such Holder's Fully Diluted Class 4(a) Ratable Portion of the Liquidation Trust Interests, (ii) such Holder's Base Class 4(a)(i)(1) Ratable Portion of the Class 5 Ratable Portion of the Liquidation Trust Interests, and (iii) such Holder's Base Class 4(a)(i)(1) Ratable Portion of the Class 6 Ratable Portion of the Liquidation Trust Interests.  Holders of Allowed Class 4(a)(i)(2) Claims shall receive no property or distributions under the Plan.

(c)     *Voting*:  Class 4(a)(i) is Impaired.  Holders of the Allowed Class 4(a)(i) Claims against the Sub-Con Debtors are entitled to vote to accept or reject the Plan.

6.     <u>Class 4(a)(ii) -- Trade Debt and Employee Claims Against Sub-Con Debtors</u>

(a)     *Classification*:  Class 4(a)(ii) consists of the Allowed Trade Debt Claims and Allowed Employee Claims against the Sub-Con Debtors.  Holders of Allowed Class 4(a)(ii) Claims that do not exercise the Release Opt-Out Election are classified as Class 4(a)(ii)(1) Claims.  Holders of Allowed Class 4(a)(ii) Claims that do exercise the Release Opt-Out Election are classified as Class 4(a)(ii)(2) Claims.

(b)     *Treatment*:  Each Holder of an Allowed Class 4(a)(ii)(1) Claim shall receive, in full and complete satisfaction, settlement and release of, and in exchange for, such Claim, on the Effective Date, or as soon thereafter as reasonably practicable, such Holder's Fully Diluted Class 4(a) Ratable Portion of the Liquidation Trust Interests.  Holders of Allowed Class 4(a)(ii)(2) Claims shall receive no property or distributions under the Plan.

(c)     *Voting*: Class 4(a)(ii) is Impaired. Holders of the Allowed Class 4(a)(ii) Claims against the Sub-Con Debtors are entitled to vote to accept or reject the Plan.

7.      Class 4(b) -- General Unsecured Claims Against Sunfish Management Group LLC

(a)     *Classification*: Class 4(b) consists of the Allowed General Unsecured Claims against Sunfish Management Group LLC. Holders of Allowed Class 4(b) Claims that do not exercise the Release Opt-Out Election are classified as Class 4(b)(i) Claims. Holders of Allowed Class 4(b) Claims that do exercise the Release Opt-Out Election are classified as Class 4(b)(ii) Claims.

(b)     *Treatment*: Each Holder of an Allowed Class 4(b)(i) Claim shall receive, in full and complete satisfaction, settlement and release of, and in exchange for, such Claim, on the Effective Date, or as soon thereafter as reasonably practicable, such Holder's Ratable Portion of the Sunfish Management Distribution Fund. Holders of Allowed Class 4(b)(ii) Claims shall receive no property or distributions under the Plan.

(c)     *Voting*: Class 4(b) is Impaired. Holders of the Allowed Class 4(b) Claims against Sunfish Management Group LLC are entitled to vote to accept or reject the Plan.

8.      Class 5 -- Subordinated Debt Claims Against Sub-Con Debtors

(a)     *Classification*: Class 5 consists of the Allowed Subordinated Debt Claims against the Sub-Con Debtors.

(b)     *Treatment*: Holders of Allowed Class 5 Claims shall be deemed to have received the Class 5 Ratable Portion of the Liquidation Trust Interests and immediately upon receipt thereof, to have transferred such Class 5 Ratable Portion of the Liquidation Trust Interests to the Holders of Allowed Class 4(a)(i)(1) Claims in accordance with the contractual subordination provisions in the documents under which the Subordinated Debt Claims arise and section 510(a) of the Bankruptcy Code.

(c)     *Voting*: Class 5 is Impaired. Holders of the Allowed Class 5 Claims against the Sub-Con Debtors are entitled to vote to accept or reject the Plan.

9.      Class 6 -- TruPs Claims Against Sub-Con Debtors

(a)     *Classification*: Class 6 consists of the Allowed TruPs Claims against the Sub-Con Debtors.

(b)     *Treatment*:  Holders of Allowed Class 6 Claims shall be deemed to have received the Class 6 Ratable Portion of the Liquidation Trust Interests and immediately upon the receipt thereof, to have transferred such Class 6 Ratable Portion of the Liquidation Trust Interests to the Holders of Allowed Class 4(a)(i)(1) Claims in accordance with the contractual subordination provisions in the documents under which the TruPs Claims arise and section 510(a) of the Bankruptcy Code.

(c)     *Voting*:  Class 6 is Impaired.  Holders of Allowed Class 6 Claims against the Sub-Con Debtors are entitled to vote to accept or reject the Plan.

10.     <u>Class 7 -- Securities Litigation Claims Against the Debtors</u>

(a)     *Classification*:  Class 7 consists of the Allowed Securities Litigation Claims against any or all of the Debtors.

(b)     *Treatment*:  Holders of Allowed Class 7 Claims shall receive no property or distributions under the Plan on account of such Claims in accordance with the effect of section 510(b) of the Bankruptcy Code.

(c)     *Voting*:  Class 7 is Impaired.  Holders of Allowed Class 7 Claims against any or all of the Debtors are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

11.     <u>Class 8 -- Interests in the Debtors</u>

(a)     *Classification:*  Class 8 consists of the Allowed Interests in the Debtors.

(b)     *Treatment:*  On the Effective Date, the Allowed Interests in the Debtors shall be indefeasibly canceled and the Holders of such Interests shall receive no property or distributions under the Plan on account of such Interests.

(c)     *Voting:*  Class 8 is Impaired.  Holders of the Allowed Class 8 Interests in the Debtors are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**B.     Substantive Consolidation of Certain Debtors for
<u>Purposes of Voting, Confirmation and Distribution</u>**

The Plan provides for the substantive consolidation of the Debtors' Estates, except for the Estate of Sunfish Management Group LLC (collectively, the "<u>Sub-Con Debtors</u>") solely for purposes of voting, confirmation, and making distributions to the Holders of Allowed Claims against the Sub-Con Debtors under the Plan.  On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the Holders of Allowed Claims against the Sub-Con Debtors under the Plan:  (a) all guarantees of any Sub-Con Debtor of the payment,

performance or collection of another Sub-Con Debtor with respect to Claims against such Sub-Con Debtor shall be eliminated and cancelled; (b) any single obligation of multiple Sub-Con Debtors shall be treated as a single obligation in the Sub-Con Debtors' Estate; and (c) all guarantees by a Sub-Con Debtor with respect to Claims against one or more of the other Sub-Con Debtors shall be treated as a single obligation in the Sub-Con Debtors' Estate. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Sub-Con Debtors, all Claims based upon guarantees of collection, payment, or performance made by a Sub-Con Debtor as to the obligation of another Sub-Con Debtor shall be released and of no further force and effect. Further, on or after the Effective Date, any and all Intercompany Claims shall be deemed to be and treated as Disallowed Claims for all purposes.

1.      The Effect of Substantive Consolidation

Pursuant to Article II of the Plan, the Sub-Con Debtors will be deemed consolidated solely for the purposes of voting, confirmation and making distributions to the Holders of Allowed Claims under the Plan. Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the chapter 11 cases of affiliated debtors, among other instances. Substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of multiple debtors for certain purposes under a plan. The effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors for purposes of voting on the reorganization plan. In the absence of substantive consolidation, the creditors of an individual debtor could only look to the assets of that debtor to fully or partially satisfy such creditor's claim.

2.      The Basis for Substantive Consolidation in the Chapter 11 Cases

Substantive consolidation of the Sub-Con Debtors is an important element of the Debtors' successful implementation of the Plan. The Debtors submit that the proposed substantive consolidation structure is supported by the applicable legal standards, practical considerations and the Sub-Con Debtors' prepetition operations and financial affairs. Substantive consolidation will avoid the onerous costs and substantial delay that would result from attempting to confirm eight separate plans of reorganization ("Separate Entity Plans"). Separate Entity Plans will inevitably rest on certain assumptions; for instance, as the Debtors are not managed operationally on an individual entity basis, it may be difficult or impossible to allocate value and operational costs and benefits on a legal entity basis. In addition, as all of the Sub-Con Debtors are obligors with respect to all Claims relating to, or arising under, the Senior Credit Facility, there is no Sub-Con Debtor for which the value of its prepetition assets exceeds the amount of the Senior Lender Claims that would be asserted against it. Therefore, in the Debtors' view, it is extremely unlikely that Separate Entity Plans would produce an entitlement to a recovery for any creditor that is more than what is available under the Plan.

The Debtors are not seeking to substantively consolidate offensively (*i.e.*, with a primary purpose of disadvantaging tactically a group of creditors in the plan process or altering creditors' rights). To the contrary, as set forth above, substantive consolidation as set forth in Section 2.1 of the Plan benefits all general unsecured creditors.

Notwithstanding the substantive consolidation of the Sub-Con Debtors for the purposes set forth in section 2.1(a) of the Plan, each Debtor shall calculate and pay UST Fees in respect of all disbursements, including disbursements in and outside of the ordinary course of business, until the entry of a Final Decree in the Chapter 11 Cases.

The substantive consolidation of the Sub-Con Debtors for the limited purposes set forth in section 2.1(a) of the Plan shall not affect (i) the legal or organizational structure of the Debtors, (ii) pre- or post-Petition Date Liens, (iii) defenses to any Causes of Action, or (iv) distributions of the Insurance Policies or proceeds of or payments in respect of such policies.

The substantive consolidation of the Sub-Con Debtors for the limited purposes set forth in section 2.1(a) of the Plan shall not give rise to the creation of Causes of Action to the extent such Causes of Action do not exist prior to the substantive consolidation.

## C.  Full Satisfaction, Settlement and Release

The payments, distributions and other treatment afforded to Holders of Allowed Claims and Interests in the Debtors under Article IV of the Plan will be in full and complete satisfaction, settlement and release of, and in exchange for, such Allowed Claims and Interests in the Debtors.

## D.  Treatment of Executory Contracts and Unexpired Leases

### 1.  Treatment of Executory Contracts and Unexpired Leases

On the Effective Date, except for an Executory Contract that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court, each Executory Contract of every kind and nature entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms prior to the Effective Date will be rejected pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, except:  (i) any executory contract or unexpired lease that is the subject of a separate motion to assume or reject filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order, provided, however, that upon denial or withdrawal of any such motion, such executory contract or unexpired lease shall automatically be deemed rejected as of the Effective Date; and (ii) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not an executory contract that is later determined by the Bankruptcy Court to be an executory contract that is subject to assumption or rejection under section 365 of the Bankruptcy Code, which agreements shall be subject to assumption or rejection within 30 days of any such determination.

Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief were granted and such order were entered prior to the Confirmation Date.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejection of the executory contracts and unexpired leases as provided for by Section 5.1 of the Plan, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, as of the Effective Date.

2. Insurance Policies

All of the Insurance Policies and any agreements, documents or instruments relating thereto, are treated as executory contracts and shall be deemed assumed under the Plan.  Except as set forth in Article X of the Plan, nothing therein shall constitute or be deemed a waiver of any Claims or Causes of Action that the Debtors may hold against any Entity or Person, including without limitation, under any of the Debtors' Insurance Policies.

3. Rejection Claims

All Rejection Claims that have not been allowed by a Final Order prior to the Confirmation Date will be filed on or before the Rejection Claims Bar Date.  Rejection Claims that have not been allowed by a Final Order and are not filed on or before the Rejection Claims Bar Date will be disallowed and expunged in their entirety without further order of or process before the Bankruptcy Court.  Allowed Rejection Claims will be classified and treated as General Unsecured Claims in the applicable sub-class of Class 4.

> **UNDER THE PLAN, THE REJECTION CLAIMS BAR DATE IS THE LATER OF (i) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE CONFIRMATION DATE AND (ii) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE BANKRUPTCY COURT ENTERS AN ORDER APPROVING THE REJECTION OF THE EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT GIVES RISE TO THE REJECTION CLAIM. ALL REJECTION CLAIMS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE LIQUIDATION TRUSTEE ON OR BEFORE THE REJECTION CLAIMS BAR DATE OR BE FOREVER BARRED.**

## E. Means for Implementation of the Plan

1. Liquidation Trustee

The Plan contemplates the appointment of the Liquidation Trustee on the Effective Date to administer certain post-Effective Date responsibilities and exercise post-Effective Date rights under the Plan and the Liquidation Trust Agreement.  The powers, authority, responsibilities and duties of the Liquidation Trustee are set forth in and will be governed by the Plan and the Liquidation Trust Agreement, in substantially the form annexed as an exhibit to the Plan.  After the Effective Date, the Liquidation Trustee, *inter alia*, will be the representative of the Creditors, responsible for making distributions to Holders of Allowed Claims in accordance with the terms of the Plan, and responsible for winding-down the Debtors' Estates.

2. Formation of the Liquidation Trust

On the Effective Date, the Liquidation Trust shall be formed.  The Liquidation Trustee shall sign the Liquidation Trust Agreement and accept the Assets to be transferred to the Liquidation Trustee pursuant to section 6.2 of the Plan on behalf of the beneficiaries thereof, and

the Liquidation Trust will then be deemed created and effective without any further action of the Debtors or the employees, officers, directors, members, partners or shareholders of the Debtors. The Liquidation Trust shall be established for the purpose of liquidating its assets and making post-Effective Date distributions under the Plan, with no objective to continue or engage in the conduct of a trade or business. The beneficiaries of the Liquidation Trust shall be bound by the Liquidation Trust Agreement. The Liquidation Trustee shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidation Trustee to extend such term as applicable law shall allow as set forth in the Liquidation Trust Agreement.

The Liquidation Trustee shall be the exclusive trustee of the assets of the Liquidation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect trust assets; (b) pay taxes or other obligations incurred by the trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants (including those Persons that have served as employees, professionals, consultants or claims, noticing and disbursing agents during the Chapter 11 Cases) to advise and assist in the administration, prosecution and distribution of trust assets; (d) calculate and implement distributions of trust assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of that agreement, all claims vested in the Liquidation Trust, including, without limitation, Causes of Action; (f) resolve issues involving Claims and Interests in accordance with the Plan and the Liquidation Trust Agreement; (g) perform any and all duties and obligations arising under any other agreements executed or entered into pursuant to the Plan, the Confirmation Order or any other order of the Bankruptcy Court; (h) make all distributions to Holders of Allowed Claims required to be made under the Plan and the Liquidation Trust Agreement after the Effective Date; and (i) perform all other acts reasonably necessary or appropriate to carry out the Plan that are not otherwise prohibited by law.

All costs and expenses associated with the administration of the Liquidation Trust, including reasonable compensation for the Liquidation Trustee, shall be the responsibility of and paid by the Liquidation Trust in accordance with the Liquidation Trust Agreement.

The Liquidation Trustee shall be responsible for filing all federal, state and local tax returns for the Liquidation Trust. The Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Liquidation Trust shall be subject to any such withholding and reporting requirements.

3.  Capitalization of the Liquidation Trust

On the Effective Date, the then-existing amount of Residual Cash, all Avoidance Actions (other than those, if any, against the Administrative Agent or any Senior Lender, in each case, in any capacity) and the Look-Back Rights shall be transferred to the Liquidation Trust, free and clear of all Claims, Liens, and Interests, and all setoff and recoupment rights, except as otherwise specifically provided in the Plan or in the Confirmation Order.

Annexed hereto as **Exhibit B** is the Debtors' Sources and Uses of Cash Analysis that contains a breakdown of the sources of Cash that will be used to fund the post-Effective Date winding-down of the Debtors' Estates as well as distributions to Holders of Allowed Priority Claims and Holders of Allowed General Unsecured Claims. The Sources and Uses of Cash Analysis also contains a breakdown of the Allowed Administrative Claims of the Debtors' Estates.

4.     Establishment of Disputed Claims Reserve

On the Effective Date or as soon thereafter as reasonably practicable, the Debtors shall establish the Disputed Claims Reserve and shall deposit therein, Cash that constitutes Released Collateral in an amount equal to the sum of the Face Amount of all Administrative Claims and all Priority Claims that are, or that the Debtors anticipate will become (including those potential claims not yet filed), Disputed Claims. If any amounts remain on deposit in the Disputed Claims Reserve immediately prior to the Debtors' dissolution, the Debtors shall transfer the Disputed Claims Reserve to the Liquidation Trustee.

5.     Treatment of Employees; Implementation of Management Incentive Plan

On the Effective Date, the Participating Employees shall cease being employees of the Debtors and shall become independent contractors of the Debtors and shall thereupon be free to pursue other full-time employment. The Debtors management may, in its discretion, determine that one or more of the Participating Employees shall cease being employees and shall become independent contractors, free to pursue other full-time employment, prior to the Effective Date. Participating Employees who become independent contractors prior the Effective Date shall be entitled to hourly compensation at rates determined by the Debtors' management in its reasonable discretion (based on the Participating Employees compensation while serving as employees of the Debtors) for hours actually worked on tasks prescribed by the Debtors' management prior to the Effective Date. From and after the Effective Date, all Participating Employees shall perform the duties described in the Management Incentive Plan in exchange solely for the payments described in the Management Incentive Plan. Other than as set forth in the Plan and in the Management Incentive Plan, the Participating Employees shall be entitled to no other compensation and no benefits from and after the date on which they become independent contractors. Commencing on the Effective Date and continuing until their dissolution, the Debtors shall make all payments to the Participating Employees contemplated by the Management Incentive Plan. No payments shall be made under the Management Incentive Plan until the Effective Date.

6.     Investments

All Cash held by the Liquidation Trustee will be invested (a) in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and (b) as deemed appropriate by the Liquidation Trustee.

7.     Disposition of Assets

Subject to the provisions of Article VI of the Plan, all Assets not previously disposed of will be sold or otherwise liquidated or, if appropriate in the judgment of the Liquidation Trustee,

abandoned in any commercially reasonable manner, including to a charitable organization or organizations designated by the Liquidation Trustee in respect of Assets of inconsequential value.

8.     Release of Liens

On or before the Effective Date, any Person or Entity will execute and file such document, notice or public statement as is reasonably necessary or appropriate under applicable law in the relevant jurisdictions to evidence and effect the termination of the Liens formerly held by such parties or any Liens held in favor of such Person or Entity in respect of the Assets.  In addition, the Liquidation Trustee will be appointed as an attorney-in-fact under the laws of the United States of America for each party whose Lien is terminated pursuant to the Plan, with full power and authority to execute on behalf of such party any notices or other public statements as are necessary or appropriate to evidence the termination of such party's Lien and any financing statement relating to any and all security interests in the Assets.

9.     Liability of the Liquidation Trustee

The Liquidation Trustee may rely, and will be fully protected in acting or refraining from acting if the Liquidation Trustee relies, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Liquidation Trustee reasonably believes to be genuine and to have been signed or presented by the party or parties properly authorized to do so or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties, and the Liquidation Trustee may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein.  The Liquidation Trustee may consult with counsel and other professionals with respect to matters in their area of expertise, and any advice of counsel will be full and complete authorization and protection in respect of any action taken or not taken by the Liquidation Trustee.  The Liquidation Trustee will be entitled to rely upon the advice of such professionals in acting or failing to act, and will not be liable for any act taken or not taken in reliance thereon.  The Liquidation Trustee will have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning the Liquidation Trust Agreement, the Plan or any other document executed in connection therewith, and the Liquidation Trustee will be entitled to rely upon such instructions in acting or failing to act and will not be liable for any act taken or not taken in reliance thereon.

Persons and Entities dealing with the Liquidation Trustee will look only to the Assets to satisfy any liability incurred by the Liquidation Trustee to such Person or Entity in carrying out the terms of the Liquidation Trust Agreement and the Plan, and the Liquidation Trustee will have no personal obligation to satisfy any such liability, except to the extent such liability or obligation is determined by Final Order to have arisen as a result of gross negligence, willful misconduct, fraud or criminal conduct of the Liquidation Trustee in which case the Assets will not be subject to such claims or liabilities.

10. <u>Exculpation and Indemnification of the Liquidation Trustee Exculpated Parties</u>

From and after the Effective Date, the Liquidation Trustee, the Liquidation Trustee's employees, independent contractors, professionals, agents and representatives (collectively, the "<u>Liquidation Trustee Exculpated Parties</u>") will be exculpated by all Persons and Entities including without limitation Holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Liquidation Trustee by the Liquidation Trust Agreement, the Plan or any Final Order entered pursuant to or in furtherance of the Plan or the Liquidation Trust Agreement, or applicable law or otherwise, except only for actions or omissions to act only to the extent determined by Final Order to be due to the respective Liquidation Trustee Exculpated Party's gross negligence, willful conduct, fraud or criminal conduct after the Effective Date. No Claim Holder or any other party in interest will have or be permitted to pursue any claim or cause of action against the Liquidation Trustee Exculpated Parties for making distributions or for implementing the provisions of the Plan and the Liquidation Trust Agreement except in cases of gross negligence, willful misconduct, fraud or criminal conduct as determined by Final Order. The Liquidation Trustee will indemnify, defend and hold harmless the Liquidation Trustee Exculpated Parties from and against any claims, causes of action, liabilities, obligations, damages or expenses, including attorneys' fees and costs (unless determined by Final Order to be due to the respective Liquidation Trustee Exculpated Parties' own gross negligence, willful misconduct, fraud or criminal conduct after the Effective Date), to the fullest extent permitted by applicable law. Any action taken or act omitted to be taken with the approval of the Bankruptcy Court will conclusively be deemed not to constitute gross negligence, willful misconduct, fraud or criminal conduct.

11. <u>Indemnification of Directors, Officers, Managers and Employees of the Debtors</u>

The obligations of the Debtors to indemnify any Person serving at any time on or prior to the Effective Date as one of its directors, officers or employees by reason of such Person's service in such capacity, or as a director, an officer, a partner, a trustee, an employee or an agent of the Debtors to the extent provided in the Debtors' constituent documents, by a written agreement with the Debtors or applicable state law, each as applicable, will be deemed and treated as executory contracts that are assumed by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive unimpaired and unaffected by the Confirmation Order, irrespective of whether such indemnification is owed for an act or an event occurring before or after the Petition Date, except if such claim or liability is determined by a Final Order to have resulted from gross negligence, willful misconduct, fraud or criminal conduct of such indemnified Person.

12. <u>Insurance Preservation</u>

Nothing in the Plan, including any releases, will diminish or impair the enforceability of the Insurance Policies of the Debtors that may cover any Claims against the Debtors or any other Person or Entity.

13. <u>Dissolution of the Debtors</u>

The Debtors shall continue to exist after the Effective Date until June 1, 2011 solely for the purposes of (i) the filing of final tax returns for the Debtors, (ii) the issuance of K-1s to the Holders of Interests in C-BASS, (iii) completing the wind-up and audits with respect to the Fish Funds (as defined in the Restructuring Facilitation Agreement), (iv) filing and resolving objections to Other Secured Claims, Priority Claims and Administrative Claims that are Disputed Claims, (v) making all distributions in respect of or otherwise treating in accordance with the Plan all Secured Claims, Priority Claims and all Administrative Claims that become Allowed Claims prior to June 1, 2011, (vi) making distributions in accordance with the Plan in respect of all Class 4(b) Claims that become Allowed Claims prior to June 1, 2011, (vii) making all payments permitted or required to be made to the Participating Employees under the Management Incentive Plan, and (vii) paying all post-Effective Date fees and expenses. On June 1, 2011 or as soon as reasonably practicable thereafter, the Debtors shall commence dissolution proceedings under applicable non-bankruptcy law and pay all applicable fees for such proceedings from Cash that constitutes Released Collateral.

14. <u>Dissolution of the Committee</u>

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in these Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to have a right to be heard with respect to any and all applications for payment of Professional Fees.

F. **<u>Releases, Exculpations and Injunctions Against Interference with the Plan</u>**

1. <u>Releases</u>

**In consideration of the contributions of the Released Parties to the Debtors' reorganization and Chapter 11 Cases, the Plan provides for the following releases:**

(a) **<u>Releases by the Debtors</u>**. *As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including without limitation the services of the Released Parties in facilitating the expeditious liquidation of the Debtors and the implementation of the transactions contemplated by the Plan, each of the Debtors (and any Person or Entity seeking to exercise the rights of the Debtors' Estates, including without limitation the Liquidation Trustee or other successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, hereby irrevocably, absolutely and permanently releases, waives and discharges all Released Parties from any and all claims and Causes of Action that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity or Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date arising out of or in any way related to the Debtors, the Chapter 11 Cases or the Plan; provided, however, that there shall be no such release on account of Claims or liabilities in respect of any contractual obligation owed by such Entity or Person to the Debtors hereunder*

*or in any contracts, instruments or agreements delivered hereunder; <u>provided</u>, <u>further</u>, that the provisions of section 10.1(a) of the Plan shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a Final Order.*

(b) **<u>Releases by Holders of Claims</u>**. *As of the Effective Date, in exchange for their rights and distributions hereunder, each Holder of a Claim that either (i) has voted to accept or reject the Plan and has not exercised the Release Opt-Out Election or (ii) has failed to vote or abstained from voting on the Plan, hereby shall be deemed to have released, waived and discharged, irrevocably, absolutely and permanently, each of the Released Parties from any and all Claims or Causes of Action based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date arising out of or in any way related to the Debtors, the Chapter 11 Cases or the Plan; <u>provided</u>, <u>however</u>, that the provisions of section 10.1(b) of the Plan shall have no effect on the liability of the Released Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a Final Order (the "<u>Third-Party Releases</u>").*

2. <u>Exculpations and Limitation of Liability</u>

*Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including without limitation the service of the Exculpated Parties in facilitating the expeditious liquidation of the Debtors and the implementation of the transactions contemplated by the Plan, none of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Interest or any other Person or Entity for any action or omission arising out of or in connection with the Debtors' restructuring and liquidation or the Chapter 11 Cases, regardless of whether such action or omission occurred or failed to occur, respectively, before or after the Petition Date, including without limitation the commencement of the Chapter 11 Cases, the negotiation or execution of the Disclosure Statement, the negotiation, execution and performance of the Plan, the solicitation of votes for and the pursuit of Confirmation of the Plan, the Effective Date of the Plan, the consummation of the Plan or the administration of the Plan or the Assets to be distributed under the Plan, or any act or failure to act by the Administrative Agent, in consultation with the Oversight Committee, to direct or not direct any Debtor to deliver or not to deliver any Remaining Collateral hereunder; <u>provided</u>, <u>however</u>, that the provisions of section 10.2 of the Plan shall have no effect on the liability of the Exculpated Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a final and non-appealable order of the Bankruptcy Court. The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under and in connection with the Plan.*

3. <u>Injunction Related to Releases and Exculpations</u>

*In addition to the injunction provided under sections 524(a) and 1141 of the Bankruptcy Code, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released or*

*exculpated pursuant to the Plan, including without limitation the claims and causes of action released in Sections 10.1 and 10.2 of the Plan.*

## G. **Plan Provisions Governing Distributions**

### 1. Disputed Claims

a. *No Distributions Pending Allowance*. No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a final and non-appealable order of the Bankruptcy Court or, after the Effective Date, by written agreement between the Debtors or the Liquidation Trustee, as applicable, and the Holder of the Claim. No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

b. *Estimation of Claims*. The Debtors or the Liquidation Trustee, as applicable, may, at any time, and from time to time, request that if a Disputed Claim the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection. Any final and non-appealable order of the Bankruptcy Court that estimates a Disputed Claim pursuant to section 7.1(b) of the Plan irrevocably shall constitute and be a conclusive and final determination of the maximum allowable amount of the Claim of such Creditor, should it become an Allowed Claim. Accordingly, the Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to section 7.1(b) of the Plan shall not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Holder of such Claim shall not have recourse to the Debtors, the Liquidation Trust, or any Assets of the foregoing in the event the allowed amount of the Holder's Claim is at any time later determined to exceed the estimated maximum allowable amount. As soon as practicable after entry of an order estimating a Disputed Claim under section 502(c) of the Bankruptcy Code, the Debtors or the Liquidation Trustee, as applicable, shall deposit into the Disputed Claims Reserve the amount of cash or other consideration to be provided under the Plan to the Holder of the Disputed Claim as if the Disputed Claim were an Allowed Claim in its maximum allowable amount.

c. *Payment of Claims*. Following the date on which a Disputed Claim becomes an Allowed Claim after the Effective Date, the Debtors or the Liquidation Trustee, as applicable, shall pay directly to the Holder of such Allowed Claim the amount provided for under Article IV of the Plan, as applicable. Conversely, following the date a Disputed Claim becomes a Disallowed Claim, the Debtors or the Liquidation Trustee, as applicable, shall transfer the entire amount on reserve in the Disputed Claims Reserve with respect to such Disputed Claim to the Liquidation Trust to be distributed in accordance with the terms of the Plan and the Liquidation Trust Agreement.

d.    *Resolution of Claims After the Effective Date.*    From the period commencing on the Effective Date and continuing until their dissolution in accordance with section 6.4 of the Plan, the Debtors shall have the exclusive right to object to all Other Secured Claims, all Priority Claims, all Administrative Claims, and all Class 4(b) Claims.  From and after the Effective Date, the Liquidation Trustee will have the exclusive right to object to all other Claims.  Additionally, if any Other Secured Claims, Priority Claims, Administrative Claims or Class 4(b) Claims remain Disputed Claims as of the Debtors' dissolution, thereafter, the Liquidation Trustee also shall have the exclusive right to object to such Claims.  Each of the Debtors and the Liquidation Trustee will attempt to resolve consensually any disputes regarding the amount of any Claim.  On or before the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the Debtors or the Liquidation Trustee, as applicable, may file with the Court an objection to the allowance of the applicable type of Unclassified Claim or applicable Class of Claim, as the case may be, or any other appropriate motion or adversary proceeding with respect thereto.    All such objections, motions or adversary proceedings may be litigated to a final and non-appealable order; provided, however, that the Debtors or the Liquidation Trustee, as applicable, may compromise and settle, withdraw or resolve by stipulation or any other method approved by the Bankruptcy Court any objections to such Claims, including, without limitation, in accordance with the provisions of the Plan or the Liquidation Trust Agreement.

2.    No Postpetition Interest on Claims

The Debtors, the Liquidation Trustee, or their respective duly appointed disbursing agents, as applicable, shall make all distributions of Cash or other Assets required under the Plan, unless the Plan specifically provides otherwise.  All Residual Cash and other Assets held by the Liquidation Trust for distribution under the Plan shall be held in trust for the exclusive benefit of the Holders of Liquidation Trust Interests and Holders of Disputed Claims that become Allowed Claims, and shall not be subject to any claim by any Person or Entity except as provided under the Plan.

3.    No Postpetition Interest on Claims

Unless otherwise required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

4.    No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the allowed amount of such Claim.

5.    Setoffs

The Debtors or the Liquidation Trustee, as applicable, may, to the extent permitted under applicable law, setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature (other than Causes of Action arising under Chapter 5 of the Bankruptcy Code) that the Debtors

or the Liquidation Trustee may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trustee of any such claims, rights and causes of action that the Debtors or the Liquidation Trustee possess against such Holder.

6.      Manner of Payment Under the Plan

At the option of the Liquidation Trustee, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

## H.      Conditions Precedent to Confirmation and Effective Date of the Plan

1.      Conditions Precedent to Confirmation

It is a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan will have been approved in the Confirmation Order or waived pursuant to the provisions of section 8.3 of the Plan.  It is a further condition to Confirmation of the Plan that the Plan, Disclosure Statement and Confirmation Order all be in form and substance reasonably satisfactory to the Debtors, and the Administrative Agent in its reasonable discretion in consultation with the Oversight Committee.

2.      Conditions Precedent to the Occurrence of the Effective Date

Unless otherwise waived pursuant to the provisions of section 8.3 of the Plan, the following are conditions to the occurrence of the Effective Date:

a.      the Confirmation Order, in form and substance acceptable to the Administrative Agent in its reasonable discretion in consultation with the Oversight Committee, shall have been approved by the Bankruptcy Court and duly entered on the docket for the Chapter 11 Cases by the Clerk of the Bankruptcy Court, shall not have been modified without the consent of the Debtors and the Administrative Agent in consultation with the Oversight Committee, shall not be subject to a pending motion filed pursuant to section 1144 of the Bankruptcy Code and shall have become a Final Order;

b.      the Plan approved by the Confirmation Order shall be in form and substance satisfactory to the Administrative Agent, in its reasonable discretion in consultation with the Oversight Committee;

c.      there shall not be in effect any order, law or regulation staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan;

d.      all other actions and documents necessary to implement the provisions of the Plan on the Effective Date shall have been, respectively, effected or duly executed and delivered; and

e.     all outstanding UST Fees shall have been paid in full.

### 3.     Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay

The Debtors, with the consent of the Administrative Agent, in its reasonable discretion in consultation with the Oversight Committee, may waive any of the conditions precedent to Confirmation of the Plan set forth in section 8.1 of the Plan and the conditions precedent to occurrence of the Effective Date set forth in section 8.2 of the Plan, at any time, without notice, without leave or an order of the Bankruptcy Court, and without any formal action other than a proceeding to confirm and/or consummate the Plan.  Further, the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), shall be deemed waived by the Confirmation Order.

### 4.     Effect of Non-Occurrence of Conditions Precedent to the Effective Date

If the conditions precedent to occurrence of the Effective Date have not been satisfied or waived in accordance with Article VIII of the Plan on or before the first Business Day that is more than 60 days after the Confirmation Date or by such later date as is approved by the Bankruptcy Court after notice and a hearing, then on a motion by the Debtors made prior to the time that all of the conditions precedent have been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order and the Confirmation Order will be of no force and effect. Notwithstanding the foregoing, the Confirmation Order will not be vacated if all of the conditions to the occurrence of the Effective Date set forth in Article VIII of the Plan are either satisfied or waived, in accordance with the terms thereof, prior to the entry by the Bankruptcy Court of an order granting the relief requested in such motion.

If the Confirmation Order is vacated, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (i) constitute a waiver or a release of any Claims by or against the Debtors or any Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors; or (iii) constitute an admission, an acknowledgment, an offer or an undertaking by the Debtors in any respect.

## I.     **Effect of Plan Confirmation**

### 1.     Binding Effect

On and after the Confirmation Date, and subject to the occurrence of the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interests in, the Debtors and their respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has voted to accept the Plan, and whether or not such Holder will receive a distribution.

### 2.     Cancellation of Existing Agreements and Securities

Except for the purposes of evidencing a right to receive a distribution under the Plan or as otherwise provided hereunder, on the Effective Date, all the agreements or other documents evidencing any Claims or rights of any Holder of a Claim against the Debtors, including all indentures, credit agreements, security agreements and notes evidencing such Claims, and any Interests, options or warrants (regardless of whether exercised) to purchase Interests, shall be

deemed cancelled, surrendered to the Debtors, and of no further force or effect; provided that the Senior Credit Facility shall continue in effect for the sole purposes of permitting the Administrative Agent to (i) made distributions to the Senior Lenders in accordance with the Plan and perform such other functions as are contemplated by the Plan and (ii) maintain and assert any rights or Liens; provided, further, that nothing herein shall or shall be deemed to impair or discharge any rights of the Administrative Agent vis-à-vis the Senior Lenders or any other Person or Entity (other than the Debtors and those parties described in clause (i) of the definition of "Released Parties" in section 1.3 of the Plan) under the Senior Credit Facility, including without limitation any indemnification obligations of the Senior Lenders. On the Effective Date, the Debtors shall be deemed to have no authorized Interests.

3.      Preservation of All Causes of Action

Except as otherwise provided in the Plan, in a final and non-appealable order of the Bankruptcy Court, or in any contact, instrument, release or agreement entered into in connection with the Plan, in accordance with the provisions of the Bankruptcy Code, including but not limited to section 1123(b) of the Bankruptcy Code, the Liquidation Trustee shall be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors or the Estates may have against any Person or entity. The Liquidation Trustee may pursue such retained claims or Causes of Action in accordance with the best interests of the creditors of Debtors, the Estates, or the Liquidation Trust. Without further order of the Bankruptcy Court, the Liquidation Trustee shall be substituted as the party in interest in all adversary proceedings pending on the Effective Date. Notwithstanding anything to the contrary herein, no distribution shall be made to the Holder of any Claim, including by way of setoff or recoupment by such claimant, if the Debtors or the Liquidation Trustee, as applicable, has taken action to recover, or given notice to the applicable party of intent to take such action, on a Cause of Action against the Holder of such Claim (or the direct or indirect transferor of such Holder), until such Cause of Action is resolved.

4.      Discharge

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation shall not discharge any of the Claims against the Debtors; provided, however, that no Creditor may on account of such Claim seek to receive any payment or other treatment from, or seek recourse against the Debtors or the Liquidation Trustee or their respective property, except as expressly provided herein.

5.      Liquidation Trustee as Successor

The Liquidation Trust shall be the successor to the Debtors and the Estates for the purposes of sections 1123, 1129 and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation-related matters. The Liquidation Trust shall succeed to the attorney-client privilege of the Debtors and the Estates with respect to all Causes of Action and other litigation-related matters, and the Liquidation Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matters, or portion thereof, in the Liquidation Trustee's discretion. The Liquidation Trustee shall be substituted as the party litigant in all adversary proceedings pending in which either the Debtors

or the Committee is a party. After the Effective Date, the Liquidation Trustee shall have the exclusive authority and standing to file, prosecute, withdraw, settle or compromise, without the approval of the Bankruptcy Court, all (a) objections to Claims, (b) estimation proceedings with respect to Claims, and (c) Causes of Action.

## J.     **Retention of Jurisdiction**

     1.     General Scope of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including without limitation such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out.

     2.     Specific Jurisdiction

Without in any way limiting the scope of the Bankruptcy Court's retention of jurisdiction over the Chapter 11 Cases as otherwise set forth in the Plan, the Bankruptcy Court will retain jurisdiction for the following specific purposes:

     a.     to hear and determine any applications or motions pending on the Effective Date for the rejection, assumption or assumption and assignment of any executory contract and to hear and determine, and, if need be, the allowance or disallowance of Claims resulting therefrom;

     b.     to hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter arising in or related to the Chapter 11 Cases pending on or commenced after the Confirmation Date;

     c.     to ensure that distributions to Holders of Allowed Claims are accomplished as provided herein;

     d.     to hear and determine objections to Claims, including ruling on any and all motions to estimate Claims that are filed pursuant to Article VII of the Plan;

     e.     to allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

     f.     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

     g.     to enter and enforce any order for the sale of Assets pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

     h.     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the

consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

i.      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

j.      to hear and determine any and all applications for allowances and payment of Professional Fees and the reasonableness of any Professional Fees authorized to be paid or reimbursed under the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

k.      to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Liquidation Trust Agreement, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

l.      to take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or maintain the integrity of the Plan following consummation of the Plan;

m.      to hear and determine other matters and for such other purposes as may be provided in the Confirmation Order;

n.      to hear and determine all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all applicable periods);

o.      to issue such orders in aid of execution of the Plan as may be authorized by section 1142 of the Bankruptcy Code;

p.      to adjudicate all claims or controversies to a security or ownership interest in the Assets or in any proceeds thereof;

q.      to resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article X of the Plan and to enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

r.      to consider and act on the compromise and settlement of any Claim against or Cause of Action by or against a Debtor arising under or in connection with the Plan;

s.      to determine such other matters or proceedings as may be provided for under the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or in any order or orders of the Bankruptcy Court, including but not limited to the Confirmation Order or any order which may arise in connection with the Plan or the Confirmation Order;

t.      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code;

u.      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located; and

v.      to enter a Final Decree closing the Chapter 11 Cases.

3.      Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, declines to exercise, or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including the matters set forth in Article XI of the Plan, then Article XI of the Plan will not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## K.      **Miscellaneous Provisions of the Plan**

1.      Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote on the Plan shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 12.11 of the Plan and section 1127 of the Bankruptcy Code or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to Impaired Classes of Claims or Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

2.      Elimination of Vacant Classes

Any Class of Claims does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

3.      Voting Classes

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

4.      Revocation and Withdrawal of the Plan

The Debtors reserve the right in their sole discretion, but in consultation with the Administrative Agent, to revoke or withdraw the Plan at any time before entry of the Confirmation Order.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be

deemed to be null and void as to the Debtors' Estates. In such event, nothing contained in the Plan or in any document relating to the Plan shall be deemed to constitute an admission of validity, waiver or release of any Claims by or against the Debtors or any Person or any Entity or to prejudice in any manner the rights of the Debtors or any Person or any Entity in any proceeding involving the Debtors.

5.      Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, notwithstanding any conflicts of law principles, rules or laws to the contrary.

6.      Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor or assign of such Person or Entity.

7.      Payment of UST Fees; Post-Confirmation Reports

On the Effective Date, and thereafter, as may be required until the entry of a Final Decree, the Debtors or the Liquidation Trustee, as the case may be, will pay all fees payable pursuant to section 1930 of Title 28 of the United States Code and Section 3717 of Title 31 of the United States Code (collectively, the "UST Fees"). In addition, the Liquidation Trustee will file post-confirmation quarterly reports in conformity with the U.S. Trustee guidelines until the entry of a Final Decree. Any deadline for filing Administrative Claims shall not apply to UST Fees.

8.      Substantial Consummation

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

9.      Company and Corporate Action

On and after the Effective Date, the matters under the Plan involving or requiring company or corporate action of the Debtors or their subsidiaries, including without limitation actions requiring the vote or other approval of the officers, members, board of directors, board of managers, or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, members, directors, managers or shareholders of the Debtors or their subsidiaries. The officers, members, managers and directors of the Debtors shall cease to serve immediately after the Effective Date.

10.   Direction to Parties

From and after the Confirmation Date, the Debtors or the Liquidation Trustee, as applicable, may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver, or to join in the execution or delivery, of any instrument required to effect a transfer of property required under the Plan, and to perform any other act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan, pursuant to section 1142(b) of the Bankruptcy Code, provided that such direction is in accordance with the Plan.

11.   Amendments

a.   *Plan Modifications.* The Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Administrative Agent in its reasonable discretion in consultation with the Oversight Committee, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by applicable law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, with the consent of the Administrative Agent, in its reasonable discretion in consultation with the Oversight Committee, the Debtors or the Liquidation Trustee, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, provided that any such proceeding does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to the Plan.

b.   *Other Amendments.*  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan, with the consent of the Administrative Agent in its reasonable discretion in consultation with the Oversight Committee, without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims or Interests.

12.   Term of Injunctions or Stays

Unless otherwise provided in the Plan or an applicable order of the Bankruptcy Court, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date.

13.   Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of the Assets contemplated by the Plan (including real and personal property) shall not be subject to any stamp, real estate transfer, mortgage recording sales, use or similar tax.

14.     <u>Compliance with Tax Requirements</u>

In connection with the Plan, to the extent required by law, the Debtors, the Liquidation Trustee or any agent thereof making distributions shall deduct any federal, state or local withholding taxes from the distributions and shall remit such taxes to the appropriate governmental unit on a timely basis. All Holders of Allowed Claims shall be required to provide any information reasonably requested in writing to effect the withholding of such taxes, and the Debtors, the Liquidation Trustee or any disbursement agent thereof may withhold any distribution absent the provision of such information or further order of the Bankruptcy Court. The Debtors, the Liquidation Trustee and or any agent thereof shall reasonably cooperate with Claim Holders in demonstrating an exemption from any applicable withholding taxes. If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirement of any governmental unit within sixty (60) days after the date of the first written notification by the Debtors, the Liquidation Trustee or any disbursement agent to the Holder of the Claim of the need for such information, then such Holder's distribution shall be treated as an unclaimed distribution in accordance with the terms of the Liquidation Trust Agreement.

15.     <u>Non-Severability of Plan Provisions</u>

The provisions of the Plan are non-severable and mutually dependent, including without limitation Article X thereof.

16.     <u>Further Actions</u>

Each of the Debtors and the Liquidation Trustee are authorized to prepare, execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take any other actions as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.

17.     <u>Notice and Service of Documents</u>

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors or the Liquidation Trustee shall be sent by first class mail, postage prepaid or reliable overnight courier (e.g., Federal Express) to each of the following:

>Credit-Based Asset Servicing and Securitization LLC
>335 Madison Avenue, 19th Floor
>New York, New York  10017
>Attn:  Shari Kushner, Esq.
>
>-with copies to-
>
>Hunton & Williams LLP
>200 Park Avenue, 53rd Floor
>New York, New York 10166
>Attn:   Peter S. Partee, Sr., Esq.

- and -

Office of the United States Trustee
   for the Southern District of New York
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn: Susan Golden, Esq.

18.   <u>Notice of Effective Date</u>

No later than five calendar days after the occurrence of the Effective Date, the Liquidation Trustee shall file a notice of the occurrence of the Effective Date and mail such a notice via first class mail, postage prepaid, to all parties that filed a request to receive notices pursuant to Bankruptcy Rule 2002 in the Chapter 11 Cases.

19.   <u>Conflicts</u>

Except as set forth in the Plan, to the extent that any provision of this Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

20.   <u>Filing of Additional Documents</u>

On or before the Effective Date, the Debtors may file such agreements and documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

21.   <u>Disposal of Documents as of the Effective Date</u>

As of the Effective Date of the Plan, the Debtors shall dispose, destroy, recycle or otherwise cease to maintain any and all documents in its possession, custody or control, documents include, without limitation, any writings, records, correspondence, memoranda, notes, studies, reports, spreadsheets, analyses, ledgers, agreements, drafts, calendars, voice recordings or video recordings, in any media or format, including but not limited to tangible and electronic media. Any person or entity that wishes for any document in the possession of any of the Debtors to be preserved after the Effective Date must (i) notify counsel for the Debtors, in writing received before the Effective Date, that he wishes to have documents that are currently in the possession, custody or control of one or more of the Debtors to be preserved; (ii) identify which document(s) he wishes to have preserved; (iii) identify which Debtor(s) he believes possesses such documents; and (iv) agree to undertake and assume sole responsibility for any and all costs associated with or related to the identification and preservation of such documents. No current or former employee, agent, advisor or attorney shall have any liability for compliance with the terms of this paragraph in any judicial, administrative or legislative case, proceeding or matter of any type or nature.

# VI.   CONFIRMATION OF THE PLAN

## A.   Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after appropriate notice, hold a hearing on confirmation of a plan of reorganization (the "Confirmation Hearing").  The Bankruptcy Court has established the date and time of the Confirmation Hearing as April __, 2011 at __:___ a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequently adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Objections to Confirmation of the Plan must be filed and served on or before April __, 2011 at _:__ p.m. (prevailing Eastern Time) in accordance with the notice accompanying this Disclosure Statement.

> **UNLESS OBJECTIONS TO CONFIRMATION OF THE PLAN ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## B.   Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy Court will enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any plan payment made or to be made by the Debtors under the Plan for services or for costs and expenses in, or in connection with the Chapter 11 Cases, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable;

- With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or an Interest in such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims and Allowed Priority Non-Tax Claims will be paid in full (i) on the Effective Date or as soon thereafter as practicable, or (ii) on the date on which such Claim would have been due and payable if the Chapter 11 Cases had not been commenced;

- Except to the extent that the Holder of a particular Allowed Priority Tax Claim agrees to a different treatment, the Plan provides that Allowed Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims not including any acceptance of the Plan by any Insider (as defined in section 101(31) of the Bankruptcy Code) holding a Claim in such Class will have accepted the Plan;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors under the Bankruptcy Code, unless such liquidation or reorganization is proposed in the Plan; and

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee will be paid as of the Effective Date.

Set forth below is a summary of the relevant statutory confirmation requirements and an analysis of how the Plan satisfies these requirements.

1.      Best Interests of Creditor Test

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim or Interest in such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors was liquidated under chapter 7 of the Bankruptcy Code. In other words, if an Impaired Class does not unanimously accept the Plan, then the Bankruptcy Court must determine that it is in the "best interests" of each Holder of an Allowed Claim or Interest that did not vote to accept the Plan.

In chapter 7 liquidation cases, unsecured creditors and equity security holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have been paid in full or payment has been provided for:

- Secured creditors (to the extent of the value of their collateral).

- Priority creditors.

- Unsecured creditors.

- Debt expressly subordinated by its terms or by an order of the Bankruptcy Court.

- Equity security holders.

The Debtors have proposed a joint liquidating plan. In any event, whether by the Debtors or a chapter 7 trustee, as the case may be, the Assets will be liquidated. Accordingly, there is no reorganization value to be calculated, or distribution scenarios related thereto. In addition, the activities of the Liquidation Trustee after the Effective Date of the Plan are the very same ones that would be pursued by a chapter 7 trustee. However, unlike a chapter 7 trustee who may seek to charge statutory fees of up to 3% of the disbursements, the Liquidation Trustee will be compensated at a fixed annual rate. It is also possible that a distribution of the proceeds of the liquidation of the Assets could be delayed for a period of time in order for a chapter 7 trustee and its professionals to become knowledgeable about the Chapter 11 Cases and the Claims against the Debtors.

After careful review of the estimated recoveries of a chapter 11 liquidation scenario and a chapter 7 liquidation scenario, the Debtors have concluded that recoveries to Creditors will be maximized by the transactions contemplated under the Plan, completing the liquidation of the Assets under chapter 11 of the Bankruptcy Code in accordance with the priority scheme set forth in the Bankruptcy Code and making distributions and payments pursuant to the Plan. The Debtors believe that the Debtors' Estates have value that would not be fully realized by Creditors in a chapter 7 liquidation primarily because (i) additional administrative expenses would be incurred in a chapter 7 liquidation in accordance with the priority scheme set forth in the Bankruptcy Code, specifically those of a chapter 7 trustee charging statutory fees of up to 3% of disbursements and the cost of the chapter 7 trustee's professionals, all of whom would need to spend many hours reviewing, understanding and duplicating the lengthy investigation of the facts and circumstances of the Chapter 11 Cases and the Claims against the Debtors already undertaken by the Debtors and their professionals; and (ii) the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions.

The Plan offers the advantage to Creditors that they will likely receive more than they would receive in a chapter 7 liquidation case. The Plan contemplates the creation of a Liquidation Trustee who will proceed with the administration of the Assets without the additional time and expense that would be imposed by conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code. A conversion to a case under chapter 7 of the Bankruptcy Code at this point would only serve to delay the orderly process already in place and lower the amount of distributions to Holders of Allowed Claims.

Thus, the Debtors believe the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code because under the Plan all Holders of Impaired Claims or Interests will receive distributions, if any, that have a value that is not less than the value of the distribution, if any, that each such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

2.      Plan Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Bankruptcy Code, unless such liquidation or reorganization is proposed in the Plan.  The Plan proposed by the Debtors provides for a liquidation of the Assets and a distribution of the Cash proceeds to Creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan.  The Debtors will not be conducting any business operations after the Effective Date of the Plan and the ability to make distributions according to the terms of the Plan does not depend on future earnings or operations of the Debtors.

As demonstrated by the Sources and Uses of Cash Analysis that is annexed hereto as **Exhibit B**, the Cash expected to be on hand in the Debtors' Estates on the Effective Date should provide the Debtors with more than sufficient funds to make all payments due under the Plan on the Effective Date, including without limitation the distributions to the Holders of Allowed Administrative Claims and Holders of Allowed Priority Claims.  Moreover, as shown by the projections contained in the Sources and Uses of Cash Analysis annexed hereto as **Exhibit B**, the Debtors estimate that the Liquidation Trustee will have sufficient Cash in the Unsecured Distribution Fund, on the Unsecured Distribution Date, to make a distribution in the aggregate amount of **$_____** to Holders of Allowed General Unsecured Claims.  Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

3.      Acceptance by Impaired Classes of Claims and Interests in the Debtors

As a condition to confirmation of the Plan, the Bankruptcy Code requires that each Class of Impaired Claims and Interests in the Debtors vote to accept the Plan, except under certain circumstances.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by Holders of at least two-thirds in dollar amounts and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or reject the Plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in dollar amounts and a majority in number actually voting cast their Ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a Class of Interests in the Debtors has accepted the Plan if Holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan.  Holders of Claims or Interests in the Debtors who fail to vote are not counted as either accepting or rejecting the Plan.

Classes 2, 4(a)(i), 4(a)(ii), 4(b), 5 and 6 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.  Classes 1 and 3 are Unimpaired under the Plan and, therefore, is conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 7 and 8 are Impaired under the Plan and are neither receiving nor retaining any property under the Plan, and thus are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Because Classes 7 and 8 are deemed to have rejected the Plan, the Debtors are required to satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 7 and 8. It is also possible that one or more of the other Classes will reject the Plan.

4.  Satisfaction of Confirmation Requirements With Respect to Non-Accepting <u>Classes</u>

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances, which mechanism is commonly referred to as "cram down," where the plan is not accepted by all impaired classes of claims and equity security interests. Under section 1129(b) of the Bankruptcy Court, the Court may "cram down" the Plan over the deemed rejection or actual rejection by an Impaired Class so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such Classes.

(i)  *No Unfair Discrimination*

This test applies to Classes of Claims or Interests in the Debtors that are of equal priority and are receiving different treatment under the Plan. A plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of the dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require the treatment be the same or equivalent, but that such treatment be "fair."

Classes 1, 2, 3, 4(a)(i), 4(a)(ii), 4(b), 5, 6, 7 and 8 do not have similarly situated Classes and none of the Classes will receive more than it legally is entitled to receive for its Claims. Accordingly, the Debtors believe there can be no discrimination against any of Classes under the Plan.

(ii)  *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of allowed claims in such class. As to the dissenting classes, this test sets different standards depending upon the type of claims or interests in such class:

a.  Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and for each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; (ii) for the sale of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

The Debtors believe that the Plan "is fair and equitable" with respect to Class 3 because the Holders of the Allowed Other Secured Claims are receiving the indubitable equivalent of such Claims.

b.    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest.

The Debtors believe that the Plan is "fair and equitable" with respect to Classes 4(a)(i), 4(a)(ii), 4(b), 5, 6 and 7 (which Class of Allowed Securities Litigation Claims against the Debtors is deemed to have rejected the Plan) because no Class that is junior to Classes 4(a)(i), 4(a)(ii), 4(b), 5, 6, and 7 will receive or retain any property on account of the Claims or Interests in the Debtors in such Class.

c.    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest, or (ii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors believe that the Plan will satisfy the "fair and equitable" treatment requirement notwithstanding that Class 8 (Allowed Interests in the Debtors) is deemed to reject the Plan because no Class that is junior to Classes 8 will receive or retain any property on account of the Claims or Interests in the Debtors in such Class.  Because at least one Class of Claims of General Unsecured Claims is not being paid in full, the Allowed Interests (as well as the Allowed Securities Litigation Claims in Class 7) are being extinguished.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE ("IRS"), AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THE DISCUSSION SET FORTH BELOW IS FOR GENERAL INFORMATION ONLY AND DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS, AND EACH SUCH HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

### A. Federal Income Tax Consequences of the Plan to the Debtors

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the Debtors and the Holders of Claims and Interests. This summary is based upon the Internal Revenue Code of 1986 (as amended, the "Tax Code"), the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof. These authorities are all subject to change at any time by legislative, judicial or administrative action, and any such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtors.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

1.      IRS Circular 230 Disclosure

**TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE DEBTORS INFORM YOU THAT (A) ANY UNITED STATES FEDERAL TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS OR DISCLOSURES) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY PERSON OR ENTITY FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) ANY SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN AND (C) ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

2.      Ownership Structure

C-BASS is a partnership for U.S. federal income tax purposes.  Debtors C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC and Sunfish Management Group LLC are disregarded entities for U.S. federal income tax purposes that are 100% owned by C-BASS.  Therefore, the income and expense of these disregarded entities is treated as income and expense of C-BASS for U.S. federal income tax purposes.  Debtor C-BASS CBO Holding LLC is a corporation that is taxed as a real estate investment trust for U.S. federal income tax purposes.  Debtor C-BASS Credit Corp. is a corporation for U.S. federal income tax purposes.

3.      Federal Income Tax Consequences to the Debtors

Generally, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price.  The amount of COD income is, in general, the excess of (i) the amount of the indebtedness satisfied, over (ii) the amount of cash and the fair market value of any other consideration (including any new indebtedness issued by the taxpayer or stock of the taxpayer) given in exchange for the indebtedness satisfied.

A debtor generally must include in its gross income the amount of any COD income that is realized during the taxable year.  However, COD income is not included in gross income to a debtor if the discharge occurs in a formal Title 11 bankruptcy case or when the debtor is insolvent (except with respect to certain discharged intercompany debt which is discussed below).  Rather the debtor generally must instead, after determining its tax for the taxable year of discharge, reduce its NOLs and any capital losses and loss carryovers first and then, as of the first day of the next taxable year, reduce the tax basis of its assets by the amount of COD income excluded from gross income.  Pursuant to applicable Treasury Regulations, the tax basis of the debtor's assets used in its trade or business or held for investment is to be reduced before

reducing the tax basis in the debtor's inventory, accounts receivables or notes. As an exception to the order of reduction described above, a taxpayer may elect to reduce its tax basis in its depreciable assets first, then its NOLs. COD income realized from the discharge of intercompany debt is generally not excluded from gross income but rather is offset by a corresponding bad debt deduction to the intercompany lender.

In a case of a partnership such as C-Bass, the COD income rules, in general, apply at the partner level rather than the partnership level. Therefore, a partnership that recognizes COD income allocates the income to its partners and the bankruptcy or insolvency exceptions to recognition of COD income are applied at the partner level. Accordingly, those exceptions will apply to the COD income recognized by C-Bass only to the extent C-Bass's owners are bankrupt or insolvent. However, if an abandoned asset is encumbered by liabilities, abandonment generally results in a capital loss. A partner's tax basis in its partnership interest is generally increased by its share of COD income and decreased by its share of deemed distribution of liability relief.

To the extent that a debtor abandons assets, the debtor generally will be entitled to an ordinary loss deduction in an amount equal to its tax basis in the asset. To the extent that recourse debt is satisfied with the underlying collateral property, generally the debtor recognizes gain from the disposition of property based on an amount realized equal to the fair market value of such property over the debtor's basis in such property, with any balance of the debt in excess of the fair market value of the property (less any other consideration paid to discharge such debt) treated as COD. By contrast, to the extent that nonrecourse debt is satisfied with the underlying collateral property, generally the debtor recognizes gain from the disposition of property based on an amount realized equal to the nonrecourse debt balance over the debtor's tax basis in such property, as opposed to COD income.

**B.**     **Federal Income Tax Consequences of the Plan to Holders of Claims and Interests**

> **THE FOLLOWING IS NOT INTENDED TO BE A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR AN INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN INDIVIDUAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER.**

A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on the Claim but was not previously included in income by the Holder of the Allowed Claim. A Holder of an Allowed Claim or Allowed Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in the Claim or the Interest and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder, the nature of the Claim or Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the Holder's holding period for the Claim or Interest.  If the Claim or Interest possessed by the Holder is a capital asset, the gain or loss realized will be generally be characterized as a capital gain or loss.  Such gain or loss will constitute long-term capital gain or loss if the Holder is a non-corporate taxpayer and held such Claim or Interest for longer than one year or short-term capital gain or loss if the Holder held such Claim or Interest for less than one year.  Holders should consult with their own tax advisors as to the tax character of any gain or loss with respect to amounts received under the Plan and the application of any special limitations on the deduction of any loss that is realized.

A Holder of an Allowed Claim or Allowed Interest who receives, in respect of its Claim or Interest, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad debt deduction or a worthless securities deduction.  However, whether a Holder of Claims or Interests will recognize a bad debt deduction, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims or Interests.  Accordingly, Holders of Claims and Interests should consult their own tax advisors.

The Debtors or the Liquidation Trustee, as applicable, will withhold distributions provided under the Plan and required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code.  Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding."  Backup withholding generally applies if the holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the holder is not subject to backup withholding.  Your Ballot contains a place to indicate your TIN.

If any party fails to provide the Debtors or the Liquidation Trustee with a requested TIN within sixty (60) days of that request, such failure will be deemed a waiver of rights to distributions under the Plan.  Proceeds that would have been distributed to such a party will be distributed to the other parties based upon their pro rata beneficial interests.

1.  Federal Income Tax Treatment of the Liquidation Trust

For federal income tax purposes, it is intended that the Liquidation Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations and that such trust be owned by its beneficiaries (i.e., the Holders of Allowed Claims in Classes 4(a)(i), 4(a)(ii), 4(b), 5 and 6).  Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in the assets of the Liquidation Trust and then contributed such interests to the Liquidation Trust.

2.  Liquidation Trust Assets Treated as Owned by Holders of Allowed Claims

For all federal income tax purposes, all parties (including, without limitation, the Debtors,

the Liquidation Trust, and the Holders of Allowed Claims in Classes 4(a)(i), 4(a)(ii), 4(b), 5 and 6) shall treat the transfer of assets to the Liquidating Trust for the benefit of the Holders of Allowed Claims in Classes 4(a)(i), 4(a)(ii), 4(b), 5 and 6 as (i) a transfer of the assets of the Debtors' Estates directly to the Holders of Allowed Claims in Classes 4(a)(i), 4(a)(ii), 4(b), 5 and 6 followed by (ii) the transfer by such Holders to the Liquidation Trust of the assets of the Liquidation Trust in exchange for beneficial interests in the Liquidation Trust. Accordingly, the Holders of such Allowed Claims shall be treated for federal income tax purposes as the grantors and owners of their respective share of the assets of the Liquidation Trust.

## VIII.  CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS

### A.  Failure to Receive Requisite Acceptances of the Plan

Classes 2, 4(a)(i), 4(a)(ii), 4(b), 5 and 6 are the only Classes that are entitled to vote to accept or reject the Plan. If none of these Classes accept the Plan, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, because at least one Impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. Further, if the Impaired Classes do not accept or cannot be deemed to have accepted the Plan, the Debtors may seek to accomplish any alternative restructuring of their capitalization and obligations to Creditors and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Senior Lenders and/or may be required to liquidate their Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any alternative restructuring arrangement or a chapter 11 plan would be similar to or as favorable to Creditors as those proposed in the Plan.

### B.  Failure to Confirm the Plan

Even if the Impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court, which, as a court of equity which may exercise substantial discretion, may decide not to confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things, (a) that confirmation of the Plan not be followed by liquidation or a need for further financial reorganization of the Debtors, unless the Plan provides for such liquidation or a need for further financial reorganization, (b) that the value of distributions to dissenting Holders not be less than the value of distributions to such Holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, and (c) the Plan and the Debtors as the plan proponents otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtors believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the solicitation of votes from Impaired Creditors to accept the Plan must comply with section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period and the adequacy of the information contained in the Disclosure Statement. Although the Debtors believe that the solicitation of votes from Impaired Creditors to accept the Plan will comply with section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## C.     Failure to Consummate the Plan

Pursuant to section 8.2 of the Plan, one condition to consummation of the Plan is the entry of the Confirmation Order, as well as consummation of certain transactions to implement the Plan, including the sale of the CM Business.  As of the date of this Disclosure Statement, there can be no assurances that these or the other conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## D.     Delays of Confirmation or the Effective Date

Any delays of either Confirmation or the Effective Date of the Plan could result in, among other things, increased administrative costs, including Professional Fee Claims.  These negative effects of delay of either Confirmation or the Effective Date could endanger the ability of the Debtors to consummate the Plan and emerge from bankruptcy protection.

## E.     Risk of Successfully Creating Value in Liquidation Trust

Based on the Debtors' present forecasts, the estimated range of potential distributions to General Unsecured Creditors varies from a nominal sum to up to __% of the Allowed amount of General Unsecured Claims.  The potential to have more than a nominal distribution to unsecured Creditors, if any distribution at all, is dependent largely on the success of the Liquidation Trustee in controlling the costs of winding down the Debtors' businesses, pursuing various Causes of Action and liquidating other assets being transferred to the Liquidation Trust.  The Debtors cannot state with any certainty the likely outcome of the Liquidation Trustee's efforts to create value for the Creditors.

## F.     Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate

Many of the statements included in this Disclosure Statement contain forward-looking statements and information relating to the Debtors.  These forward-looking statements are generally identified by the use of terminology such as "may," "will," "could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project," "forecast," "anticipate," "believe," or similar phrases or the negatives of such terms. These statements are based on the beliefs of management as well as assumptions made using information currently available to management.  Such statements are subject to risks, uncertainties and assumptions, as well as other matters not yet known or not currently considered material by management. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. Given these risks and uncertainties, you are cautioned not to place undue reliance on such forward-looking statements.  Forward-looking statements do not guarantee future performance. You should recognize these statements for what they are and not rely on them as facts.  The Debtors do not undertake any obligation to update or revise any of these forward-looking statements to reflect new events or circumstances after the date of this Disclosure Statement.

# IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include:

## A. Liquidation Under Chapter 7 of the Bankruptcy Code

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in lower distributions being made to Creditors than those provided for in the Plan because of: (i) the likelihood that the Assets of the Debtors would have to be sold or disposed of in a less orderly fashion, and (ii) additional administrative expenses attendant to the appointment of a chapter 7 trustee and the trustee's employment of attorneys and other professionals.

The Debtors, together with their advisors, have concluded that there would be substantial challenges to a sale of all or substantially all of the Debtors' Assets pursuant to section 363 of the Bankruptcy Code, and that such an approach would not likely increase the value of the recovery by the Debtors' stakeholders. Specifically, the Debtors believe that due to the size of the Senior Lenders Claims as compared to the value of the Debtors' Assets which secure the Claims of the Senior Lenders, it would be improbable for the Debtors to attract buyers. Further, the Debtors believe that a purchase of their Assets by the Senior Lenders would likely be effected through a credit bid and would not bring any Cash into the Estates to provide any value to the Debtors' stakeholders.

## B. Alternative Plan(s) of Reorganization

The Debtors believe that the failure to confirm the Plan will lead inevitably to expensive and protracted Chapter 11 Cases. In formulating and developing the Plan, the Debtors have explored numerous alternatives and engaged in an extensive negotiating process with the Senior Lenders.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims, but also that the Plan provides superior recoveries to Classes 2, 3, 4(a)(i), 4(a)(ii) and 4(b) over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling many stakeholders to maximize their returns. Rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests in the Debtors.

> **THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTIONS OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## C.    Dismissal of the Chapter 11 Cases

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the Creditors, and possibly resulting in costly and protracted litigation in various jurisdictions. More significantly, dismissal of the Chapter 11 Cases may permit acceleration of the obligations under the Senior Credit Facility. Moreover, the Holders of the Class 2 Senior Lender Claims Against Sub-Con Debtors may be permitted to foreclose upon the Assets that are subject to their Liens, which are all of the Debtors' Assets including Cash. Unless the Prepetition Collateral was demonstrated to be worth more than approximately $196 million (the aggregate amount of the Allowed Senior Lender Claims), no other Creditors of the Debtors would likely receive any funds. Dismissal of the Chapter 11 Cases may also permit certain unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe these actions would destroy the Debtors' going concern value and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

## X.    CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives discussed herein because it will provide the greatest recovery to Creditors. Other alternatives would include significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to Creditors. The Debtors urge Holders of Impaired Claims in Classes 2, 4(a)(i), 4(a)(ii), 4(b), 5 and 6 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptances by returning their Ballots to the Voting Agent so that they will be received not later than 5:00 p.m. (prevailing Eastern Time) on April __, 2011.

Dated: February 8, 2011
New York, New York

**CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, on behalf of itself and its affiliated debtors and debtors-in-possession**

By:    _/s/Andrew Rickert_
      Name:  Andrew Rickert
      Title:   Executive Vice President, Treasurer and Assistant Secretary

Counsel:

Peter S. Partee, Sr.
Jack A. Molenkamp
Andrew Kamensky (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000