Peter S. Partee, Sr.
Jack A. Molenkamp
Andrew Kamensky (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

*Attorneys for Debtors and Debtors-in-Possession*

Hearing Date and Time: March 4, 2011 at 10:00 a.m.
Objection Deadline: February 25, 2011 at 5:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 10-16040 (ALG)<br><br>(Jointly Administered) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING
AND APPROVING THE SALE OF RMBS SALE ASSETS**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), by and through their undersigned counsel, hereby move the Court (the "Motion") for the entry of an order, the proposed form of which is annexed hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the sale of the RMBS Sale Assets (defined below) to Fortress Investment Group LLC (the "Purchaser") free and clear of all claims (as defined in section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages,

---

[1] The other Debtors are C-BASS CBO Holding LLC, C-BASS Credit Corp., C-BASS Investment Management LLC, NIM I LLC, Pledged Property II LLC, Starfish Management Group LLC, and Sunfish Management Group LLC.

pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "Encumbrances"). In support of this Motion, the Debtors respectfully represent as follows:

### I. Jurisdiction, Venue and Predicates for Relief Requested

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York*, dated July 14, 1984 (Ward, Acting C.J.). Venue of these chapter 11 cases and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

2. The predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

### II. Background

**A. The Chapter 11 Cases**

3. On November 12, 2010 (the "Petition Date"), each of the Debtors filed a *Voluntary Petition* for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court"). By an order [Docket No. 28] entered on November 16, 2010, the Debtors' chapter 11 cases (the "Chapter 11 Cases") have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

4. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On December 1, 2010, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Creditors Committee").

No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases.

5. A description of the Debtors' businesses, the reasons for filing the Chapter 11 Cases, and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 of the Bankruptcy Code is set forth in the *Declaration of Andrew Rickert in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 3], which was filed on the Petition Date.

### B. The Debtors' Capital Structure

6. As set forth in greater detail in the First Day Declaration, from its founding in 1996, the Debtors were a leading issuer, servicer, and investor specializing in credit-sensitive residential mortgage assets. These assets included performing subprime and "Alt A," non-performing, re-performing, and second-lien residential mortgage loans and small commercial mortgage loans ("Whole Loans"), as well as subordinated and mezzanine residential mortgage-backed securities with prime, subprime, Alt A and high loan-to-value collateral ("RMBS").

7. The Debtors financed their prepetition activities through a variety of secured and unsecured debt as well as RMBS and Whole Loan repurchase agreements (collectively, the "Repurchase Agreements"). In the Summer of 2007, the Debtors were a party to (i) Whole Loan Repurchase Agreements with three different counterparties (collectively, the "Whole Loan Repo Counterparties") representing an aggregate repurchase obligation in excess of $750 million and (ii) RMBS Repurchase Agreements with 17 different counterparties (collectively, the "RMBS Repo Counterparties"; together with the Whole Loan Repo Counterparties, the "Repo Counterparties"), representing an aggregate repurchase obligation in excess of $730 million. The

3

Repo Counterparties hold first liens on the respective Whole Loans and RMBS covered by their Repurchase Agreements (collectively, the "Repo Collateral"), including the RMBS Sale Assets.[2]

8. The Debtors' principal secured debt consisted of a $1,855,000,000 senior secured credit facility (the "Senior Credit Facility") syndicated among a number of lenders (the "Senior Lenders") and secured by first liens on and security interests in substantially all of the Debtors' assets (other than the Repo Collateral) and junior liens on and security interests in the Repo Collateral (the "Senior Credit Facility Collateral").

9. As part of a large-scale forbearance and restructuring in the Summer and Fall of 2007, culminating in the execution of the Override Agreement (as defined in the First Day Declaration), the Debtors granted numerous subordinate liens and security interests, including without limitation (i) second-priority liens on and security interests in the Senior Credit Facility Collateral as additional collateral security for all of the Repurchase Agreements, (ii) second-priority liens on and security interests in the RMBS or Whole Loans subject to each Repurchase Agreement as additional collateral security for all other Repurchase Agreements, and (iii) third-priority liens on and security interest in the RMBS and Whole Loans subject to the Repurchase Agreements as collateral security for the Senior Credit Facility.

10. Under the Intercreditor Agreement (as defined in the First Day Declaration) executed simultaneously with the Override Agreement, each Override Party with a first-priority lien on or security interest in collateral has the exclusive and unilateral right to enforce their liens and security interests against, and otherwise consent to dispositions of, such collateral, notwithstanding the junior liens granted on such collateral to the other Override Parties.

---

[2] Substantially all of the Repurchase Agreements constituted repurchase agreements within the meaning of section 101(47) of the Bankruptcy Code and fell within the safe-harbor of section 559 of the Bankruptcy Code.

11. Over the course of the past 40 months, based on defaults under the Senior Credit Facility triggered by the mortgage crisis in the United States and pursuant to multiple forbearance and related agreements, the vast majority of the collateral for the Senior Credit Facility has been sold or foreclosed upon and the proceeds thereof applied to reduce the balance of the Senior Credit Facility. The Repo Collateral and Senior Credit Facility Collateral remaining in the Debtors' possession and control as of the Petition Date (collectively, the "Remaining Collateral") consists principally of (i) various subordinated tranches of mortgage-backed securities, including the RMBS Sale Assets, (ii) certain collateralized bond obligation management rights, (iii) whole loans, (iv) REOs, (v) claims against third parties, (vi) deposits with surety bond providers, (vii) furniture, fixtures, equipment and various forms of intellectual property, (viii) receivables for the unused amount, if any, of professional retainers, and (ix) cash collateral on deposit in the Debtors' centralized cash operating account.

12. Similarly, based on defaults under the Repurchase Agreements triggered by the mortgage crisis in the United States, all of the Repurchase Agreements have been terminated by the respective counterparties. All of the Repo Collateral has been sold or retained by Repo Counterparties, or is being marketed for sale by the Debtors. Thus, the Repo Collateral in the Debtors' possession is excess collateral remaining after the payment in full of Repurchase Agreements and serves as additional collateral first for Repo Counterparties and second for the Senior Lenders.

13. Pursuant to the Restructuring Facilitation Agreement, dated as of September 20, 2010 (the "RFA"), by and among the Debtors, JPMorgan Chase Bank, N.A., as administrative agent under the Senior Credit Facility (the "Administrative Agent"), and certain lenders under the Senior Credit Facility that are signatories to the RFA (collectively, the "Participant

Lenders"), the Administrative Agent and Participant Lenders have agreed *inter alia* to permit the Debtors to use up to $8.2 million of the cash proceeds of the Senior Credit Facility Collateral in accordance with the terms and conditions of an adequate protection stipulation. The RFA provides a timeline pursuant to which the Debtors are to use their respective best efforts to liquidate the Remaining Collateral, including the RMBS Sale Assets.

### C. The RMBS Sale Assets

14. As part of their efforts to liquidate the Remaining Collateral, the Debtors have been engaged in marketing efforts to sell the RMBS Sale Assets to third parties since before the Petition Date. In connection with their marketing efforts, prior to the Petition Date, the Debtors began contacting a number of large financial institutions that they believed to be promising bidders for all or substantially all of the RMBS identified on **Exhibit B** attached hereto (collectively, the "RMBS Sale Assets"). After receiving several expressions of interest, the Debtors concluded that an offer by the Purchaser to purchase the RMBS Sale Assets for $25,000.00 provided the greatest recovery to the Debtors' estates and creditors. Following good faith, arms'-length negotiations, the Debtors agreed to sell the RMBS Sale Assets to the Purchaser pursuant to the following terms:

- **Purchase and Sale of RMBS.** Purchaser shall purchase all or substantially all of the RMBS Sale Assets.

- **Purchase Price.** On the Closing Date (defined below), Purchaser shall pay the Debtors, by wire transfer of immediately available funds to the account designated by the Debtors, an amount equal to $25,000.00.

- **Conditions to Closing.** Purchaser's purchase of the RMBS Sale Assets is conditioned on (i) the consummation of the proposed sale by no later than March 4, 2011 (the "Closing Date") and (ii) that all payments received by the Debtors related to the RMBS Sale Assets after January 25, 2011 are to be directed to the Purchaser.

15. This Motion seeks to sell the RMBS Sale Assets pursuant to the following provisions, which the *Amended Guidelines for the Conduct of Asset Sales*, adopted by this Court's General Order M-383 on November 18, 2009, require to be separately disclosed. All such provisions also are included in the Proposed Order.

- **Sale Free and Clear:** As described above, the sale of the RMBS Sale Assets will be free and clear of all Encumbrances.

- **Private Sale/No Competitive Bidding.** As set forth above, the Debtors actively engaged in a competitive bidding process for the RMBS Sale Assets and are satisfied that all interested, qualified buyers were afforded the opportunity to bid on the RMBS Sale Assets. The time and effort associated with marketing the RMBS Sale Assets for sale at a public auction would needlessly duplicate the previous efforts made by the Debtors and would far exceed any benefit to be derived from such efforts.

- **Deadline for Closing:** As explained above, it is imperative that the Debtors consummate the sale of the RMBS Sale Assets by no later than March 4, 2011.

- **No Good Faith Deposit.** Given the value of the RMBS Sale Assets and the need to consummate the proposed sale by March 4, 2011, the Debtors are not requiring the Purchaser to submit a good faith deposit.

- **Requested Findings as to Fraudulent Conveyance:** The Debtors believe the consideration that will be provided for the RMBS Sale Assets constitutes reasonably equivalent value under the Bankruptcy Code and applicable law.

- **Relief from Bankruptcy Rules 6004(h):** As set forth below, the Debtors seek relief from the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

16. Accordingly, the Debtors believe that the offer by Purchaser to purchase the RMBS Sale Assets pursuant to the terms and conditions set forth herein (i) represents the highest and best offer for the RMBS Sale Assets, (ii) is fair and reasonable, (iii) was the product of good faith, arms'-length negotiations, and (iv) will provide the greatest recovery for the Debtors' estates and creditors. The Debtors further submit that consummation of the proposed sale of the RMBS Sale Assets is in the best interests of the Debtors' estates and creditors and

will facilitate the feasibility of and the payments contemplated under any chapter 11 plan to be filed with the Court.

17. In accordance with the Override Agreement and the Intercreditor Agreement, the Repo Counterparties, as first lien creditors on the Repo Collateral, hold the exclusive authority to enforce liens against or consent to dispositions of the RMBS Sale Assets. To date, not all of the Repo Counterparties have consented to the sale of the RMBS Sale Assets to the Purchaser in accordance with the terms set forth herein. Pursuant to multiple termination and forbearance agreements, each of the Repo Counterparties has consented to the sale of the Repo Collateral, including the RMBS Sale Assets, except for RBS/Greenwich and Lehman (the "<u>Non-Consent Parties</u>").

## IV. <u>Relief Requested</u>

18. By this Motion, the Debtors seek authority, pursuant to sections 105 and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004 and the terms and conditions set forth herein, to sell the RMBS Sale Assets to the Purchaser free and clear of all Encumbrances.

## V. <u>Basis for the Relief Requested</u>

### A. <u>Approval of the Sale of the RMBS Sale Assets Is Appropriate</u>

19. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease other than in the ordinary course of business property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that a court may approve the sale of property outside of the ordinary

course of business when it finds a good business reason for such sale); *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995); *In re Global Crossings Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

20. Section 105 of the Bankruptcy Code provides, in relevant part, that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

21. Furthermore, Bankruptcy Rule 6004(f)(1) permits private sales by a debtor and courts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."); *see*, *e.g., In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 18, 2008); *In re Loral Space & Commc'ns Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005); *In re Int'l Wire Group, Inc.*, Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court's approval of private sale conducted by chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving private sale of chapter 11 debtor's assets where standards of section 363(b) were met).

22. The Debtors believe that there is more than adequate business justification for the proposed sale of the RMBS Sale Assets to the Purchaser at this time; namely, that the Debtors will be able to maximize the value for the RMBS Sale Assets through the sale to the Purchaser

and the proceeds of the sale will help fund the Debtors' chapter 11 plan that was filed with the Court on February 8, 2011 [Docket No. 214].

23. Additionally, as explained above, the Debtors made significant efforts to market the RMBS Sale Assets. Thus, the Debtors believe that all potential, qualified bidders were afforded the opportunity to bid on the RMBS Sale Assets and that the purchase price is fair and reasonable and represents the highest and best offer. The time and effort associated with marketing the RMBS Sale Assets for sale at a public auction would needlessly duplicate the previous efforts made by the Debtors and would far exceed any benefits to the Debtors, their estate or their creditors. The Debtors, therefore, submit that holding a public auction for the RMBS Sale Assets is unnecessary and would only entail unwarranted delay and additional expense.

24. The Debtors submit that the notice described below constitutes adequate and proper notice of the sale of the RMBS Sale Assets and this Motion. As explained above, given the marketing completed by the Debtors to ensure the highest price was achieved, the Debtors submit that the sale of the RMBS Sale Assets has been proposed in good faith. Accordingly, the Court should authorize the Debtors to consummate the proposed sale.

### B. The Sale Satisfies the Requirements of Section 363(f)

25. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a "free and clear" sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding. 11 U.S.C. § 363(f).

26. The Debtors submit that one or more of the tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the proposed sale of the RMBS Sale Assets. The RMBS Sale Assets are encumbered by a first priority lien in favor of certain Repo Counterparties, a subordinate lien in favor of the Senior Lenders under the Senior Credit Facility and by certain other subordinate liens pursuant to the Override Agreement, Intercreditor Agreement and related agreements. To date, all of the Repo Counterparties have consented to the proposed sale of the RMBS Sale Assets, except for the Non-Consent Parties. If the Non-Consent Parties fail to object to the relief requested herein, their consent to the proposed sale should be inferred. Moreover, to the extent any party holding any Encumbrance timely objects, the sale should still be approved because they are adequately protected by having their Encumbrances, if any, attach to the cash proceeds of the sale of the RMBS Assets with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

### C. The Purchaser Is A "Good Faith" Purchaser

27. As set forth above, the Debtors believe that the Purchaser is a buyer in good faith of the RMBS Sale Assets under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby. Although the Bankruptcy Code does not define the term "good faith purchaser," the traditional equitable definition of "one who purchases the assets for value, in good faith, and without notice of adverse claims" has been adopted by various courts. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)).

28. Given that the Purchaser and the price for the RMBS Sale Assets were determined following an extensive marketing process and good faith, arms'-length negotiations, the

Debtors submit that the Purchaser will be providing substantial value for the RMBS Sale Assets and has not have engaged in "the misconduct that would destroy a purchaser's good faith status at a judicial sale [such as] fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Paolo*, 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1198). Further, to the Debtors' knowledge, no adverse claims exist with respect to the RMBS Sale Assets.

29. The Debtors are not seeking the authority to sell the RMBS Sale Assets to "insiders" (as defined in section 101 of the Bankruptcy Code). Upon information and belief, the Purchaser is an affiliate of FIG, LLC. FIG, LLC is the buyer of the Debtors' Collateral Management Business, which sale was approved by the Court on January 13, 2011 [Docket No. 178]. In addition, Mr. John Draghi, the Debtors' former Chief Executive Officer, is a Managing Director of Fortress Capital Finance III, an affiliate of the Purchaser. Notably, Mr. Draghi has not been employed by the Debtors since December 10, 2007.

### E. This Court Should Approve the Request for Waiver of Stay

30. Bankruptcy Rule 6004(h) provides, "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtors submit that, given the nature of the sale of the RMBS Sale Assets and the need to close the sales no later than March 4, 2011, cause exists for the Court to exercise its discretion and abrogate the 14 day stay provided for by Bankruptcy Rule 6004(h).

### VI. Notice

31. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the administrative agent for the Senior Lenders, Davis Polk & Wardwell LLP; (c) counsel to the Creditors Committee; (d) counsel for the Purchaser; (e) the Repo Counterparties; and (f) all

parties that have filed a notice of appearance or have requested service in these chapter 11 cases. In light of the nature of the relief requested herein and the potential harm to the Debtors' estates if the relief requested herein is not granted, the Debtors respectfully submit that no other or further notice need be provided.

### VII. No Prior Request

32. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order, substantially in the form of the Proposed Order, granting the relief requested herein, and (b) grant to the Debtors such other and further relief as the Court may deem just and proper.

Dated: New York, New York
February 10, 2011

Respectfully submitted,

*/s/ Peter S. Partee, Sr.*
Peter S. Partee, Sr.
Jack A. Molenkamp
Andrew Kamensky (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

*Attorneys for Debtors and Debtors-in-Possession*